IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
MIDLAND-ODESSA DIVISION

| | | |
|---|---|---|
| **MICHAEL DEAN GONZALES,** | § | |
| | § | |
| Petitioner, | § | |
| | § | |
| | § | |
| -v- | § | CIVIL NO. 7:12-cv-00126-DAE |
| | § | |
| | § | *CAPITAL CASE* |
| | § | |
| **WILLIAM STEPHENS**, Director, | § | |
| Texas Department of Criminal Justice, | § | |
| Correctional Institutions Division, | § | |
| | § | |
| Respondent. | § | |

_____

_____

**SECOND AMENDED PETITION FOR A WRIT OF HABEAS CORPUS**
_____

**THIS IS A DEATH PENALTY CASE**


**Mandy Welch**
Texas Bar No. 21125380

**Richard Burr**
Texas Bar No. 24001005

BURR AND WELCH, PC
Post Office Box 525
Leggett, Texas 77350
Tel. (713) 516-5229

mandy.burrandwelch@gmail.com
dick.burrandwelch@gmail.com

*Counsel for Petitioner Michael Dean Gonzales*

# TABLE OF CONTENTS

TABLE OF EXHIBITS ...................................................................................................v

PETITION FOR WRIT OF HABEAS CORPUS ..........................................................1

INTRODUCTION ...........................................................................................................1

JURISDICTION ..............................................................................................................4

PROCEDURAL HISTORY..............................................................................................4

CLAIMS FOR RELIEF ..................................................................................................7

SECTION ONE: CLAIMS BASED ON MR. GONZALES'S INCOMPETENCE TO STAND TRIAL IN HIS CAPITAL RESENTENCING TRIAL ...................................7

    Material Facts Common to the Claims Related to Competence for the Resentencing Trial ...............................................................................................8

    A.    Mr. Gonzales's Social and Psychological History...................................8

    B.    Neuropsychological Evidence that Mr. Gonzales's Brain Functioning Was Impaired ..............................................................................................11

    C.    Dr. Cunningham's Conclusions in 1995 Concerning Mr. Gonzales's Mental Disorders...................................................................................13

    D.    Mr. Gonzales's History in TDCJ, 1995-2007, and the Ector County Jail, 2007-2009 ...........................................................................................14

    E.    The Onset of Diabetes and Its Implications for Mr. Gonzales's Mental Health .........................................................................................15

    F.    Mr. Gonzales's Relationship with Appointed Counsel for Resentencing Proceedings in Ector County ..............................................................17

    G.    The Trial Court Had Broad Knowledge of Mr. Gonzales's Mental Health History as Mr. Gonzales's Dysfunction in Relation to His Defense Team and Inappropriate Courtroom Behavior Was Unfolding on the Record ...............23

    H.    Mr. Gonzales Engaged in Inappropriate Courtroom Behavior During Trial........27

    I.    Mr. Gonzales Insisted on Testifying and in his Brief Testimony, Told the Jury They Could Sentence Him to Death Because It Made No Difference to Him ..................................................................................................34

J.      On the Day After He Was Resentenced to Death, Mr. Gonzales Waived the Appointment of State Habeas Counsel and State Habeas Proceedings ..........34

K.      A Recent Retrospective Evaluation of Mr. Gonzales's Competence to Stand Trial in His Resentencing Trial by Dr. Mark Cunningham Has Determined that Mr. Gonzales Was Incompetent to Stand Trial ..........................37

Claims Related to Competence for the Resentencing Trial ...............................................42

I.      MR. GONZALES'S RESENTENCING TRIAL VIOLATED DUE PROCESS BECAUSE HE WAS INCOMPETENT TO STAND TRIAL ..........................................42

II.     MR. GONZALES'S RESENTENCING TRIAL VIOLATED DUE PROCESS BECAUSE THE TRIAL COURT WAS AWARE OF FACTS THAT REQUIRED AN INQUIRY INTO MR. GONZALES'S COMPETENCE BUT FAILED TO CAUSE ANY INQUIRY TO BE UNDERTAKEN.....................................50

III.    MR. GONZALES'S TRIAL COUNSEL VIOLATED HIS RIGHT TO EFFECTIVE ASSISTANCE OF COUNSEL BECAUSE THEY FAILED TO PURSUE QUESTIONS CONCERNING MR. GONZALES'S COMPETENCE TO STAND TRIAL ........................................................................................................57

A.      Counsel's failure to pursue questions concerning Mr. Gonzales's competence to stand trial fell below the objective standard of reasonableness as measured by professional norms ..............................57

B.      But for counsel's failure to pursue Mr. Gonzales's competence to stand trial, the result of the resentencing proceeding would have been different ..........75

The Procedural Posture of Mr. Gonzales's Competency Claims ......................................76

SECTION TWO: CLAIMS RELATED TO DUE PROCESS AND THE RIGHT TO COUNSEL ...................................................................................................................................83

I.      BECAUSE OF THE EFFECTIVE ABSENCE OF MEANINGFUL REPRESENTATION AND SUPPRESSION OF EVIDENCE AT THE GUILT PHASE, NO MEANINGFUL ADVERSARIAL TESTING OF THE STATE'S EVIDENCE OF GONZALES'S CULPABILITY FOR CAPITAL MURDER HAS OCCURRED, IN VIOLATION OF THE SIXTH, EIGHTH, AND FOURTEENTH AMENDMENTS TO THE UNITED STATES CONSTITUTION ............................................................................................................83

A.      Mr. Gonzales is being held pursuant to a Judgment of Conviction entered on May 9, 2009; accordingly, challenges to the constitutionality of that conviction can be brought in this proceeding ........................................................83

B.    The trial court appointed starkly unqualified counsel to represent Mr. Gonzales during his 1995 capital murder trial ..........................................................85

C.    As a consequence of trial counsel's sheer incompetence, evidence of Mr. Gonzales's guilt was not meaningfully adversarially tested and substantial doubt about his culpability remains ....................................................................89

D.    The State's failure to disclose negative luminal testing contributes to the lack of confidence in the guilty verdict................................................................104

E.    As a consequence of Mr. Gonzales's incompetency during his resentencing, newly presented evidence of his culpability went meaningfully unchallenged, and should provide no confidence in Mr. Gonzales's guilt .........................................................................................................106

F.    The Court should not have confidence in Mr. Gonzales's conviction................112

CONCLUSION AND PRAYER FOR RELIEF ........................................................................116

VERIFICATION...........................................................................................................................117

CERTIFICATE OF SERVICE ....................................................................................................117

# TABLE OF PETITIONER'S EXHIBITS

| Exhibit | Document |
| --- | --- |
| 1 | Letter from Dr. J. Arturo Silva to Danalynn Recer (Mar. 2, 2009) |
| 2 | Email from Robert Cowie to the Gulf Region Advocacy Center (Apr. 15, 2009) |
| 3 | Declaration of Dr. Mark Cunningham (Nov. 2, 2013) |
| 4 | Letter from Woody Leverett to Hon. Bill McCoy (Dec. 3, 2007) |
| 5 | Declaration of Danalynn Recer (Nov. 5, 2013) |
| 6 | Email from Woody Leverett to Danalynn Recer (Jul. 3, 2008) |
| 7 | Affidavit of Charles Kenimer (May 7, 1994) |
| 8 | OPD Summary of Interview of Charles Kenimer (Apr. 22, 1994) |
| 9 | OPD Transcribed Interview of Eric Butler (May 16, 2000) |
| 10 | OPD Summary of Interview of Martha Reyes (May 24, 2000) |
| 11 | OPD Transcribed Interview of Martha Reyes (June 7, 2000) |
| 12 | Written Statement of Martha Gonzales (May 7, 1994) |
| 13 | OPD Summary of Interview of Ike Isaacs (May 23, 2000) |
| 14 | OPD Transcribed Interview of Michelle Payne (May 6, 1994) |
| 15 | OPD Transcribed Interview of Michelle Payne (June 2, 2000) |
| 16 | Texas Department of Public Safety Preliminary Report (Jan. 13, 1995) |

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
MIDLAND-ODESSA DIVISION

| | | |
|---|---|---|
| **MICHAEL DEAN GONZALES,** | § | |
| | § | |
| Petitioner, | § | |
| | § | |
| | § | |
| -v- | § | CIVIL NO. 7:12-cv-00126-DAE |
| | § | |
| | § | *CAPITAL CASE* |
| | § | |
| **WILLIAM STEPHENS**, Director, | § | |
| Texas Department of Criminal Justice, | § | |
| Correctional Institutions Division, | § | |
| | § | |
| Respondent. | § | |

_____

_____

**SECOND AMENDED PETITION FOR A WRIT OF HABEAS CORPUS**
_____

Petitioner Michael Dean Gonzales asks this Court to issue a writ of habeas corpus and grant him relief from his unlawful confinement.

## INTRODUCTION

Michael Gonzales comes before this Court convicted and sentenced to death for the 1994 capital murder of his two neighbors, Merced and Manuel Aguirre. From 1994 to the present, justice has cast only a glimmer of light on Mr. Gonzales's case. Mr. Gonzales prays that this Court direct the full light of justice into the darkest corners of his case.

In his original trial, counsel appointed to represent Mr. Gonzales were by no measure competent to try a serious criminal case, much less a capital case. One, Benny Lowe, had struggled with alcoholism for years and been disciplined for misconduct and negligence due to alcohol's toxic effect on his practice of law. The other, Garry Garrison, was a profoundly

inexperienced criminal defense lawyer who had never handled a felony case in trial and whose previous criminal trial experience encompassed fewer than a dozen misdemeanor cases. Neither sought appointment and both protested their appointment due to lack of experience, qualification, and ability – but the trial court kept them on the case.

In keeping with their limited abilities, Mr. Garrison and Mr. Lowe conducted virtually no investigation or preparation with respect to guilt/innocence or sentencing, and have admitted under oath that their representation was plagued by inadequate preparation, ignorance of the law, ignorance of the facts, and negligence. The State's evidence of guilt upon which Mr. Gonzales's conviction rested was exceedingly thin and on several occasions the prosecution exploited trial counsel's ignorance to gain admission of unreliable hearsay evidence. Garrison and Lowe rested at guilt phase without presenting any evidence and called just two witnesses on Mr. Gonzales's behalf at the sentencing phase.

In his initial federal habeas petition, Mr. Gonzales raised claims challenging the judgment in his original trial. These claims included substantial challenges to the effectiveness of his representation and to the State's suppression of favorable evidence undermining its case of guilt, some of which were deemed procedurally defaulted and left unreviewed and some of which were reviewed and denied. Ultimately, however, this Court granted Mr. Gonzales sentencing relief due to the State's improper reliance on race during sentencing.

The one effective thing Mr. Garrison and Mr. Lowe did in the original trial – securing funding for a psychological evaluation by Dr. Mark Cunningham and a neuropsychological evaluation by Dr. Sam Brinkman for purposes of mitigation – could have redounded to Mr. Gonzales's benefit in his resentencing trial if the attorneys appointed to represent him in his resentencing trial had served as Mr. Gonzales's advocates. Instead, they became his adversaries.

Counsel Woody Leverett and Jason Leach were appointed to represent Mr. Gonzales in his resentencing trial. Neither understood mental illness or brain damage of the sort that plagued Mr. Gonzales's life. Born with congenital brain damage, slow to develop, ridiculed within his family and bullied outside his family for the deficits associated with his developmental delays, beaten by his father, exposed to the brutality his father directed toward his mother, drawn in to drinking by his father before he reached his teens, Mr. Gonzales struggled to survive an adolescence plagued by PTSD, a psychotic mood disorder, and a damaged brain.

Mr. Leverett and Mr. Leach believed that the way to work with a client was to show the client that the lawyer is in control. Mr. Gonzales took their high-handedness as disrespect, reacted with paranoia and self-protection as a result of his trauma-laden life history. He very quickly distrusted these new lawyers and developed a paranoid delusion that they were his enemies rather than his advocates. Unable to obtain the appointment of new counsel, Mr. Gonzales, responding to his delusions, wholly refused to engage with his lawyers or assist in his own defense. Though he wanted to avoid the death penalty, Mr. Gonzales's out-of-control efforts to protect himself from perceived threat posed by his lawyers – behavior seen by everyone else as self-destructive – assured the re-imposition of a death sentence.

Despite massive evidence that Mr. Gonzales was incompetent to be tried in his resentencing proceeding, and despite a campaign by the defense team's mitigation specialist to persuade them to raise Mr. Gonzales's incompetence to stand trial, Leverett and Leach resisted. They saw their contest with Mr. Gonzales as a contest of wills rather than the consequences of Mr. Gonzales's mental impairments. As a result failed to protect their client from himself.

So now, Mr. Gonzales seeks the sanctuary of this Court's habeas jurisdiction to remedy the wrongs of a justice system that is intended to protect his rights. He seeks relief from his re-

imposed death sentence because he was incompetent to be tried in the resentencing trial, because the trial court should have undertaken an inquiry into his competence based on the evidence before it, and because his resentencing lawyers provided ineffective assistance in their failure to pursue a competence inquiry.   He also seeks relief from the newly imposed judgment for the denial of virtually any assistance by counsel in his original trial.

## JURISDICTION

This court has jurisdiction pursuant to 28 U.S.C. § 2241 and § 2254.

## PROCEDURAL HISTORY

The 358th District Court of Ector County, Texas entered a capital judgment against Mr. Gonzales on December 8, 1995.   The Texas Court of Criminal Appeals ("CCA") affirmed the judgment on June 3, 1998. *Gonzales v. State*, No. AP–72,317 (Tex. Crim. App. June 3, 1998) (not designated for publication).   On October 12, 1998, Mr. Gonzales filed a habeas corpus application in state court.   No hearing was held on the application.   On March 10, 1999, the CCA denied the application.   *Ex parte Gonzales*, No. WR-40,541-01 (Tex. Crim. App. Mar. 10, 1999) (not designated for publication).

On January 10, 2000, Mr. Gonzales filed a petition for writ of habeas corpus in this Court.   On October 26, 2000, Respondent filed a Notice of Error and Partial Motion for Summary Judgment with Brief in Support wherein Respondent conceded that the State's reliance on Mr. Gonzales's race at the sentencing phase violated the constitution.   On December 5, 2000, the state trial court held a hearing to consider whether to set an execution date.   On January 3, 2001, the state trial court set an execution date for Mr. Gonzales despite the State's confession of error in federal court.   Two days later, Respondent filed in this Court an advisory that it did not oppose staying the scheduled execution pending resolution of the federal proceedings.

On March 15, 2001, this Court held an evidentiary hearing on Mr. Gonzales's petition, at the conclusion of which the Court entered an order staying the execution. On December 19, 2002, this Court granted sentencing relief based on the Director's concession of error. *Gonzales v. Cockrell*, No. 7:99-cv-00073 (W.D. Tex. Dec. 19, 2002) (not designated for publication). Mr. Gonzales appealed the decision denying guilt phase relief and the United States Court of Appeals for the Fifth Circuit affirmed the judgment. *Gonzales v. Quarterman*, No. 03-50021 (5th Cir. July 31, 2006) (not designated for publication).

On May 7, 2009, and following a resentencing trial, the 358th District Court entered a new judgment against Mr. Gonzales sentencing him to death. The next day, the trial court brought Mr. Gonzales to the courtroom to appoint separate counsel for direct appeal and state habeas proceedings. When Mr. Gonzales said that he did not want any counsel and did not want to appeal, the court advised him that the direct appeal is automatic, *see* Art. 37.071, § 2(h), and appointed direct appeal counsel. The court later determined that Mr. Gonzales had waived habeas counsel and was proceeding *pro se*.

No state habeas application was thereafter filed. On November 10, 2010, the CCA issued an order holding that Mr. Gonzales had waived his right to an initial habeas corpus application, and that any future application filed by him or on his behalf would be considered a subsequent application. *Ex parte Gonzales*, No. WR-40,541-03 (Tex. Crim. App. Nov. 10, 2010) (not designated for publication). On September 28, 2011, the CCA, in a 7-2 decision, affirmed the second capital judgment. *Gonzales v. State*, 353 S.W.3d 826 (Tex. Crim. App. 2011).

Thereafter, on November 27, 2012, the trial court set Mr. Gonzales's execution for March 21, 2013. In mid-December, 2012, Mr. Gonzales's case came to the attention of Texas federal

habeas resource counsel who monitor capital cases entering and pending in federal habeas proceedings.  Upon determining that Mr. Gonzales was unrepresented and that his federal statute of limitations would expire on December 27, 2012, undersigned counsel, Mandy Welch, in her capacity as federal resource counsel, visited Mr. Gonzales to advise him about the expiration of his federal filing deadline.  During that meeting, he told Ms. Welch he would like to pursue federal habeas remedies.  Because it was impossible to obtain counsel to represent him before the filing deadline, Ms. Welch agreed to represent him for the limited purpose of filing a habeas petition and assisting him in obtaining appointed federal counsel.  A federal petition was filed on December 27, 2012.  On January 14, 2013, the federal court stayed Mr. Gonzales's execution and appointed Kathryn Black and Mandy Welch to represent Mr. Gonzales.

On November  5, 2013, Mr. Gonzales filed an Amended Petition for Writ of Habeas Corpus.  After Respondent answered, Mr. Gonzales replied and moved for a stay of the federal habeas proceedings in order to exhaust state court remedies.  Thereafter on July 31, 2014, this Court granted the request for a stay.

Mr. Gonzales filed an application for writ of habeas corpus in the state trial court on September 9, 2014.  Treating the application as a subsequent application, the court transferred his case to the Court of Criminal Appeals.  On June 3, 2015, the Court of Criminal Appeals, with Judges Yeary and Alcala dissenting, dismissed his habeas application as an abuse of the writ. *Ex parte Gonzales*, 463 S.W.3d 508 (2015).

Upon giving notice to this Court of the state court's decision, the Court entered an order requiring Mr. Gonzales to file a second amended petition for writ of habeas corpus by September 1, 2015.  Undersigned counsel Richard Burr was substituted for Kathryn Black as co-counsel for Mr. Gonzales.

# CLAIMS FOR RELIEF

## SECTION ONE

### CLAIMS BASED ON MR. GONZALES' INCOMPETENCE TO STAND TRIAL IN HIS CAPITAL RESENTENCING TRIAL

Mr. Gonzales returned to Ector County from TDCJ on June 12, 2007 for resentencing trial proceedings. His actual retrial began with jury selection on April 1, 2009, 13 RR-R 1, and ended with a judgment sentencing him to death on May 7, 2009, 30 RR-R 51. Early on in this nearly two-year period, Mr. Gonzales became incompetent to stand trial. His underlying mental disorders combined to cause him to develop paranoid delusions concerning his defense team, which in turn caused him not to work with or in any way relate to his lawyers and investigators on matters of his defense. The disorders and the delusions they produced in turn caused Mr. Gonzales to have enormous anger and a profound sense of futility, leading him to disengage from the seriousness of the proceedings and behave during trial – to his great detriment -- as if the sentence at issue did not matter to him.

Three claims arise out of these facts:

(1)    Mr. Gonzales's trial violated due process because he was incompetent to stand trial;

(2)    Mr. Gonzales's trial violated due process because the trial court was aware of facts that required an inquiry into Mr. Gonzales's competence but failed to cause any inquiry to be undertaken; and

(3)    Mr. Gonzales's trial counsel violated his right to effective assistance of counsel because they knew that Mr. Gonzales had a long history of serious mental disorders that produced paranoia and rigidity in his thinking processes; that within two months of their appointment to represent Mr. Gonzales they knew he came to the fixed belief that they could not be trusted; and that, thereafter, Mr. Gonzales not only did not consult with them but also hindered their investigation, impeded their presentation of evidence, did not follow their advice in any respect, and would (and did) disrupt trial proceedings in extremely self-defeating and self-destructive ways -- and yet they failed to raise any question concerning Mr. Gonzales's competence to stand trial.

The material facts that are common to all three claims will be set out in the next pages of the petition.   Thereafter, each of the three claims supported by these facts will be set out separately.   Factual matters particular to any claim will be set out in the pleading of that claim.

**Material Facts Common to the Claims Related
to Competence for the Resentencing Trial**

**A.     Mr. Gonzales' Social and Psychological History**

Psychologist Mark Cunningham conducted a clinical evaluation of Mr. Gonzales for the defense prior to his initial capital trial in 1995.   He testified to the following clinically-significant information in Mr. Gonzales's social and psychological history:

(1)     Mr. Gonzales's brain functioning appears to have been impaired from early childhood.   Michael experienced delays in meeting developmental milestones, including motor coordination, toilet training, drinking consistently from a cup or glass, and the evolution of speech.   He had attention deficit problems.   He also had learning difficulties in school, reflected by repeating the 2nd and 5th grades and assignment to special education classes.   18 RR 98-100.[1]

(2)     Mr. Gonzales was the victim of severe emotional and physical abuse, and neglect throughout his childhood and adolescence.   Michael's father was extremely violent to his mother day-in and day-out -- beating her throughout the day, throwing objects at her, and breaking bottles over her head.   18 RR 100-102.   Michael observed all this and was also himself the target of his father's violence -- being slapped repeatedly in the head as a small child, held off the ground and beaten with a belt, and punched, slapped and backhanded in the face.   *Id*. at 102-104.   Michael's older sister and her friends also bullied, punched, and ridiculed Michael. *Id*. at 104.   Michael was emotionally abused and neglected as well.   His father pressured his

---

[1] "RR" refers to the Reporter's Record, or transcript, of the initial trial proceedings.  The volume number precedes RR and the page number(s) follow it.

mother to abort Michael after conception. He and other family members were verbally abusive, cruelly ridiculing Michael's speech impairments and toileting delays. *Id.* In addition, his mother neglected and failed to provide guidance to, or protection for, Michael. She often left him with his sister or aunt. She exercised no effective discipline or guidance as Michael grew up, allowing him to drink alcohol in the home from age 12, allowing his troubled girlfriends to move into the home, letting him run with older peers, providing money, which he spent on alcohol and drugs, lying to cover for him with authorities, and allowing her drug-dealing boyfriend to provide him with cocaine. *Id.* at 104-105. His father consistently provided misguidance to Michael, telling him that if the school principal paddled him to take the paddle and retaliate by hitting the principal back, telling him he would beat him if he ever lost a fight, and letting him play with an unloaded handgun. *Id.* at 105. After his parents' divorce, Michael's father disowned and abandoned him, giving the same name to a child conceived in his next marriage and letting Michael know that this child replaced Michael. *Id.* at 106.

(3) Mr. Gonzales was isolated and ridiculed by peers and by late adolescence had no prospects for a better life. Michael fared as badly with his peers as he did within his family. He was seen as fat, with ugly hair, talking oddly, and wearing ill-fitting clothes. He was socially inept and put on a false bravado that most of his peers saw through. His peer associations involved younger, immature, or drug/alcohol-impaired kids. He was an academic failure. By mid-to-late adolescence, he had no money, no car, no athletic abilities, no job, no education, and no future. 18 RR 106-107. When someone showed him some degree of compassion and talked to him with respect, it was not uncommon for him to break down and cry. *Id.* at 108.

(4) Mr. Gonzales began consuming drugs and alcohol at an early age and by adolescence had become a heavy abuser of drugs and alcohol. Michael's history of alcohol and

drug abuse was initiated and facilitated by his father, then by subsequent parental figures and his sister's friends. His father first gave him alcohol as a toddler, and, by the time Michael was six years old, he was sitting and drinking with his father. 18 RR 108. By nine years old, Michael was sniffing glue, and by ten years old he was huffing an aerosol varnish supplemented with gasoline and paint thinner and drinking a six-pack of beer per day. *Id.* at 109. By 14 years old, he was injecting cocaine and speedballs of cocaine and heroin. By 15 years old, he was drinking 40-ounce malt liquors and taking amphetamines. *Id.* During this time, Michael was admitted to a Vernon State Hospital drug rehabilitation program, where he stayed for seven weeks. Upon release, Michael resumed his heavy alcohol and drug consumption. *Id.* at 110. By the time of his arrest at 21 years old, Michael was using marijuana daily, cocaine periodically, and consuming several quarts of beer daily. *Id.*

(5) <u>Mr. Gonzales experienced multiple head injuries.</u> At eight years old, Michael fell from the tailgate of a pickup, hit his head, and lost consciousness for up to ten minutes. Throughout his life with his father, Michael's father repeatedly hit him in the head. At age 16, he was hit with a tire iron in a fight, which caused him to feel light-headed for several months. Michael was hit with a frying pan at Brownwood State School and rendered unconscious for an hour. He had a number of fist fights throughout his life. He engaged in a boxing program at the age of 17 at Brownwood State School, and at age 18 he was knocked unconscious by a baseball bat. 18 RR 113.

(6) <u>Mr. Gonzales was diagnosed as having a psychotic mental illness when he was in the custody of the Texas Youth Commission.</u> Between May 25, 1989 and October 31, 1990 – while Michael was between the ages of 15 and 17 – he was committed to two Texas Youth Commission institutions, the West Texas Children's Home and the Brownwood State School.

18 RR 119.   In both institutions, he was seen by mental health staff because he was experiencing "paranoia and auditory hallucinations, as well as difficulties with explosiveness and aggressiveness…." *Id.* at 120.   Psychiatrists at both institutions diagnosed him as having polysubstance abuse and a "schizo-affective disorder, which is a combination of a major depression and … some sort of psychotic process." *Id.* at 119-120.   Doctors at both institutions prescribed Navane, an "antipsychotic medication," in an effort "to treat his paranoia and auditory hallucinations, … explosiveness and aggressiveness." *Id.* at 120.   Dr. Cunningham indicated that these diagnoses and the prescribed course of treatment with Navane were significant, because the "only clinical indication [for Navane], essentially, is for the treatment of psychotic disorders.   They are not casually administered." *Id.* at 120-121.[2]

## B.   Neuropsychological Evidence that Mr. Gonzales's Brain Functioning Was Impaired

Additional evidence that Mr. Gonzales suffered brain impairment was provided at the 1995 trial by the testimony of Dr. Sam Brinkman, who conducted a neuropsychological evaluation of Mr. Gonzales.[3]   Dr. Brinkman found that, as a result of congenital neurological impairment, the heavy ingestion of alcohol, drugs, and inhalants from an early age, and multiple head traumas, "Michael had personality change that is associated with … [these] factors, and also had what is called dementia, or the reduction of thinking abilities in reading, problem solving and learning…."  18 RR 87.

---

[2] While Dr. Cunningham did not testify to this, Mr. Gonzales's TYC records show that at the proper dosage, his symptoms were ameliorated by the Navane.

[3] Dr. Brinkman explained that,

> Neuropsychology is a specialty area of psychology that is concerned with the study of brain behavior relationships.  As we know, the brain organizes complex psychological processes, like memory, language, judgment, decision making, etc., and neuropsychology is specifically concerned with the diagnosis and the treatment of abnormal states of the brain, whether that be due to trauma or disease or some other condition such as a developmental disorder.

18 RR 76.

Explaining the personality change associated with Michael's brain impairments, Dr. Brinkman testified that it would be characterized as "labile, disinhibited, aggressive, paranoid." *Id.* Dr. Brinkman then amplified these terms:

> Labile …means becoming extremely emotional at fairly low levels of being provoked.

> Disinhibited … means doing things that we normally would inhibit ourselves from doing…. Disinhibited means that behaviors will come out much more quickly, much more strongly. That may be angry behaviors, that may be aggressive behaviors, it may be behaviors of any of a number of other types but all motivationally based, emotionally based, and drive based behaviors.

> The aggressive is as its name applies, and as you are aware, has characterized Mr. Gonzales' history for some time.

> The paranoid has to do with thought processes that cause a misperception or a somewhat bizarre perception of events and bizarre thought processes that have to do with interpreting people's motivations and interpreting people's attitudes toward him, interpreting people's trustworthiness, etc., as such that he might think that someone would unjustifiably want to hurt him, unjustifiably want to do him in, screw him over, whatever the term may be.

> It also involves thought processes that have to do with making one's self think that he is something he really isn't. That he has great powers, that he is a great leader, that he is, in this case, bad. That he is a bad guy. What it does is, of course, just gradually alters the influence that this environment will have on him.

*Id.* at 88-89.

Dr. Brinkman then explained that Michael developed dementia, because his multiple neurological insults and disabilities "reduce[d] his thinking and problem solving skills, his language and communication skills, his memory and learning attention and executive processes." In describing the impairment of the brain's "executive processes," Dr. Brinkman testified that these processes are the "planning and control centers for the brain." *Id.* at 78. When there is dysfunction in the brain's executive processes, the

> most common symptoms … would be memory disorder, disturbance of attention, and then disturbance in complex behaviors, such as inhibition of impulses, a

knowledge of the social appropriateness of one's behavior, relevancy of behaviors, the ability to look at a problem from different standpoints and not become highly rigid in one's thinking, and this sort of thing.

*Id.* at 79.

Finally, Dr. Brinkman testified that a person with the kind of brain damage Michael has will function at his best – and in the context in which Dr. Brinkman testified, be the least dangerous – in the structured setting of a prison:

An individual with this pattern tends to create the greatest havoc and will create the greatest problems in life when there is the least amount of structure, and that, of course, would mean out on the street. An individual who is in a highly structured setting where there are predictable daily patterns, predictable responses to behaviors that are outside of the bounds of acceptability and that sort of thing, an individual like this tends to pick up their functioning quite a lot and function maximally, function at optimal efficiency in a highly structured setting, such as a prison setting.

*Id.* at 90. Even though Dr. Brinkman was addressing whether Michael would be dangerous in prison, his observations inadvertently forecast that Michael might have significant difficulty in working with counsel in a retrial setting, where he was called upon to think about complex issues pertaining to his defense, and subject to changing routines and demands, and the unpredictability of legal proceedings, following a long period of highly structured incarceration on death row:

### C.    Dr. Cunningham's Conclusions in 1995 Concerning Mr. Gonzales's Mental Disorders

As Dr. Cunningham explained in a declaration he submitted to this Court in connection with Mr. Gonzales's Motion to Extend Time for Filing Amended Petition for Writ of Habeas Corpus, Docket No. 25 (Appendix 1), on the basis of Mr. Gonzales's social and psychological history, Dr. Brinkman's neuropsychological evaluation, and his own extensive clinical interviews with Mr. Gonzales:

I found that, together, the abuse and neglect and social ostracism Michael experienced, amount to ongoing exposure to trauma. As the mental health

community then understood the chronic exposure to trauma, such experiences often produced depression, deficits in self-esteem, difficulty in maintaining intimate relationships, and alcohol-and-substance abuse, and put a person at risk for antisocial and violent behavior.

In Michael's circumstances, the consequence of trauma were made much worse by three factors: apparent congenital impairments in brain function first manifested in developmental delays, acquired brain impairments from numerous serious head injuries, and chronic alcohol-and-substance abuse. The brain damage he suffered from birth and as a result of later head injuries, together with the acute and chronic brain impairment associated with his level of alcohol and substance ingestion during childhood and adolescence, led to his virtual inability to control and regulate his strong impulses. As I put it in my trial testimony in 1995, his brain impairments affected "how well [his] brakes worked in inhibiting impulses."

*Id.* at 9-10 (summarizing the diagnostic impressions provided in his trial testimony, at 18 RR 111-114).

### D. Mr. Gonzales's History in TDCJ, 1995-2007, and the Ector County Jail, 2007-2009

Mr. Gonzales was committed to death row on December 11, 1995, and returned to Ector County for his resentencing trial on June 12, 2007. He had episodic contact with institutional mental health services in TDCJ, due to mental health problems he reported experiencing, from November 1999, to October 2005. His complaints centered on hearing voices, occasionally feeling like he was going to explode, and depression in the wake of his mother's death in September 2004. Approximately two months after his mother's death, he appeared suicidal and was sent for a brief time to TDCJ's in-patient mental health facility, the Jester-IV Unit.

TDCJ mental health staff discounted Mr. Gonzales's complaints about hearing voices as not credible. They administered several personality assessment instruments and found that he was exaggerating most of his mental health symptoms on all of them. They did not believe his reports that he had been medicated for a psychotic illness when he was in the Texas Youth Commission. They characterized his complaints of mental health problems as simply an effort

to get access to medications.   Even after they obtained his records from TYC, which confirmed that Mr. Gonzales had reported his mental health history there accurately, TDCJ staff did not change their view of his self-reported symptoms.   In October 2005, when Mr. Gonzales's depression appeared to resolve, they discharged him from any further mental health services. Michael never sought mental health services thereafter.

Mr. Gonzales's disciplinary history in TDCJ involved only two serious offenses in twelve years and a handful of less serious offenses.   The serious offenses were an assault/stabbing of another death row inmate in November 1998, and an assault by throwing hot liquid on a correctional officer in April 2006.   Another offense was the possession of a shank in April 2006. Seven minor offenses involved six for refusing orders or disrespecting officers and one for possession of pornographic photographs.

### E.      The Onset of Diabetes and Its Implications for Mr. Gonzales's Mental Health

Mr. Gonzales was diagnosed with adult-onset Diabetes Mellitus-Type II on September 15, 2003.   Diabetes is diagnosed by the presence of abnormally high glucose in the blood. Normal ranges of blood glucose are 70-110 mg/dl.   If a person has two readings of fasting blood glucose 126 mg/dl or higher, that person is diagnosed with having Diabetes.   Insulin is administered to control blood glucose levels, in an effort to keep the glucose levels to the normal range of 70-110 mg/dl.   If glucose levels are not well-controlled, the patient can suffer a number of health consequences.

Mr. Gonzales's glucose levels have been poorly controlled by prison and jail medical staff.   In the period between his diagnosis at TDCJ in 2003, and his return to Ector County in 2006, only 16% of his glucose readings were within the normal range.   By contrast, 58% were between 111 and 200, and 26% were from 201 to over 400.   While he was incarcerated at the

Ector County Detention Center, only 3% were in the normal range, 40% were between 111 and 200, and 57% were from 201 to over 400.

In connection with the resentencing trial, the defense team was permitted to secure the expert assistance of a psychiatrist in San Jose, California, named Arturo Silva.   Dr. Silva was sought in part because he has studied, and is familiar with, the mental health complications that can ensue from poorly-controlled glucose levels in people with Diabetes.   Dr. Silva was unable to examine Mr. Gonzales or to assess the likelihood of his having mental health complications due to poorly controlled Diabetes.   However, he did set out the potential mental health consequences of poorly controlled glucose in a letter to the defense team dated March 2, 2009:

> Uncontrolled or poorly controlled diabetes produces symptoms such as irritability, anxiety, memory loss, fatigue, mood changes and possibly mental confusion, which may mask or be confused with symptoms of various psychiatric disorders. If such a condition is permitted to last for a period of years, it can result in complications associated with cognitive impairments and serious mood abnormalities due to permanent brain damage….
>
> [A]ny evaluation of Mr. Gonzales must assess the possibility that diabetes is affecting the defendant's central nervous system as well as his psychiatric status. A reasonable evaluation may begin if available medical records are provided for review, and if a psychiatrist is able to conduct an interview with Mr. Gonzales, designed to assess the possibility that the diabetic process could be associated with brain dysfunction.   After such evaluation is completed, it may be necessary to refer the defendant to a diabetologist (i.e. an endocrinologist with specialized expertise in diabetes).   For example, the defendant may be suffering from peripheral neuropathy associated with pain, which may be worsening the defendant's psychiatric status.   Polyneuropathy may be partially diagnosed with appropriate nerve conduction tests.   The defendant could be experiencing worsening vision secondary to retinopathy, and this may also predispose him toward greater likelihood of frustration and hostility.   More direct central nervous effects may be at work, and the possibility that they may exist could be further clarified by the medical expert in diabetes.

Exhibit 1 (Letter from Dr. J. Arturo Silva to Danalynn Recer, Mar. 2, 2009).

The examination and assessment of Mr. Gonzales and his medical records recommended by Dr. Silva was not done in connection with his resentencing trial, nor has it been done since.

Accordingly, whether Mr. Gonzales's Diabetes exacerbated his underlying psychiatric disorders and brain impairments and thus contributed to his inability to work with and assist his defense team has never been properly assessed.

      **F.**      **Mr. Gonzales's Relationship with Appointed Counsel for Resentencing Proceedings in Ector County**

The resentencing trial record makes it apparent that Mr. Gonzales stopped consulting with defense counsel and assisting in his defense very early in the representation. Counsel Woody Leverett and Jason Leach were appointed on July 21, 2007. 1 CR-R 3-4.[4] Just three months later, on October 31, 2007, the trial court held a hearing as a result of Mr. Gonzales's having sent a letter to Mr. Everett firing him as his counsel. 3 RR-R 3-5.[5] The reason Mr. Gonzales gave was contained in various letters (which Mr. Gonzales read into the record) recounting his request to Leverett to engage a mitigation specialist Charles Lanier from New York. *Id.* at 5-7. Leverett told Mr. Gonzales that he had checked out Lanier and found that he had no experience as a mitigation specialist but was a psychologist and an anti-death penalty advocate. *Id.* at 7-8. Mr. Gonzales in turn learned from Lanier that this information was incorrect—that he had been appointed and served as a mitigation specialist in numerous capital cases for more than a decade, that he was not a psychologist, and that he was not an anti-death penalty advocate. *Id.* at 8-11. For these reasons, Mr. Gonzales believed Leverett had lied to him and wanted him removed as counsel. *Id.* at 12.

The trial court refused to remove Leverett because he "is a very fine lawyer who has handled probably more capital cases than any lawyer around in the area." 3 RR-R 13. Leverett

---

[4] "CR-R" refers to the Clerk's Record of Mr. Gonzales's resentencing trial. The number preceding CR-R is the volume number, and the number after CR-R is the page number within the volume.

[5] "RR-R" refers to the Reporter's Record, or transcript of courtroom proceedings, for the resentencing trial. The number preceding RR-R is the volume number, and the number after RR-R is the page number within the volume.

then explained that "those misstatements I made about him [Lanier] being a psychologist or whatever, that was my understanding of the situation, and I did not mean to lie in any way to Mr. Gonzales." *Id*. at 14. He then explained why he thought having a local mitigation specialist instead of a mitigation specialist based in New York would serve Mr. Gonzales's interests more effectively. *Id*. The trial court then asked Mr. Gonzales if he would cooperate with his appointed counsel and their investigator/mitigation specialist Nancy Piette, and he responded, "I would not acknowledge them, or her, or whatever." *Id*. at 15. The court then engaged in the following colloquy with Mr. Gonzales:

> THE COURT: Do you want to remain here or do you want to go back to the penitentiary?
>
> THE DEFENDANT: Makes me no difference.
>
> THE COURT: Certainly doesn't make me any, but I just want to know what you want to do. If you are not going to talk to these attorneys—they probably need you here and would like to have you here, but if you are not going to talk to them, I guess they will prepare it on the old record. Your defense, I mean.
>
> THE DEFENDANT: I would like to fire them and go pro bono—I mean pro se. I have got that right.
>
> THE COURT: Well, they are going to remain on the case. Now, if you want to speak for yourself, certainly you may do so.
>
> THE DEFENDANT: Like I said, I won't acknowledge them.
>
> THE COURT: The attorneys are going to remain on the case.
>
> THE DEFENDANT: I don't have that trust in them. I don't feel my life is worth the representation.

*Id*. at 15-16.

Four months later, on February 29, 2008, trial counsel filed a Motion to Withdraw as Attorneys of Record. 1 CR-R 33-35. Without giving any details, counsel wrote:

A conflict has arisen between the Defendant and Counsel.  This conflict threatens the ability of counsel to render effective representation in this case.  The Defendant will not be adversely affected by the granting of this Motion, and this Motion is not filed to delay these proceedings, but rather to ensure the Defendant receives effective assistance of counsel and a fair trial....

Continued representation of the Defendant by counsel will result in prejudice to the Defendant in that he will not receive effective assistance of counsel and/or a fair trial in this case for the reasons stated above.

1 CR-R 33.

On May 13, 2008, the trial court held a hearing to address this motion.   At the outset, Leach informed the court that he had conferred with Mr. Gonzales, and that Mr. Gonzales wanted Leach and Leverett removed as counsel and new counsel appointed, or if the court would not do that, to represent himself.   4RR-R 3.   The following colloquy between the trial court and Mr. Gonzales then ensued:

THE COURT: All right.  Mr. Gonzales, do you wish to address that?

THE DEFENDANT:  I got nothing to say.   I already said everything I had to say last time I was here.

THE COURT: Are you going to cooperate –

THE DEFENDANT:  I won't acknowledge these attorneys.

THE COURT: Well, I mean –

THE DEFENDANT: I don't trust them and I don't want nothing to do with them, plain and simple.

THE COURT: Do you plan to represent yourself?

THE DEFENDANT: Fact is it has gotten to the point where I don't give a damn no more.   You can issue an execution date right now, makes me no difference.   So whatever you see fit, I don't give a damn.

THE COURT: Okay.   But back to my question, do you plan to represent yourself?

THE DEFENDANT: I got nothing more to say.

THE COURT: All right.   Then I am going to accept that for the time being as if you are not going to talk to me, if you are not going to talk to your lawyers, that you are going to be your own lawyer.

THE DEFENDANT: I never said that.

THE COURT: You didn't?

THE DEFENDANT: No.

THE COURT: Well, we are going to have a trial and we are going to proceed. Now, are you going to cooperate with your lawyers?

THE DEFENDANT: I don't acknowledge these attorneys that you represented me.

THE COURT: All right.

THE DEFENDANT: I addressed this Court last time of my concerns.   I don't trust them, plain and simple.   When an attorney lies to you one time, he is going to lie to you every time, so my point, they aren't worth shit.

THE COURT: Okay.

THE DEFENDANT: Either they are for you or against you.   In this case, they have already showed me they aren't for me.   Why don't you just issue an execution date right now.

THE COURT: I'm sorry?

THE DEFENDANT: I said why don't you just issue an execution date right now. Get this shit over with.   Makes me no difference.

THE COURT: Attorneys approach the bench.

(Off the record discussion at the bench.)

THE COURT: All right.   That being your attitude.  Mr. Gonzales, this is going to be the order of the Court for the time being.   I am going to give you ten days to think about this.   And if you come back in here with the same attitude, you are not accepting these lawyers, then the other alternative is that you represent yourself.   I will have some admonishments for you at that time.   Today I am not going to waste my time or yours until I get a definite decision.   And if you are not going to make the decision, I will make it for you.   So with that, we will be in recess for—give me a date.   Ten days from today or thereabout.   I will let the

lawyers know exactly when that will be.   All right.   Thank you very much.   We
will be in recess and you may remove the prisoner.
....

(The defendant as he was being removed from the courtroom:)

THE DEFENDANT: (Inaudible.)  Fuck y'all.

(Hearing concluded.)

4 RR-R 3-8.

Thereafter, on May 28, 2008, defense counsel filed a First Amended Motion to Withdraw

as Attorneys of Record.   3 CR-R 549-61.   The motion was identical to the motion filed on

February 29, 2008, except that this motion had sealed affidavits attached from each member of

the trial team (Leverett, Leach, and Piette), chronicling the dozens of times that they had tried to

see or consult with Mr. Gonzales without success.   As Leverett averred, "[T]he defense team has

absolutely no working relationship with our client...."   *Id*. at 558.   Leverett had conferred with

Mr. Gonzales "only three times since my appointment as his lawyer," and at each of those brief

meetings, Mr. Gonzales was uncooperative.   *Id*.   Leverett concluded, "In almost 30 years of

practice I have never had a poorer relationship with a client.   In my professional opinion, it is

absolutely impossible for the present defense team to provide Mr. Gonzales with the effective

assistance of counsel."   *Id*. at 559.

As Leach explained in his affidavit,

Defendant's aversion to his current defense team has led to his refusal to sign the
necessary documentation for a competent defense of his case.   For example,
Defendant has refused to sign releases needed for his mitigation specialist, Ms.
Piette, to obtain records essential to his defense….   The breakdown of the
attorney-client relationship in this case, including but not limited to Defendant's
failure to speak to or cooperate with any member of his defense team, makes the
gathering and presentation of this evidence unrealistic, if not impossible.

*Id.* at 555.

Nancy Piette expanded on these concerns:

> As a mitigation specialist, it is imperative to prepare a bio-psycho-social history. This history can only be prepared through a review of records, through witness interviews, and through many interviews with the subject of the history, the defendant. While a partial history can be prepared by conducting witness interviews with family members and friends and reviewing records, in order for any such history to be complete, the defendant must be willing to work with the mitigation specialist. There are most assuredly childhood memories and events and names of potential witnesses that are only known to the defendant. Without the ability to meet with a defendant in order to prepare this history, mitigation themes cannot and will not be developed and effective assistance of counsel will be denied.

*Id.* at 553.

On the very same day this motion was filed, the trial court held a hearing on the motion. There was no colloquy with counsel about the motion. There was no indication that Mr. Gonzales was present. The only thing the court said about the motion was the following:

> THE COURT: We are here today for the purposes of considering the motion, the first amended motion to withdraw the attorneys. I have considered those motions, I have read your affidavits that you have filed and your motion is denied.

5 RR-R 3.

The trial took place nearly ten months after this hearing, and at no point between this point and the trial did the defense team develop any working relationship with Mr. Gonzales. He refused to see them and refused to assist them. He directed his family members and friends not to speak with members of the defense team, including the investigator and mitigation specialist. This led to even greater difficulty investigating mitigation than Nancy Piette's affidavit, *supra*, articulated. Mr. Gonzales did, however, occasionally seek the defense team's assistance with problems that arose at the Ector County Jail, in gaining access to things that made his life in jail a bit better, and in facilitating social and family contacts. The defense team

tried to respond to these requests, but was deeply frustrated by the situation.[6]  However, Mr.

Gonzales and the defense team never had a meaningful attorney/team-client relationship:  He

never "disclose[d] to counsel pertinent facts, events, and states of mind." TEX. CODE CRIM.

PROC. art. 46B.024(1)(B)  (setting out the capacities essential for a defendant to be competent to

stand trial).   Nor did he "engage in a reasoned choice of legal strategies and options."  Art.

46B.024(1)(C).

> G.     **The Trial Court Had Broad Knowledge of Mr.,  Gonzales' Mental Health
> History as Mr. Gonzales's Dysfunction in Relation to His Defense Team and
> Inappropriate Courtroom Behavior Was Unfolding on the Record**

The judge presiding over Mr. Gonzales's resentencing trial was the Hon. Bill McCoy,

District Judge for the 358th District Court of Ector County.   Judge McCoy also presided over

Mr. Gonzales's original capital trial in 1994-95.   As such, he heard the trial testimony of Dr.

Cunningham and Dr. Brinkman as they described Mr. Gonzales's life history and the mental

illnesses and brain impairments that he suffered, described *supra*, in sections A-C.   During

pretrial resentencing proceedings, Judge McCoy read motions and heard testimony that would

have served to refresh his recollection concerning that testimony, as well as alerted him to the

very real concern that Mr. Gonzales's Diabetes may have worsened his brain impairments since

the first trial.

On January 8, 2009, Judge McCoy held a hearing on the defense team's First Amended

Motion for Continuance.   9 RR-R 3.   Danalynn Recer, the lead mitigation specialist, testified

concerning the need for more time to conduct the mitigation investigation before the

resentencing trial began, noting a number of aspects of Mr. Gonzales's mental health history that

needed further investigation.   Initially, she referred to "Mr. Gonzales's extensive mental health

---

[6] This caused Leverett to write in his notes:  "D refuses to help me with his case – only thing he wants to discuss
with us are need for glasses, his mother's estate and argument w/ his sister over the house and his request for jail
manuals – he's treating us like his butlers – not his lawyers."

history and the number of mental health institutions he was in and out of prior to the case…." *Id.*

at 10.   She then explained that "he was evaluated numerous times by Texas officials and

diagnosed with very serious mental illnesses and placed on some serious psychotropic

medication, beginning in his childhood." *Id.* at 11.   Specifically, she testified as to the severity

of one of his diagnoses of mental illness:

> He was diagnosed beginning, I believe, around the age of 14 as schizophrenic,
> schizoaffective disorder, and has had multiple diagnoses over the years from
> various evaluations.   Borderline personality traits have been observed in him by
> virtually whoever has worked with him.   He has an extensive history of exposure
> to trauma, abuse and neglect and abandonment as a child that was noted in, again,
> Texas State records prior to the capital case.   Diagnosis of a schizoaffective
> disorder, which is really remarkable at the age of 13 or 14 because in these Texas
> Institutions, particularly state hospitals, they are seeing really the worst of the
> worst cases, they are very conservative in their diagnoses.   And a diagnosis of
> that severity in someone that young from one of those institutions is a remarkable
> thing that I don't see very often at all.

*Id.* at 12.   She subsequently noted that two mental health experts testified for the defense in the

first trial, "Dr. Cunningham, and … a neuropsychologist." *Id.* at 17.

Thereafter, on March 4, 2009, the defense filed Supplemental Briefing in Support of the

First Continuance Motion.   4CR-R 809-82.   This pleading systematically reviewed all of Mr.

Gonzales's mental health-related history.   By way of overview, the pleading explained,

> The defense team's investigation thus far suggests that Michael Gonzales's life
> history is comprised of a debilitating and damaging mix of severe child abuse,
> developmental delays, head injuries, poor school performance, abusive and
> ineffective institutional living, serious mental illness, and substance addiction.
> *See, e.g.,* 18 Tr. 94-144.

4-CR-R 14.   The citation was to Dr. Cunningham's testimony in the first trial.   The

pleading then reviewed each aspect of this history:

(a)       "Documentation of Michael Gonzales's mental health problems suggests that he

has long lived with a serious mental illness, repeatedly diagnosed as schizoaffective disorder.

Some of the symptoms of that illness have been auditory hallucinations, paranoia, and issues of aggressiveness. *See, e.g.,* 18 Tr. 120-21." 4 CR-R 11 (citing Dr. Cunningham's trial testimony).

(b)     "During a recent interview, one of the psychiatrists who prescribed Navane and Cogentin to Mr. Gonzales as a child [for Schizoaffective Disorder and Depression] indicated that the fact Mr. Gonzales improved while taking the medication is further indication he was suffering from Bipolar Disorder and not Depression, as it has since become accepted medical knowledge that Navane makes Depression worse and not better.   Unfortunately, however, Mr. Gonzales was medicated with Navane only briefly, and has not been properly medicated during his adult incarcerations, in part because of inappropriate reliance on the wrong diagnoses during his youth." *Id.* at 10.

(c)     "This case involves reports of Michael Gonzales sustaining several head injuries as a child, including various instances when he lost consciousness in fights or after serious accidents as a child.   18 Tr. 113-14.   And, as early as birth, when he was delivered using forceps, his head may have been damaged during delivery, resulting in lumps and grooves on his head.  18 Tr. 98." 4 CR-R 11 (citing Dr. Cunningham's trial testimony).

(d)     "The defense team's initial investigation suggests severe and unrelenting abuse of Michael Gonzales at his family's hands, and that he was forced to observe the abuse of his mother on a regular basis.  Some of the reports indicate that Michael's father routinely slapped him about the head when he was a small child, punch, slapped, backhanded him in the face, whipped him with a belt and a three-foot leather whip, while his older sister and friends bullied an punched him.   18 Tr. 103-04." 4 CR-R 17 (citing Dr. Cunningham's trial testimony).

(e)     "Hand-in-hand with the abuse Michael Gonzales experienced as a child was the fact that his father gave him alcohol to drink, and that his parents subsequently neglected to supervise him when he then graduated to the sniffing of toxic household products and the use of various illegal drugs.   18 Tr. 108-111."  4 CR-R 18 (citing Dr. Cunningham's trial testimony).

(f)     "Developmental delays are important on two fronts: 1) they may serve as evidence of brain or neurological damage that lasts a person's entire lifetime; and 2) the delays themselves may cause long-lasting psychological problems stemming from lack of self esteem and self regard.   Evidence indicates that as a child, Michael failed to achieve toilet training until the age of five, had a speech impediment, and coordination problems that caused him to fall into several clumsy accidents.   18 Tr. 98-100, 104."  4-CR-R 19 (citing Dr. Cunningham's trial testimony).

Finally, the pleading advised the trial court of the potentially serious implications of Mr. Gonzales's uncontrolled Diabetes:

> Mr. Gonzales is quite physically ill.   Although only 35 years old, he suffers from high blood pressure, Hepatitis C and Type II, insulin dependent, diabetes.   There are also indications that Mr. Gonzales' poorly controlled blood glucose levels would likely cause symptoms such as irritability, anxiety, memory loss, fatigue, mood changes and sometimes mental confusion, which are also symptoms of various mental health disorders such that the diabetes may have skewed the results of previous mental health evaluations.   Further, there are also indications that Mr. Gonzales' diabetes may have been so poorly controlled over such a period of time that it has actually caused permanent brain damage resulting in cognitive impairments and mood abnormalities.

*Id.* at 8-9.   With respect to this aspect of Mr. Gonzales's physical and mental health history, the defense attached the letter from Dr. Arturo Silva concerning the mental health and brain impairment consequences of uncontrolled Diabetes – the same letter that is referred to and quoted *supra*, in section E.

### H.    Mr. Gonzales Engaged in Inappropriate Courtroom Behavior During Trial

The last pretrial hearing before jury selection began was on March 27, 2009.   At the end of that hearing, defense counsel informed the court that they had told Mr. Gonzales they would have civilian clothing for him to wear during the trial, since such clothing would make a better appearance before the jury, and Mr. Gonzales told them he was not going to wear any clothing they brought to him.   12 RR-R 40-42.

Jury selection began on April 1, 2009.   Toward the end of that day, after Judge McCoy asked counsel if they were satisfied with the exemptions claimed by prospective jurors, Mr. Gonzales blurted out, "Fuck you, you punk ass mother fucker.   What kind of attorney are you, man?" 13 RR-R 95.   When given the chance to explain what had happened, Leverett, stated:

> Your Honor, that was brought about by the defendant just now asking -- telling me he wanted a shuffle and I told him that the time to have requested a shuffle had since past.   His response to me was, "you didn't tell me that."
>
> I responded to him, you told us that you were not going to acknowledge us as your lawyers previously.   That is what brought on that outburst.   I wanted to make it clear on the record of whatever prompted that exchange and we respectfully request a mistrial at this time, Your Honor.

*Id*. at 98.   The court denied the request for mistrial but did grant a jury shuffle.

While there were no other outbursts or any other disruptive or self-destructive behavior by Mr. Gonzales noted on the record of the jury selection proceedings, there was at least one occasion on which an observer noted the following about Mr. Gonzales's appearance and demeanor:

> Mr. Gonzales had not dressed in street clothes for jury selection.   He was still wearing the tan outfits of non-rip clothing provided by the Ector County Jail.   He was wearing white socks and jail slippers.  Visually, Mr. Gonzales' dress appeared to be unconcerned with any impression that it would make on the jury insofar as his clothes looked like an inmate's clothes….

Mr. Gonzales is, at any time, a large man.   I originally met him in November or December of 2007 at the Ector County Jail with Danalynn Recer.   Mr. Gonzales was carrying a substantial amount of extra weight at that time; on the date of jury selection, Mr. Gonzales appeared to be carrying more weight than he had before. I estimate that he weighed 280 lbs. to 300 lbs.   I believe that his head looks extremely large.   Because of the extra weight and his large head, Mr. Gonzales was physically an imposing figure on April 9th.   Additionally, his eyes did not appear to be substantially open; this was no different than the first time that I met him.   He was not wearing glasses.

Although he was not dressed out for court, Mr. Gonzales did nothing additional to cover his tattoos.   The tattoos on his face, neck and both arms were clearly visible to anyone who could see him in court.

In essence, Michael, based solely on his physical appearance while sitting at counsel table, appeared to be a large, intimidating man.   He appeared to be entirely separated from his defense.

This physical appearance described above was amplified by Mr. Gonzales' mannerisms in the court room.   He rarely paid attention to or focused on the questions that his team or the prosecution asked.   He frequently looked at his paper and appeared to be drawing something on a notepad during most of the question[s].

Exhibit 2 (Email from Robert Cowie to the Gulf Region Advocacy Center, Apr. 5, 2009).

Mr. Cowie further observed the following:

During the first prospective juror in the afternoon, members of the victims' family were sitting in the first row of seats in the gallery behind the prosecution team. Mr. Gonzales shaped his fingers like a gun and pointed his fingers at either the victims' family or at one of the Ector County deputies who was in the courtroom. He then pretended as if he were pulling the trigger.   Because Mr. Gonzales, the family members, and the deputy were sitting in a straight line, it was not possible to tell whether Mr. Gonzales was pointing his finger at the deputy or at the victims' family.   I do not believe that the prospective juror, who was successfully challenged for cause by the defense, could see Mr. Gonzales' action.   However, had there been any jurors in the box, they would have absolutely been able to see this motion.

*Id.*

After the jury was selected, trial began on May 4, 2009.   Before its formal

commencement, trial counsel again made a record that Mr. Gonzales refused to wear the civilian

clothing they had brought him. 27 RR-R 6. In this same moment, the prosecutor informed the

court that Mr. Gonzales had told security personnel he was going to disrupt the trial. 27 RR-R

7. Later that day, when the prosecution called Mr. Gonzales's former wife Martha Reyes as a

witness, Mr. Gonzales spoke out:

> THE DEFENDANT: If she don't want to testify, leave her alone, man. That's my wife. She has the right to plead the Fifth Amendment. She don't got to testify against nobody. You are harping her, man. You are fucking with her mind. Leave her alone. She don't want to testify.
>
> THE COURT: Retire the jury.
>
> (Jury retired from the courtroom.)
>
> THE DEFENDANT: See how you got her all emotional. You ain't got to testify, Martha. Don't let them get in your head. You have got the right to keep the Fifth Amendment. You should be ashamed of yourself, man.
>
> THE COURT: Now, where are we?
>
> MR. MAU: Ms. Reyes has told me that she is frightened, that she is scared of the defendant, and I think she-
>
> THE DEFENDANT: Goddamn right she is scared because y'all put her in that fucking position, man. Just leave her alone. She don't want to testify.

27 RR-R 55. Thereafter, Reyes informed the Court she was willing to testify.

Toward the end of Reyes's testimony, the following occurred, after Reyes testified about

a man named Daniel Lugo, who had been killed before the trial:

> THE DEFENDANT: Same thing's gonna happen to you, bitch. I'm gonna fucking have somebody kill your ass.
>
> MR. MAU: Judge --
>
> THE BAILIFF: Everyone please rise. Please rise.
>
> (The jury retired from the courtroom.)
>
> THE DEFENDANT: You fucking shit on your own, dumb-ass. Watch. 102 apartment, watch.

THE DEFENDANT: No sense in crying now.

THE COURT: All right.  We will be in recess.

27 RR-R 83-84.

Once the jury was out of the courtroom, the following colloquy ensued between Judge

McCoy and Mr. Gonzales:

THE COURT: You have continually interrupted the proceedings of the Court.

THE DEFENDANT: Yes, I have.

THE COURT: And I am going to once again ask you--

THE DEFENDANT: You warned me a while ago if there were any outbreaks, I
would be removed from the courtroom and you were going to gag me.  I already
said what I had to say so you have one or two things you can do, remove me from
the courtroom or gag me.

THE COURT: You are absolutely right, you have a grasp on it.  So the only way
that you are going to get to remain in here is that if you promise the Court that
you are going to sit there and quietly conduct yourself in that manner.  Are you
willing to tell me you are going to do that?

THE DEFENDANT: I would lie to you if I tell you no.

THE COURT: Okay.  So you're going to tell me you are going to continue to
create problems and –

THE DEFENDANT:  No, I am not saying that either.  I am just saying that
whenever my blood rises I speak my mind.

THE COURT:  Okay.

THE DEFENDANT: Now, I cannot say I am going to be quiet, I cannot say I
ain't going to be quiet.

THE COURT: All right.  Then --

THE DEFENDANT:  Now, you can gag me.  That's fine with me.

THE COURT: Okay. I am going to tell you once again, the next outburst, then the Court will take whatever measure that it deems proper to insure that you will stop interrupting the Court.

THE DEFENDANT: You can gag me right now. I am fine with it.

27 RR-R 87-88.

Thereafter, toward the end of the first day of trial, the prosecutor was presenting the testimony of a fingerprint examiner. When he asked the witness whether certain fingerprints "matched, in your opinion, as a --," 27 RR-R 223, Judge McCoy interrupted, and the following colloquy took place:

THE COURT: Do you want to introduce those?

MR. MAU: Mr. Leach has suggested that he wants to do something else before we actually introduce them.

(Proceedings at the bench out of the hearing of the jury.)

MR. LEACH: I was not going to get to her fingerprint testimony or require them to print Mr. Gonzales. There are documents though that we need to review prior to saying publish them to the jury.

THE COURT: That is fine.

MR. MAU: I was going to have her print Gonzales but given the way he has been acting today –

MR. LEACH: Yeah. And I think to try to create another extraneous offense, I am just trying to review those documents before they are published to the jury.

MR. MAU: I just want to get through this testimony now and we will deal with it.

27 RR-R 222-23.

On the second day of trial, May 5, 2009, Mr. Gonzales engaged in two self-destructive behaviors. First, when the prosecution focused on a letter Mr. Gonzales had written in which he said "dead men tell no tales," 28 RR-R 83, Michael blurted out, "That's right." *Id*. Second, when a correctional officer was asked if he could identify Michael, he answered, "The man over

there shooting me the California howdy." 28 RR-R 94 (referring to Michael giving him the middle finger).

On the fourth – and last – day of trial, May 7, 2009, defense counsel announced to the court at the beginning of the day that they would put on no further witnesses other than Mr. Gonzales. The reasons were explained by Leach:

> MR. LEACH: My name is Jason Leach. I am one of Michael Dean Gonzales's attorneys in this matter. I have dealt with Mr. Gonzales since approximately July, 8 2007. Throughout the course of my representation of Mr. Gonzales he has been angry, hostile and upset at both myself and Mr. Leverett and any member of the defense team. He has continuously instructed us to not put on a defense for his case. Almost immediately from the commencement of my representation and throughout the past 17, 18 months, Mr. Gonzales has been sitting next to me throughout voir dire proceedings and throughout the majority of the trial. The only time I have not sat next to Mr. Gonzales is those times during which I was conducting some type of examination. Mr. Gonzales has been upset with me in the past. I am familiar with him when he gets upset. He has been upset sometimes during voir dire proceedings and sometimes during this week during the trial. Specifically, when his wife was attempted to be called as a witness, he had an outburst in court. He again had a subsequent outburst in court. On both of those occasions Mr. Gonzales was removed from the courtroom and later returned to the courtroom to remain in the courtroom throughout these proceedings.
>
> It is the defense's intention or it was the defense's intention to call his sister or half sister, Michelle Payne, this morning as a witness and also to call his daughter, Unica Gonzales, a 16 year old minor child, both of whom have traveled from Oklahoma to testify in this case on their father's and half brother's behalf. We had previously been informed by Mr. Gonzales that we could not do that. He was adamant about that yesterday. Mr. Gonzales was more adamant than usual about that.
>
> Out of an abundance of caution Mr. Leverett and I spoke with him this morning. He said he would create a disturbance if we were to call his daughter, and then informed the Court accordingly, reached an agreement with the State of Texas to have his daughter draft a letter and enter that into the record.
>
> At the suggestion of someone, I went back and again spoke with Mr. Gonzales. I was by myself at the time. At this time I noticed Mr. Gonzales to be in a state of much more highly agitated than I have seen him in the last 17 or 18 months. I informed him of the desire to continue to call Michelle Payne, to call our expert on his behalf, and to have his daughter write a letter that would be read to the

jury. Mr. Gonzales specifically stated to me that he would go for a firearm and he would create a disturbance. He would rather be shot in the courtroom than to have anybody ask for help for him. He exhibited an emotional state that I have not seen in the 17 to 18 months that I have represented him. I am familiar with Mr. Gonzales and many occasions is somewhat of a bluffer, bolsterer or bully. I did not take his statements this morning to fall under any of those categories. I took his statements to be a serious representation of his intentions to act out in court should we proceed with calling any of these witnesses.

30 RR-R 3-5. Thereafter, the defense called no witnesses other than Mr. Gonzales, and only because he insisted on being called. *See* Section I, *infra.*

The final two incidents occurred during the prosecutor's closing argument. The prosecutor was referring to Mr. Gonzales's outburst during Martha Reyes's testimony and the following occurred:

THE DEFENDANT: Goddamn right. It is a goddamn shame when you got her up there.

MR. MAU: With that, ladies and gentlemen --

THE DEFENDANT: You know goddamn well if she would have fucking incriminated herself, y'all would have charged her ass.

MR. MAU: Your Honor, I would like the defendant admonished, please.

THE DEFENDANT: That is more fucked up about it. How y'all are going to get a woman up there and incriminate herself like that and y'all don't charge her, that is a goddamn lie. Y'all know it, man. Y'all know the law. Look it up.

THE COURT: Go ahead.

THE DEFENDANT: It is more fucked up when y'all tell the jury that.

MR. MAU: Ladies and gentlemen, you tell Martha Reyes that him having a cell phone in the jail is no big deal. You tell Martha Reyes that the defendant who has told her he is going to have somebody kill her, you saw him, you were present when he committed that crime. You tell her that having a cell phone in the - having a cell phone in the jail is nothing we should be worried about.

THE DEFENDANT: Buy it off of commissary.

30 RR-R 43-44.

33

Also during closing arguments, Michael displayed to the jury a picture that he had drawn of a clown holding a dagger.[7]

**I.** **Mr. Gonzales Insisted on Testifying and in his Brief Testimony, Told the Jury They Could Sentence Him to Death Because It Made No Difference to Him**

At the conclusion of the defense case, Michael was called as a witness, and he testified as follows:

Q. You have advised Mr. Leach and I that you want to address the jury, want to testify in your case; is that right?

A. I won't say so much as address the jury but I wanted to get on the stand, give the prosecution a shot at me.

Q. Is there anything you want to tell this jury?

A. Yeah. Y'all can fucking kill me. Makes me no fucking difference. Pass the witness.

MR. MAU: No questions, Your Honor.

THE COURT: Okay, Mr. Leverett.

THE DEFENDANT: No, man, I told you yesterday why do I want your fucking assistance, man? You won't listen to me.

MR. LEVERETT: Your Honor, the defense rests at this time.

30 RR-R 9.

**J.** **On the Day After He Was Resentenced to Death, Mr. Gonzales Purported to Waive the Appointment of State Habeas Counsel and State Habeas Proceedings**

On May 8, 2009, the day after the conclusion of his capital resentencing trial, the trial court held a hearing to appoint direct appeal and state habeas counsel for Mr. Gonzales. At this

---

[7] Nothing was noted in the record about this, but defense counsel Woody Leverett described this incident to current counsel for Mr. Gonzales.

hearing, Mr. Gonzales was no longer represented by trial counsel, nor was he provided the assistance of other counsel.[8]

When asked if he was going to hire a lawyer, Mr. Gonzales responded, "No. I would like the record to reflect I want to waive all my appeals and will [sic] have execution set as soon as possible." 31 RR-R 3. The trial court responded, "Well, that is fine," *id*., then went on to explain that since direct appeal was mandatory he was appointing a lawyer for that purpose. *Id*. Then the following colloquy ensued:

> THE COURT: .... The other thing I need to inquire into about is also from what you have just said, it indicates that, I think – I guess I know what the answer is, but you are entitled for an attorney to file a Writ of Habeas Corpus in addition to the attorney for the appeal. Now, do you wish that to be done? Do you want an attorney?
>
> THE DEFENDANT: I don't want no appeals filed on my behalf.
>
> THE COURT: All right. So you do not want an attorney?
>
> THE DEFENDANT: No.
>
> THE COURT: For the habeas corpus hearing?
>
> THE DEFENDANT: I don't want no attorney, period.
>
> THE COURT: Well, as I say, the appeal is mandatory. The law requires it. On the habeas corpus, you may proceed pro se if you decide to or I will appoint you an attorney, whatever you tell me you want to do.
>
> So do you want an attorney for the Writ of Habeas Corpus?
>
> THE DEFENDANT: I don't want no attorney, period.

31 RR-R 3-4.

---

[8] Despite the court reporter have noted in the transcript of this proceeding, 31 RR-R 2, that trial counsel appeared for Mr. Gonzales, they did not. In interviews with trial counsel during the course of preparing the Amended Petition for Writ of Habeas Corpus, trial counsel informed undersigned counsel that they had been relieved of their representation of Mr. Gonzales by the time the hearing took place and they did not appear at the hearing.

The trial court did not ask any questions of Mr. Gonzales about his understanding of the habeas corpus process or advise him of the potential consequences and dangers of foregoing counsel and habeas appeals. Nor did the court ask any questions which would enable it to make a determination as to whether Mr. Gonzales's refusal of counsel or his decision to forego counsel and habeas proceedings and be executed was the result of an impaired mental condition or the result of a knowing, intelligent, and rational decision. Since Mr. Gonzales was not represented at the hearing, he did not have the benefit of any advice from the court or counsel regarding the significance of a habeas corpus proceeding or how and whether he could change his mind with respect to the appointment of counsel and/or the habeas proceedings. Neither the trial court nor the prosecutor made any inquiry related to Mr. Gonzales's competency to waive habeas counsel or his habeas appeals.

No other hearing was conducted. On June 22, 2009, in response to a letter of the same date from the Court of Criminal Appeals inquiring about the record regarding the non-appointment of an Article 11.071 attorney. The trial court simply completed a form regarding the right to Article 11.071 habeas counsel, stating:

> 5. The defendant refused to accept a writ of habeas corpus attorney.
>
> 6. The defendant's election not to accept an appointed attorney and proceed pro se was intelligent and voluntary.

5 CR-R 1144. At the time of this inquiry from the Court of Criminal Appeals, Mr. Gonzales had been returned to the custody of TDCJ, and he was not brought back for a hearing on the intelligence and voluntariness of his waiver of counsel. The form that the court filled out was not served on Mr. Gonzales.

On November 10, 2010, the CCA issued an order finding that if Mr. Gonzales had chosen to file an application for habeas corpus relief, his application would have been due on October 4,

2010, and as of October 15, 2010, no application had been filed. The CCA held that because Mr. Gonzales had previously "expressed desire to waive his appeals, the lack of any vacillation of that waiver appearing in the record, [and his] failure to timely file an application," he had waived his right to initial review of an Article 11.071 habeas application, and any future application filed by him or on his behalf would be considered a subsequent application in accordance with the provisions of Article 11.071 § 5. *Ex parte Gonzales*, No. WR-40,541-03 (Tex. Crim. App. Nov. 10, 2010) (not designated for publication).

### K. A Recent Retrospective Evaluation of Mr. Gonzales's Competence to Stand Trial in His Resentencing Trial by Dr. Mark Cunningham Has Determined that Mr. Gonzales Was Incompetent to Stand Trial

Dr. Mark Cunningham has conducted a recent retrospective evaluation of Mr. Gonzales's competence to stand trial in his resentencing trial. Dr. Cunningham is the psychologist, referenced in numerous sections of the statement of material facts common to all the competence claims, *supra*, who evaluated Mr. Gonzales to determine the presence of mitigating circumstances in connection with his original capital trial in 1994-95. To evaluate Mr. Gonzales's resentencing trial competence, Dr. Cunningham reviewed the materials referenced in sections A-J, *supra*. In addition, he conducted a nearly four-hour clinical interview of Mr. Gonzales on October 10, 2013 at the Polunsky Unit of the TDCJ. Based on the information obtained from these sources, together with the information he already had from his assessment of Mr. Gonzales in 1995, Dr. Cunningham reached the provisional conclusion that Mr. Gonzales was incompetent to stand trial in his resentencing proceeding.[9] Exhibit 3 (Declaration of Dr. Mark Cunningham).

---

[9] Dr. Cunningham's conclusion is provisional, because, as he explains in his declaration, "the Court has not approved the expenditure of time that it would take for me to be certain that there is no information, with which I am not now familiar, that would cause me to reach a different conclusion. The standards of my profession require that I

Dr. Cunningham identified a paranoid delusional process in Mr. Gonzales that was at the core of his incompetence to stand trial.   As he explained,

> Mr. Gonzales' thought processes did not demonstrate disorganized features of circumstantial and/or tangential speech, and/or loosened associations that are often observed in persons who are overtly psychotic.  However, broad paranoia was exhibited as Mr. Gonzales was queried regarding case-related interactions with defense counsel and others, with his having concluded, from limited interaction and thin data, that these persons had malevolent intent toward him.  Similarly, it took little for Mr. Gonzales to perceive a conspiracy.  As Mr. Gonzales described the malevolent intentions of his defense team to return him to death row, it was clear that once these perceptions had formed, they were rigidly adhered to and were quite impervious to additional data or alternative perspectives.  These perceptions remain rigidly in place at present, with no evidence of reflection or reconsideration during the intervening four years.  The thin basis for his perceptions of malevolent intent and his rigid adherence to these beliefs, once formed, mark them as delusional.

Exhibit 3 at 4.

Dr. Cunningham's observation of this paranoid delusional process in Mr. Gonzales was confirmed by his own experience with Mr. Gonzales during the clinical interview on October 10, 2013:

> This same paranoid vulnerability/reactivity ultimately characterized Mr. Gonzales' response to me as well.   To explain, Mr. Gonzales was generally cooperative with and responsive to my inquiry for several hours.   His manner was somewhat wary, however, and he refused to answer some questions that would have seemed innocuous.   For example, when I inquired about what communications he had with family while pre-trial at the Ector County Jail 2007-2009, he responded that he had no family, i.e., "they are dead to me."  When the query was revised to persons with whom he shared genetic heritage, whether or not he still considered them "family," he reiterated that they were dead to him and he would not discuss them.   There was an undercurrent of brittle reactivity in Mr. Gonzales, that had I pressed him on obtaining this history or challenged him in other respects, he would have precipitously viewed me as malevolent, reacted in anger, and ended the interview.   Maintaining rapport and his cooperation with the evaluation was thus a delicate enterprise of treading very carefully.   It should be emphasized that the undercurrent of brittle reactivity did not seem to be an outgrowth of Mr. Gonzales intending to be intimidating or attempting to control

---

undertake a review of all relevant [information] sufficient to be assured that there is no other information that would cause me to question my conclusions. I have not yet been able to complete that review." Exhibit 3 at 17.

the evaluation. Rather, that he simply possessed little control over his interpersonal perceptions and reactions.

… Despite taking pains not to challenge him and to postpone topics that he was unwilling to discuss, Mr. Gonzales ultimately reacted to me with the paranoia that typified his reaction to trial counsel 2007-2009. Approximately 3 ½ hours into the interview, I queried Mr. Gonzales regarding differences in his feelings and demeanor at his original sentencing phase in 1995 and his re-sentencing in 2009. Answering this query was, of course, more cognitively complex and dependent on insight than the direct queries of historical information that had constituted much of the interview. Not understanding or not having sufficient insight to answer the question, Mr. Gonzales became visibly angry and accused me of asking him a "trick question." Once this response was ignited, it quickly expanded into an allegation that I had been asking "trick questions" throughout the interview. Mr. Gonzales would not allow Ms. Welch or me to seek clarification from him about his reaction or explain the rationale for the question. Similarly, my apology for inadvertently offending had no impact – as Mr. Gonzales insisted that this query and others had been deliberately fashioned to misrepresent his status. Reaching even further to support my having malevolent intent, Mr. Gonzales additionally asserted that I had deliberately disrespected him in my trial testimony in 1995. Mr. Gonzales then ended the interview. I did not make additional efforts to engage him, as it was clear this was both pointless and would doubtless serve to further escalate his anger.

*Id.* at 5-6.

Having made this critical set of observations, Dr. Cunningham then framed the

competence inquiry as follows:

That Mr. Gonzales did not have a functional relationship regarding his case with his defense counsel, Woody Leverett, Esq. and Jason Leach, Esq., 2007-2009, and that his trial behavior was self-destructive in terms of making a death sentence more likely, is well-established by the trial record. The critical issue is whether he *lacked the capacity* to relate to counsel with a reasonable degree of rational understanding, or simply *chose* not to.

*Id.* at 6.

The answer to this question is that Michael Gonzales *lacked the capacity* to relate to

counsel with a reasonable degree of rational understanding:

From my observation, Mr. Gonzales had little or no control over the rapid assertion of paranoid perceptions and associated precipitous escalation of anger in the concluding minutes of my interview with him. This irrational response

appears to have been identical to his paranoid perceptions and aggressive rejection of defense counsel 2007-2009.   Importantly, this reaction to me was triggered under much less stressful circumstances than he faced in relating to trial counsel.   His life context was in the more familiar environs of the Polunsky Unit, rather than the Ector County Jail.   There was no pending death penalty trial.

*Id.*

Dr. Cunningham then noted that "[a] number of factors are present that are consistent with a conclusion that Mr. Gonzales was *unable* to, rather than *chose* not to, relate to defense counsel with a reasonable degree of rational understanding."   *Id.*

First, Mr. Gonzales' paranoid and conspiratorial perceptions were most intense, but not limited to Woody Leverett.   He also viewed co-counsel, Jason Leach; mitigation investigators, Nancy Pieta [sic], Danalynn Recer, and Neil Hartley, as dishonest and having malevolent intent toward him.   In each case, his description of the basis for this belief was quite thin for the certainty of his attitude, with no recognition or incorporation of data demonstrating benevolence and no need to specify a coherent motive, e.g., how would it serve the interests of the mitigation investigators to return him to death row?

Second, contemporaneous with the sentencing re-trial, Mr. Gonzales broke off his relationship with Kay Bandell, a longstanding close pen-pal friend, because she had communicated with the mitigation investigator without advising him…. Mr. Gonzales has also severed his relationships with family members, so much so that he rigidly holds to a posture that he will not even speak of them.

*Id.* at 7.

The final set of factors that confirmed Mr. Gonzales's inability to relate to counsel is that "the delusional process that was at the core of Mr. Gonzales's interactions with his defense team was a product of three long-documented mental disorders."   *Id.*   These were:

(a)     A severe mood disorder or disorders associated with psychotic symptoms from at least the time Mr. Gonzales was sixteen years old:

When Mr. Gonzales was sixteen years old and in the custody of the Texas Youth Commission, he was evaluated by a TYC psychiatrist for complaints of paranoia and auditory hallucinations, as well as episodes of explosiveness and aggressiveness.   That pattern of behavior was observed for more than a year, continuing until Mr. Gonzales was released from TYC.   Both this psychiatrist and

another TYC psychiatrist, who saw Mr. Gonzales in a different institution several months later for the same symptoms, diagnosed Mr. Gonzales as suffering from Schizoaffective Disorder, a disorder involving a combination of a major depression and psychosis (schizophrenia spectrum symptoms). Mr. Gonzales' diagnosis was subsequently revised to Bipolar Disorder. Mr. Gonzales was treated with an anti-psychotic medication, Navane. Both Schizoaffective Disorder and Bipolar Disorder may be associated with psychotic misperceptions and delusions. Mr. Gonzales' paranoid misperceptions and delusions continued to plague him during his incarceration on death row following his first trial, during the 2007-09 retrial, and into the present in the same way: He misperceives someone as trying to harm him, he concludes that the person has conspired to do so, and any further contact with that person often catapults him into angry outbursts and other behaviors triggered by the need to protect himself from a perceived threat.

*Id.* at 8.

> (b)     Brain impairments that compounded the behavioral problems created by

his mood disorders:

> In my previous declaration to this Court, in my 1995 trial testimony, and in the 1995 trial testimony of neuropsychologist Dr. Sam Brinkman, a second mental disorder suffered by Mr. Gonzales has been described: impairments in the functioning of his brain that appeared to be the product of neurological deficits he suffered from a series of neurological insults, including prenatal/birth factors; abuse of alcohol, inhalants, and other drugs from early childhood, and numerous closed head injuries. Relevant to Mr. Gonzales' competence, the impairments stemming from the above caused Mr. Gonzales to be labile, or easily provoked by low level of provocation; disinhibited, or engaging in impulsive behaviors that normal inhibitions would ordinarily constrain; aggressive; and paranoid. In his testimony, Dr. Brinkman detailed that Mr. Gonzales suffered from impairment of the brain's "executive processes." Dr. Brinkman testified that these processes are the "planning and control centers for the brain." Volume 18 of the 1995 Trial Transcript, p. 78. When there is dysfunction in the brain's executive processes, the:

>> most common symptoms … would be memory disorder, disturbance of attention, and then disturbance in complex behaviors, such as inhibition of impulses, a knowledge of the social appropriateness of one's behavior, relevancy of behaviors, the ability to look at a problem from different standpoints and not become highly rigid in one's thinking, and this sort of thing.

> *Id.* at 79. Thus, it appears that Michael's brain impairments work in tandem with his paranoid psychotic processes.

Exhibit 3 at 8-9.

> (c)  Post-Traumatic Stress Disorder (PTSD):
>
> Relevant to his trial competence, PTSD causes Mr. Gonzales to re-experience the repeated trauma of his childhood when various events and interactions trigger the past trauma.  One of the ways in which this happens is when Mr. Gonzales feels disrespected or threatened.  He is extremely sensitive to these feelings, and when he feels them, he over-reacts to whatever the triggering behavior has been and quickly loses control.  In combination with his mood disorder and brain impairment, Mr. Gonzales has little capacity to restrain, redirect, or even reflect upon his reaction.

*Id.* at 9.[10]

**Claims Related
to Competence for the Resentencing Trial**

**I.  MR. GONZALES'S RESENTENCING TRIAL VIOLATED DUE PROCESS BECAUSE HE WAS INCOMPETENT TO STAND TRIAL.**

"The conviction of an accused person while he is legally incompetent violates due process." *Bishop v. United States*, 350 U.S. 961 (1956).   Four years after *Bishop*, in the context of a federal prosecution the Supreme Court articulated the test of competence to stand trial that has stood the test of time: "whether a criminal defendant 'has sufficient present ability to consult with his lawyer with a reasonable degree of rational understanding—and whether he has a rational as well as factual understanding of the proceedings against him.'"  *Dusky v. United States*, 362 U.S. 402 (1960).   In *Drope v. Missouri*, 420 U.S. 162 (1975), the Court reiterated the constitutional prohibition against trying incompetent criminal defendants in the following terms:

> It has long been accepted that a person whose mental condition is such that he lacks the capacity to understand the nature and object of the proceedings against

---

[10] Dr. Cunningham also noted that Mr. Gonzales's Diabetes, uncontrolled for six years by the time he went to trial in 2009, "may have exacerbated his pre-existing mental disorders" due to the possibility that the Diabetes itself may have produced two mental illnesses Mr. Gonzales *already suffered*:  "cognitive impairments and mood disorders." *Id.* at 10.  Dr. Cunningham noted that evaluation by a qualified medical expert must be undertaken to determine the extent to which Diabetes may have contributed to Mr. Gonzales's incompetence.  *Id.*

him, to consult with counsel, and to assist in preparing his defense may not be subjected to a trial.

*Id*. at 171

Mr. Gonzales "lack[ed] the capacity … to consult with counsel, and to assist in preparing his defense" during resentencing trial proceedings between 2007 and 2009 in Ector County. Because he was nevertheless tried, his trial resulting in a new capital judgment violated due process.

As the preceding statement of material facts makes clear, Mr. Gonzales lacked the capacity to consult with counsel and to assist in preparing his defense, because his underlying mental disorders – Bipolar Disorder with psychotic features, Posttraumatic Stress Disorder (complex type), Cognitive Disorder NOS, and Paranoid Personality Disorder with antisocial features, Exhibit 3 at 14 (Declaration of Dr. Mark Cunningham) -- combined to cause him to develop paranoid delusions concerning his defense team, which then caused him not to work with or in any way relate to his lawyers and investigators on matters of his defense.   Exhibit 3 at 6-7.   The disorders and the delusions they produced in turn caused Mr. Gonzales to be "overwhelmed by his paranoid mistrust of lawyers and the legal process, and [his] associated experience of anger and futility."  *Id.* at 12.   His "psychological defense to these mental illness-driven beliefs and reactions was to disengage as completely as he could from the legal process," *id.*, and to behave during trial – to his great detriment -- as if the sentence at issue did not matter to him.

In reaching the conclusion that Mr. Gonzales was incompetent to be tried during the resentencing trial proceeding, Dr. Cunningham utilized the framework that the Texas Code of Criminal Procedure has set out for the evaluation of competence to stand trial.   Article 46B.024 enumerates factors to be considered in such an evaluation, including the following:

(1)  the capacity of the defendant during criminal proceedings to:

    (A)  rationally understand the charges against the defendant and the potential consequences of the pending criminal proceedings;

    (B)  disclose to counsel pertinent facts, events, and states of mind;

    (C)  engage in a reasoned choice of legal strategies and options;

    (D)  understand the adversarial nature of criminal proceedings;

    (E)  exhibit appropriate courtroom behavior; and

    (F)  testify;

. . . .

(4)  the degree of impairment resulting from the mental illness or mental retardation, if existent, and the specific impact on the defendant's capacity to engage with counsel in a reasonable and rational manner….

After explaining the core paranoid delusional process that rendered Mr. Gonzales incompetent, Dr. Cunningham analyzed Mr. Gonzales's capacity to perform the competency-derived tasks identified in Article 46B.024.

With respect to Mr. Gonzales's capacity to rationally understand the charges and the potential consequences of his resentencing trial, Dr. Cunningham found that "Mr. Gonzales revealed a rational understanding of the charges against him and the death penalty jeopardy that he faced."  Exhibit 3 at 11.   However, with respect to the factors related to Mr. Gonzales's capacity to consult with counsel and assist in his defense, Dr. Cunningham found serious incapacity.

As to Mr. Gonzales's capacity to "disclose to counsel pertinent facts, events, and states of mind," Dr. Cunningham found as follows:

Mr. Gonzales' rigidly-held paranoid perceptions regarding defense counsel prevented him from disclosing pertinent facts, events, and states of mind.  More specifically, after concluding that defense counsel and mitigation investigators had lied to him, were not adhering to his ill-advised case directives, and thus were

participating in a conspiracy with the State and the Court to return him to death row, he refused to discuss with them historical information, experiences, and symptoms that could have informed mitigation at capital sentencing.

*Id.*

With respect to Mr. Gonzales's capacity to "engage in a reasoned choice of legal strategies and options," Dr. Cunningham found as follows with respect to trial proceedings:

Mr. Gonzales was unable to engage in a reasoned choice of legal strategies and options regarding how he could best be defended at sentencing. His paranoia-driven refusal to discuss case-related issues with his defense attorneys deprived him of the benefit of their counsel regarding available strategies and the implications of these. Mr. Gonzales' limited intellectual ability and neuropsychological deficits resulted in his having poor capacity to independently reason through the available legal strategies and options in the absence of information and advice from counsel, and to rigidly hold to idiosyncratic perceptions once these had formed. To illustrate, Mr. Gonzales rigidly asserted pretrial and in my interview of him that the re-sentencing trial [should] showcase inmates currently confined in TDCJ who would be subpoenaed to provide testimony regarding the day-to-day experience of prison. This testimony was to be offered in lieu of evidence regarding the extensive adverse and impairing factors in his background, as well as in lieu of expert testimony regarding future dangerousness. Mr. Gonzales exhibited no insight that this inmate testimony would be largely, if not entirely, irrelevant to the sentencing considerations before the jury, as well as likely inadmissible. Further, he expressed no insight that the content and impact of such testimony was unpredictable at best. Instead, the reluctance of defense counsel to endorse this strategy was viewed as evidence that they were "against" him.

*Id.* at 1-12. As to Mr. Gonzales's waiver of state habeas counsel and proceedings, Dr. Cunningham found that

[t]hese same deficits led to his waiver of counsel for habeas proceedings, and the habeas proceeding itself, on the day after the trial ended. At that point, Mr. Gonzales was still driven by the strong emotions and paranoid delusions that had characterized much of the preceding two years and could not make a knowing and intelligent decision regarding his options. He was overwhelmed by his paranoid mistrust of lawyers and the legal process, and associated experience of anger and futility. He also labored under cognitive and neuropsychological impairments reducing his ability to reflect on his options or consider that his immediate sense of anger/futility might not be his posture in the months or years to come. As with interfacing with counsel regarding his case, Mr. Gonzales' psychological defense

to these mental illness-driven beliefs and reactions was to disengage as
completely as he could from the legal process.

*Id.* at 12.   Dr. Cunningham explained more about Mr. Gonzales's efforts to disengage himself

from the legal process:

> It is important to view both Mr. Gonzales' state habeas waivers and his pretrial
> statements, and indeed his trial testimony, in this context.  He did not waive state
> habeas counsel and proceedings, invite the court to re-impose his death sentence
> in various pretrial proceedings, and invite the jury to resentence him to death in
> his trial testimony because he no longer wanted to live.  Indeed, he apparently
> came back to Ector County wanting to avoid another death sentence,
> demonstrated by his interest early on in having Mr. Lanier appointed as his
> mitigation specialist.  When he came to believe his defense team was conspiring
> to have him sentenced to death again and the court refused to get rid of his
> defense team, his psychological defenses compelled him to disengage from legal
> proceedings and behave as if the proceedings did not matter.  His paranoid
> mistrust of counsel and the legal process, the anger that this generated, and
> his sense of futility at being able to make anything be different caused him to do
> what he could to get the process over with.  He was seeking relief from the
> psychic pain he felt, not his death.

*Id.* at 12-13.

With respect to Mr. Gonzales's capacity to "understand the adversarial nature of criminal

proceedings," Dr. Cunningham found that

> Mr. Gonzales recognized that he was in a context of the State seeking the death
> penalty against him.  However, he did not recognize it as adversarial in terms of
> there being a countering advocate (i.e., defense counsel) who was seeking his best
> outcome or a neutral court overseeing the process.  Rather, his understanding was
> distorted by delusional beliefs that his trial counsel and the court were
> conspiratorially allied with the State in seeking to return him to death row.  Mr.
> Gonzales' cognitive concreteness, with associated dichotomous appraisals, render
> him unable to understand that counsel could decline to follow his ill-advised
> directives and could even find him difficult/unlikable, and still vigorously defend
> him.

*Id.* at 13.

As to Mr. Gonzales's capacity to "exhibit appropriate courtroom behavior," Dr.

Cunningham found as follows:

Mr. Gonzales' control over his demeanor, emotional reactions, and verbalizations is quite tenuous. His trauma history leaves him exquisitely sensitive to feeling disrespected or threatened. His cognitive limitations exacerbate these tendencies as he has difficulty integrating complex information on-the-fly or under stress, then projects the associated confusion as deliberately induced by others. His paranoid reactivity regarding the motives of other[s] results in the rapid escalation of anger. Further, his neuropsychological deficits in judgment and impulse control contribute to his being disinhibited. This unfortunate synergy was demonstrated in Mr. Gonzales repeated outburst and inappropriate statements in pretrial hearings and at trial.

*Id.*

With respect to Mr. Gonzales's capacity to testify, Dr. Cunningham found as follows:

As described and illustrated above, the interaction of Mr. Gonzales' paranoia, PTSD-related reactivity, cognitive limitations in understanding what he is being asked, neuropsychological impairment driven impulsivity, and poor social judgment represent significant challenges to any testimony he might offer in terms of being able to track the question, answer relevantly, appropriately modulate his emotions, and maintain a respectful demeanor. Thus, when he insisted on testifying and then simply said to the jury, "Y'all can fucking kill me[;] makes me no fucking difference," his behavior was driven by the very processes of mental illness and disorder that I have described. His paranoid mistrust of lawyers and the legal process, and associated experience of anger and futility, caused him to do what he could to get the process over with.

*Id.* at 14.

Finally, with respect to "the degree of impairment resulting from the mental illness…, if existent, and the specific impact on the defendant's capacity to engage with counsel in a reasonable and rational manner" – essentially, the *Dusky* question, Dr. Cunningham explained how Mr. Gonzales's combined mental illnesses rendered him unable to consult with counsel in a reasonable and rational manner:

Mr. Gonzales' mental illness results in only modest impairment within the highly structured and limited activities of solitary confinement on death row. This mental illness, however, would constitute a severe impairment for his capacity to engage with counsel in a reasonable and rational manner. Specifically, his beliefs regarding how he can best be defended are illogical and ill-advised. His cognitive rigidity and poor insight render him impervious to self-scrutiny of these strategies

or alternative considerations offered by counsel. He interprets resistance from counsel to his ideas as evidence that they are "against" him and have malevolent intentions. Mr. Gonzales' paranoia renders him quite reactive to perceived "dishonesty" from counsel, with associated unshakable conclusions of malevolent intent. He then withdraws from functional interactions with counsel and advises others (family/friends) not to cooperate with counsel. Counsel, then, does not have the benefit of historical information Mr. Gonzales might have offered regarding mitigation and meets resistance in obtaining this information from others. Further, as Mr. Gonzales withdraws from discussing his case with his defense counsel, he is deprived of their counsel regarding strategic decisions. It is my provisional opinion that Mr. Gonzales was unable to relate to his 2009 trial counsel with a reasonable degree of rational understanding.

*Id.* at 15-16.

Other courts have found defendants incompetent in the very circumstances presented here. When a defendant has paranoid delusions that cause him to believe that his attorneys are working against his interest and not providing an adequate defense, the defendant is incompetent to proceed because he is "unable to assist sufficiently in his defense." *United States v. Ghane*, 490 F.3d 1036, 1039-40 (8th Cir. 2007). *Accord United States v Boigegrain*, 155 F.3d 1181, 1183-90 (10th Cir. 1998) (defendant incompetent because he "was delusional and suffered from 'paranoid ideation,' causing him to believe that his lawyer was participating in a conspiracy, along with the prosecutor and the judge, to incarcerate him for reasons unrelated to the charge against him"); *United States v. Bauman*, 2008 WL 2560706 *7 (D. Kan. 2008) (defendant incompetent because he "suffers from a delusional disorder which prevents him from rationally considering his attorney's advice or cooperating with his attorney to produce information which is relevant to his defense"); *Commonwealth v. Kennedy*, 305 A.2d 890, 891 & n.4 (Pa. 1973) (defendant incompetent because "paranoia rendered him incapable of trusting anyone and he would be unable to cooperate with his counsel even if it were to his own advantage").

As the Superior Court of Sussex County, Delaware, explained in deciding that the defendant in the case before it was incompetent,

> Because of his delusions, Defendant's relationship with his attorneys is damaged to the point where communication is not feasible. This mental illness is severe, and the Defendant is not able to control it.
>
> The communication between a defendant and his counsel lies at the heart of the competency analysis.

*State v. Williamson*, No. 1106025042, 2013 WL 268981 (Del. Super.Ct. January 23, 2013).

In addition, other courts have found incompetence to assist in one's defense when a defendant engages in inappropriate courtroom behavior that is the product of mental illness. For example, the Second Circuit observed in *United States v. Hemsi*¸ 901 F.2d 293 (2d Cir. 1990), that where "the defendant's misconduct is the result of a mental disease or defect ... he cannot be said to have made an intelligent and voluntary choice." *Id.* at 296 (internal citations omitted). Thus, if the trial court were to conclude that the defendant's "unduly disruptive behavior resulted from a mental disease or defect and was beyond his rational control, it would be forced to suspend or abort the trial." *Id.* at 296. The Second Circuit held that for these reason the district court did not err in considering Hemsi's "behavior during the competency hearing as a factor relevant to his ability to participate properly in his own defense." *Id.* at 296.

For these reasons, Mr. Gonzales was incompetent during his resentencing proceedings, and due process requires a new resentencing trial.

## II. MR. GONZALES'S RESENTENCING TRIAL VIOLATED DUE PROCESS BECAUSE THE TRIAL COURT WAS AWARE OF FACTS THAT REQUIRED AN INQUIRY INTO MR. GONZALES'S COMPETENCE BUT FAILED TO CAUSE ANY INQUIRY TO BE UNDERTAKEN.

It is well-established that state procedures must be adequate to protect a criminal defendant's due process rights not to be tried while incompetent. *Pate v. Robinson*, 383 U.S. 375 (1966).

A *Pate* violation is different from a claim that the defendant was tried while incompetent. The complaint that a *Pate* procedural guarantee was violated is that, in the light of what was then known to the trial court, the failure to make further inquiry into the defendant's competence to stand trial denied him a fair trial. *Porter v. Estelle*, 702 F.2d 944, 950 (5th Cir. 1983) (citing *Drope*, 420 U.S. at 174). As the Fifth Circuit put it in *Mata v. Johnson*, 210 F.3d 324, 329 (5th Cir. 2000), "[I]f the trial court received evidence, viewed objectively, that should have raised a reasonable doubt as to competency, yet failed to make further inquiry, the defendant has been denied a fair trial." *See also Lokos v. Capps*, 625 F.2d 1258, 1261 (5thCir. 1980) (noting that the *Pate-Drope* inquiry is: "Did the trial judge receive information which, objectively considered, should reasonably have raised a doubt about defendant's competency and alerted him to the possibility that the defendant could neither understand the proceedings or appreciate their significance, nor rationally aid his attorney in his defense.").[11]

---

[11] Texas law at the time of Mr. Gonzales's trial similarly outlined the critical importance of the trial court's duty when confronted with evidence of a defendant's incompetency. As provided in TEX. CODE CRIM. PROC. art 46B.004,

> (b) If evidence suggesting the defendant may be incompetent to stand trial comes to the attention of the court, the court on its own motion **shall** suggest that the defendant may be incompetent to stand trial.

> (c) On suggestion that the defendant may be incompetent to stand trial, the court **shall** determine by informal inquiry whether there is some evidence from any source that would support a finding that the defendant may be incompetent to stand trial.

(Emphasis supplied).

In *Pate v. Robinson*, and *Drope v. Missouri, supra,* the Supreme Court provided guidance concerning the factors that trial courts must consider to assure that inquiry is made into competence to stand trial when evidence known to the court requires it. *Drope* summarized these factors succinctly:

> The import of our decision in *Pate v. Robinson* is that evidence of a defendant's irrational behavior, his demeanor at trial, and any prior medical opinion on competence to stand trial are all relevant in determining whether further inquiry is required, but that even one of these factors standing alone may, in some circumstances, be sufficient.

420 U.S. at 180.

In keeping with this, the Fifth Circuit has held, "'In determining whether the court should order a mental competency hearing, the court must consider three factors: (1) the existence of a history of irrational behavior, (2) the defendant's demeanor at trial, and (3) prior medical opinion on competency.'" *United States v. Flores–Martinez*, 677 F.3d 699, 706-07 (quoting *United States v. Ruston,* 565 F.3d 892, 902 (5th Cir. 2009). Although all three factors are "relevant in determining whether further inquiry is required," under certain circumstances, "even one of these factors standing alone" may be sufficient. *Id.* at 707.

The trial court in Mr. Gonzales's case had more than enough evidence, when viewed objectively, to require inquiry into Mr. Gonzales's competence to stand trial in the resentencing trial.

First, the trial court was aware of Mr. Gonzales's history of irrational behavior specifically related to consulting with resentencing counsel and assisting in his defense. Beginning in October, 2007, Mr. Gonzales made clear to the court that he did not trust Leverett because he believed Leverett had lied to him about his contacts with the mitigation specialist

whom Mr. Gonzales wanted for his case.[12]  As Mr. Gonzales made clear to the court in a hearing on October 31, 2007, on his request to replace counsel, "I won't acknowledge them…. I don't have that trust in them."  3 RR-R 15-16.  On December 3, 2007, Leverett informed the court by letter that,

> Mr. Gonzales has consistently refused to meet with me, Jason [Leach], and our investigator Nancy Piette, and none of us has had any personal contact with him for several weeks, save for our brief ex parte hearing on October 31, when Mr. Gonzales asked the court to discharge us, and appoint other counsel.   In short, our relationship is irreparably broken, and we are unable to provide the representation for which we were appointed.

Exhibit 4 (Letter from Woody Leverett to Hon. Bill McCoy).

Three months later, on February 29, 2008, trial counsel filed a Motion to Withdraw as Attorneys of Record.   1 CR-R 33-35.   Without giving any details, counsel wrote as follows: "A conflict has arisen between the Defendant and Counsel.   This conflict threatens the ability of counsel to render effective representation in this case."  1 CR-R 33.   In the hearing held on this motion on May 13, 2008, Mr. Gonzales said to the court, "I won't acknowledge these attorneys…. I don't trust them and I don't want nothing to do with them, plain and simple…. When an attorney lies to you one time, he is going to lie to you every time, so my point, they aren't worth shit…. Either they are for you or against you.  In this case, they have already showed me they aren't for me."  4 RR-R 3, 4-5.  Two weeks after this hearing, counsel filed another motion to withdraw, this time supported by affidavits from all three members of the defense team, in which the team informed the court that they had no working relationship with Mr. Gonzales, and that they could not effectively represent him.

---

[12] The objective facts showed that there had been a misunderstanding about the information Leverett had about Lanier, but he was nevertheless resolute in his view that he did not want Lanier to be the mitigation specialist.

At every juncture when these problems came up, the court refused to appoint different counsel for Mr. Gonzales. In response Mr. Gonzales began telling the court to go ahead and sentence him to death and set an execution date, that "it makes me no difference."

Second, the resentencing judge was aware of Mr. Gonzales's longstanding mental illnesses, because he had also presided over Mr. Gonzales's first trial, where Dr. Cunningham and Dr. Brinkman testified at length about these illnesses. Thus, the court knew that Mr. Gonzales had been diagnosed with schizoaffective disorder in TYC at the age of 16, a mental illness that caused some symptoms of psychosis, and that Mr. Gonzales's symptoms—auditory hallucinations, paranoia, and aggressiveness—had been effectively treated with an anti-psychotic medication.[13]

The court also knew that Mr. Gonzales suffered brain damage, some of it congenital and some of it acquired through his childhood and adolescence as a result of head injuries and severe drug and alcohol abuse. The court knew from the testimony of Dr. Brinkman that the damage to Mr. Gonzales's brain caused him to be extremely emotional even with little provocation, disinhibited, aggressive, and paranoid, thus paralleling and compounding the symptoms he suffered from schizoaffective or bipolar disorder. In addition, the court knew from Dr. Brinkman's testimony that Mr. Gonzales's brain damage affected the executive processes of his brain, which impaired, among other things, Mr. Gonzales's "ability to look at a problem from different standpoints and not become highly rigid in one's thinking…." 18 RR 79.

The court also knew from various motions filed by the resentencing defense team that Mr. Gonzales developed Diabetes in 2003, that the disease had been treated but uncontrolled

---

[13] The court also knew that in connection with investigation of these early diagnoses, the resentencing trial defense team learned from the two psychiatrists who diagnosed and treated Mr. Gonzales for Schizoaffective Disorder that they had come to believe that he was misdiagnosed, and that he more likely suffered from Bipolar Disorder – a mood disorder associated with a psychotic level of paranoia and aggressiveness.

ever since its onset, and that uncontrolled Diabetes for several years can itself cause brain damage resulting in "cognitive impairments and serious mood abnormalities." Exhibit 1 (Letter from Dr. J. Arturo Silva to Danalynn Recer, Mar. 2, 2009). These motions, and in one instance testimony in support of them, also reprised for the court all the serious mental disorders suffered by Mr. Gonzales that had been the subject of Dr. Cunningham's and Dr. Brinkman's testimony in the first trial.

Finally, the trial court witnessed directly Mr. Gonzales's repeated outbursts, gestures, and inappropriate statements during trial—the refusal to wear civilian clothing for trial, the "shooting" at the family of the Aguirres with his hand, the explosive anger at his lawyers for not asking for a jury shuffle, the outbursts and threats during the testimony of his wife as a prosecution witness, the loud affirmation that "dead men tell no tales" during another witness's testimony, the raising of the middle finger to a testifying correctional officer, the shutting down of the defense case—including the calling of Dr. Silva as a mental health expert who would have provided information about his history of mental illness and brain impairment—by threats to grab a firearm in the courtroom, the interruption of the prosecution's closing argument to reiterate his anger and threats against his wife for testifying for the prosecution, and the display of a picture of a clown holding a dagger during closing arguments. The trial court also bore witness to Mr. Gonzales's insistence on taking the stand to tell the jury, "Y'all can fucking kill me. Makes me no fucking difference." 30 RR-R 9.

To be sure, none of this evidence *established* that Mr. Gonzales was incompetent. However, it was indisputably "evidence, viewed objectively, that should have raised a reasonable doubt as to competency…." *Mata v. Johnson*, 210 F.3d at 329. The intersection between the incident that made Mr. Gonzales believe that his lawyers could not be trusted and were against

him—the "lies" about contacts with mitigation specialist Charles Lanier—and his mental illnesses and brain impairments was clear. Mr. Gonzales reacted in a paranoid manner to this incident, and his reaction quickly defined his entire relationship with the defense team. "[V]iewed objectively," *Mata*, it appeared that Mr. Gonzales was not "ab[le] to look at [this] problem from different standpoints and not become highly rigid in [his] thinking…." 18 RR-R 79 (Dr. Brinkman testimony). The trial court should have realized that the evidence that it had about Mr. Gonzales's mental illness and brain damage might have had something to do with this incident and its aftermath.

Similarly, Mr. Gonzales's outbursts, gestures, inappropriate statements, and testimony at trial should have raised questions for the trial court. In and of themselves, these behaviors fall into the category of a defendant's "demeanor at trial" that should raise a question about competence. Mr. Gonzales had nothing to gain and everything to lose by engaging in these behaviors. Moreover, at least some of the behaviors were described by Mr. Gonzales as being the result of uncontrollable urges. Thus, when the court warned Mr. Gonzales in the wake of his outbursts and threats during his wife's testimony, it tried to extract a promise from him that he would not be disruptive again. Mr. Gonzales said he could not say to the court whether he could control himself, because "I am just saying that whenever my blood rises I speak my mind." 27 RR-R 87-88. This behavior and this response should have triggered the trial court's knowledge of Mr. Gonzales's mental illness and brain impairment, and thus, a question about incompetence. The 1995 trial testimony demonstrated that since at least his middle teens, Mr. Gonzales has been seen as suffering from a mental illness associated with aggressiveness. His brain damage compounded this feature of his life with similar dysfunction—lability, or easily provoked strong emotion, and disinhibition, or the impulsive outburst of emotion without the constraint of

judgment—along with impairment in his executive functions of "a knowledge of the social appropriateness of one's behavior, [and] relevancy of behaviors…," 18 RR 79, 88-89 (Dr. Brinkman testimony). Surely, this "evidence, viewed objectively, … should have raised a reasonable doubt as to competency…." *Mata*.

The reason the trial court failed to step back and apply the knowledge that it had, or that was at its disposal about Mr. Gonzales, is because of a pre-existing bias toward Mr. Gonzales. In a hearing apparently conducted off the record on December 19, 2007, the court questioned the defense team about a visit to Mr. Gonzales by Danalynn Recer before she became the lead mitigation investigator for the defense. Recer recalls the trial court expressing the following in response to Leverett's bringing up the need for different counsel for Mr. Gonzales during the course of this hearing:

> The Court said that there was no reason to change lawyers because the same situation would arise. "The first time they do something he doesn't want, we will be back at this point." He said that Mr. Gonzales' "attitude" was the same at the first trial…. The Court said, based on his experience in the first trial, there is "no reason to believe it wouldn't happen again."

Exhibit 5 at 20 (Declaration of Danalynn Recer). Several months later in an email to Recer, Leverett recounted Mr. Gonzales's repeated efforts to get the court to appoint new counsel, and noted: "This has become a test of wills between the client and judge, and the judge is determined not to let [the] client run his court." Exhibit 6 (Email from Woody Leverett to Danalynn Recer, Jul. 3, 2008).

The trial court thus perceived the difficulties with Mr. Gonzales as simply a tug-of-war for control over the court's power to determine who would represent Mr. Gonzales. Because of its pre-existing view of Mr. Gonzales, it could not look objectively at the evidence in connection with the resentencing trial that demonstrated that something new and different was, perhaps,

happening with Mr. Gonzales. Had it been able to step back from its pre-existing view and examined the paranoia and rigidity of Mr. Gonzales's rejection of counsel, the devastating consequences to Mr. Gonzales of this ongoing event, and Mr. Gonzales's self-destructive behaviors at trial, in light of the 1995 testimony of Dr. Cunningham and Dr. Brinkman and the possibility that the onset and poor management of Mr. Gonzales's Diabetes contributed to his unwillingness to assist counsel, the court would have entertained a reasonable doubt as to Mr. Gonzales's competence. The failure to do so deprived Mr. Gonzales of due process.

### III. MR. GONZALES'S TRIAL COUNSEL VIOLATED HIS RIGHT TO EFFECTIVE ASSISTANCE OF COUNSEL BECAUSE THEY FAILED TO PURSUE QUESTIONS CONCERNING MR. GONZALES'S COMPETENCE TO STAND TRIAL

The standard for evaluating effective assistance of trial counsel is set out in the Supreme Court's decision in *Strickland v. Washington*, 466 U.S. 668 (1984). Under *Strickland*, Mr. Gonzales must show: (1) that counsel's performance fellow below "an objective standard of reasonableness" as measured by professional norms; and, (2) that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. *Id.* at 694.

### A. Counsel's failure to pursue questions concerning Mr. Gonzales's competence to stand trial fell below the objective standard of reasonableness as measured by professional norms.

Criminal defense counsel have a duty, not only as advocates, but as officers of the court, to ensure that a defendant is not tried when he or she is incompetent, in violation of the Due Process Clause of the Fourteenth Amendment. As the Tenth Circuit explained in *United States v. Boigegrain*, 155 F.3d 1181, 1188 (10th Cir. 1998),

> [I]n addition to their duties as counselors, attorneys are also officers of the courts. The Constitution prohibits a court from trying defendants who are mentally incompetent…. Of all the actors in a trial, defense counsel has the most intimate association with the defendant. Therefore, the defendant's lawyer is not only

allowed to raise the competency issue, but, because of the importance of the prohibition on trying those who cannot understand proceedings against them, *she has a professional duty to do so when appropriate.*

*Id.* (emphasis supplied).

Counsel's actions in this case fell below the standard of care, as outlined in the American Bar Association Standards for Criminal Justice, which are a guide in determining reasonable professional behavior. The pertinent standard states:

> Defense counsel should move for evaluation of the defendant's competence to stand trial *whenever the defense counsel has a good faith doubt as to the defendant's competence*. If the client objects to such a motion being made, counsel may move for evaluation over the client's objection. In any event, counsel should make known to the court and to the prosecutor those facts known to counsel which raise the good faith doubt of competence.

ABA, *Standards for Criminal Justice* Standard 7–4.2(c) (emphasis supplied).

The State Bar of Texas has similarly issued guidelines, intended to "articulate the statewide standard of practice for the defense of capital cases" in Texas. State Bar of Texas, *The State Bar of Texas Guidelines and Standards for Texas Capital Counsel*, 69 TEX. BAR J. 966 (2006) [hereinafter SBOT Guidelines]. Pursuant to those guidelines, lead counsel should retain a qualified mental health associate to "screen individuals for the presence of mental or psychological disorders or impairments … [and] to determine the client's mental health history for the purposes of pursuing issues of mental retardation, *competency to stand trial*, insanity at the time of the offense and other mitigating mental health problems for punishment consideration." SBOT GUIDELINE 10.2(B)(2)(c) (emphasis supplied). "In the event that the mental health associate determines the possibility of legitimate mental health issues, lead counsel should then make application to the Court that the appropriate experts be appointed by the Court for making expert of valuations of the defendant's condition." *Id.*

Counsel's failure to pursue questions concerning Mr. Gonzales's competence to stand

trial – in the face of Mr. Gonzales's documented history of serious mental disorders that produced paranoia and rigidity in his thinking processes, their direct experience of these disorders with Mr. Gonzales coming to the fixed belief that they could not be trusted after only a few weeks of representing him, thereafter refusing to consult with them and encouraging family and friends not to talk with them, impeding their presentation of evidence, failing to follow their advice in any respect, and disrupting trial proceedings in self-defeating and self-destructive ways – fell below the objective standard of reasonableness required by prevailing professional norms.

In the preceding claim, we have argued that the trial court was obliged to inquire into Mr. Gonzales's competence based on the evidence concerning Mr. Gonzales's history of mental illness and brain impairment, paranoid distrust and refusal to work with counsel, and behavior in the courtroom before and during trial. This evidence, we argued, "'viewed objectively, … should have raised a reasonable doubt as to competency.'" (Quoting *Mata v. Johnson*, 210 F.3d at 329). In keeping with professional norms, defense counsel should have pursued questions about Mr. Gonzales's competence as soon as they had a good faith doubt about it. The meaning of the phrase "good faith doubt" in this context is similar to the language in *Mata*, for both the 5th Circuit law and the ABA Guidelines are intended to provide protection to defendants who may be incompetent. *See Drope v. Missouri*, 420 U.S. at 172-74 (noting that whether the standard for inquiring into competence is a "bona fide" doubt or a "reasonable" doubt, or some other standard, it is constitutional on its face so long as the standard requires inquiry whenever "sufficient" evidence of incompetence surfaces). Thus, a good faith doubt as to competency requires assessment by counsel of whether the evidence "viewed objectively" raises a doubt about competence. For this reason, just as the trial court should have entertained a sufficient doubt, Mr. Gonzales's trial counsel should have as well, and their failure to pursue an inquiry

into competence amounted to deficient performance under *Strickland*.

Importantly, Mr. Gonzales's trial counsel had considerably more evidence pointing to incompetence than the trial court did, because they had a "qualified mental health associate," SBOT GUIDELINE 10.2(B)(2)(c) – Danalynn Recer – advising them that the difficulties they were having in working with Mr. Gonzales were due to his incompetence, and urging them to raise the issue of Mr. Gonzales's incompetence to stand trial.

Danalynn Recer is a capital defense lawyer and mitigation specialist and has been since 1991. Exhibit 5 at 1-4 (Declaration of Danalynn Recer). Within that time, and well before the commencement of Mr. Gonzales's resentencing trial proceedings in 2007, Recer rose to the top tier of mitigation specialists in the country. She has been involved as a defense lawyer or mitigation specialist in more than 100 capital cases in state and federal courts in fifteen states. *Id*. at 1-2. She has developed a mitigation "bootcamp" to train mitigation specialists in eight states. *Id*. at 2. She has taught mitigation-related topics in scores of national capital defense seminars and in twelve states. *Id.* at 3-4. She was part of a national group of mitigation specialists that helped develop a set of performance guidelines for mitigation specialists intended to supplement and elaborate upon the mitigation function of the defense as set forth in the 2003 ABA Guidelines for the Appointment and Performance of Defense Counsel in Death Penalty Cases. *Id.* at 4. In 2002, she established—and still directs—the Gulf Region Advocacy Center (GRACE) in Houston, which is dedicated to providing quality indigent defense services, including mitigation services, to capitally-charged defendants. *Id.* She is unquestionably a "qualified mental health associate" under SBOT GUIDELINE 10.2(B)(2)(c).

Recer first became involved in Mr. Gonzales's case as part of a national mitigation mentoring program designed to train people new to mitigation to become mitigation specialists.

Nancy Piette, the investigator on Mr. Gonzales's defense team, and aspiring mitigation specialist, was one of Recer's mentees.  *Id*. at 4-5.  Since the mentoring project involved working with mentees in the field, Recer began mentoring Piette in Mr. Gonzales' case.  In initial telephone conversations with Piette in September and October 2007, Recer learned that Mr. Gonzales had become very upset with the defense team and stopped accepting visits from them because Leverett had refused to accommodate Mr. Gonzales's request to secure the services of a mitigation specialist in New York.  *Id.* at 5.

Before meeting with Piette, Recer tried to help Piette with this situation by explaining to her the unique circumstances of previously-death-sentenced people who have been sent back from death row for new sentencing trials.  *Id.*

> [Recer] described to her the way in which death row inmates become so acclimated to the very close confinement and predictability of death row that it is always scary and disruptive for them to be moved anywhere and adjust to a new place, new people, new routines, etc.  It is even worse when they are returning to the county where they had been sentenced to die.  Also, clients who win resentencing, but not reversal of their convictions, are experiencing a devastating loss to realize their convictions are final, as well as the conflicting emotions of facing a new sentencing hearing and the possibility of a sentence less than death.

*Id.* at 5-6.  Recer found Piette "fairly resistant to the idea that Michael was experiencing any vulnerability," because she "saw Michael as a big, tough, violent person and struggled to imagine that he also experiences a wide range of emotions. "  *Id.* at 6.  She reflected:

> [t]his would become a recurring theme with the entire defense team – a difficulty understanding that someone convicted of a horrible crime and seen by others as very scary could also be vulnerable, frightened, traumatized or overwhelmed by emotional stressors.

*Id.*

On October 10, 2007, Recer and Piette went to the jail to meet with Mr. Gonzales.  *Id.*  At first Mr. Gonzales declined their visit but when Recer sent her business card to him he came out, because he was aware of her work on other death penalty cases.  *Id.*  While this allowed the visit

to take place, Mr. Gonzales "was still very guarded and suspicious." *Id.* Over time, "Michael warmed up to me a little bit, but would not even look at or make eye contact with Nancy at first." *Id.* at 6-7. Mr. Gonzales mentioned the defense team's refusal to seek funding for the mitigation specialist he wanted, and Recer explained that she was not in a position to make any decisions about who worked on the case. Then "[a]t some point, Nancy interjected with questions about locating life history witnesses." *Id.* at 7. The conversation that ensued illuminated the limitations of the defense team in trying to relate to Mr. Gonzales:

> Michael responded that his family wasn't going to help, that he was "dead to them", and that they wanted him to be executed. Nancy disagreed with Michael about whether no one cared about him. She said that she had spoken with a relative (I believe it was Mr. Gonzales' sister) and that she wanted to visit him and was very concerned for his welfare. Michael reacted very strongly to this and with a lot of mixed emotions and responses. He insisted that his family had abandoned him and that he was "dead to them", saying they had not visited or written and expressed no interest. He was very hurt and angry about what he perceived as abandonment and conflict in his family, saying they didn't believe in him. At times, he articulated this in a "tough guy" sort of way, saying that he didn't need them. But, he also expressed great shame and humiliation about needing their help, about having them raise his daughter and about having them go through another trial. And, he gave reasons to justify his family's abandonment, talking about himself being "bad news" and that his daughter was better off without him. It was clear that Michael was in great pain and that he was too ill to talk rationally about these topics.
>
> Nancy responded to this in a very concrete way, arguing with Michael about specific facts (such as whether he had, in fact, received visitors and whether his sister said she wanted to visit) rather than recognizing the impairments that Michael displayed or responding to the suffering that she was witnessing. Michael reacted very badly to this approach, getting more and more agitated.

*Id.* at 7-8.

At this point, Recer intervened, asked Piette to stop, and took over the conversation again. *Id.* at 8. The following ensued:

> I validated what Michael was experiencing, telling him that we were not arguing with him about the fact that he felt abandoned by his family. I moved the conversation away from his family and described how, in general, clients' family

members sometimes didn't know how to handle having a loved one sentenced to die, that they sometimes don't visit or write because it is too painful, but they often express to me how guilty they feel, so that these situations are more complex than they seem, but that doesn't change how the client feels. I suggested that it might be true that Michael's family members have "cut him off" but that they might have done it for different reasons than he believed…. Michael seemed to like the idea that maybe his family missed him and seemed to really engage with the question of how he could know what they were experiencing, but he kept returning to the notion that he was certain they believed that he "was dead to them" because that is how he felt.

*Id.* Recer then observed:

It was clear that Michael was trying, but simply unable to grasp the notion that two people (he and Nancy) could have completely different views and both be "right" or that one person (one of his family) could have two contradictory feelings or beliefs at different times or even at the same time. He had a very rigid idea that if someone loved him they would have said and done specific things and since they had not, it was factually true that they did not love him and that was the only emotion he could imagine that they had. Anyone who told him differently was lying or trying to trick him. As much as he wanted and needed to reconcile all the punishing thoughts and painful emotions he was experiencing, he could not do it conceptually. He had no flexibility in his own thoughts.

As defense team members, we did not need to argue with Michael or arrive at any "truth" about whether or not his family had "written him off". We needed to find a way for Michael to accept the idea of his defense team contacting his family without having to let go of his very rigid idea that he "was dead to them." Nancy's approach of arguing with him about this premise rather than finding a way around it had escalated him to the point where he was very close to walking out and shutting down the interview.

*Id.* at 8-9.

From this interchange, Recer came to understand that Mr. Gonzales experienced delusions,[14] and that his thinking was more disordered than most of her clients:

While virtually all of my clients have deep emotional scars and experience conflicts and hurt in their family relationships – which are often very dysfunctional – it was clear that more than this was going on with Michael. While many of my clients might be unwilling to give family members the benefit of the doubt or might insist that family members were just faking concern when

---

[14] "Delusions are fixed beliefs that are not amenable to change in light of conflicting evidence." American Psychiatric Association, DIAGNOSTIC AND STATISTICAL OF MENTAL DISORDERS (5th ed.) at 87.

talking with the legal team but really didn't care, it is uncommon to have this sort of conversation with a client who is unable to recognize that there could be more than one equally true perspective. For Michael, statements are 'true' or 'false' and people are "lying" or "telling the truth." He wasn't unwilling to engage in nuance, he was absolutely unable to do so.

It is also unusual for a client to be unable to acknowledge change over time. Most clients who have difficult or estranged family relationships are able to acknowledge that people change over time and they are (sometimes very grudgingly) willing to at least try to repair the relationship in the hopes that conflicts have mellowed over time. This is often the way clients reconcile the need for a life history investigation with their deep and terrifying fears of being rejected and hurt all over again by the family and community members the defense will contact. But, for Michael, this idea was of no help whatsoever. For him, people and ideas were absolutely fixed and static. He could not conceptualize that a person may say two different things at two different points in time and be equally truthful both times. No matter how I approached this or what non-controversial examples I used, Michael insisted that it is always the case that someone who changed what they said must have been lying at least once. It is never the case that they honestly changed their opinion or feelings or learned new facts.

It was clear that Michael could not tolerate any deviation from his premise that he was 'dead to [his family]' and that he would be unable to have a conversation with anyone who disagreed with this premise. He desperately wanted solutions but could not entertain any suggestion different from his belief and could not incorporate new information to modify or change his own rigid views, even when he very much wanted to believe what he was being told.

*Id.* at 9-10.

Recer also learned from her first meeting with Mr. Gonzales that he wanted to get a life sentence instead of a new death sentence:

In the course of the visit, Michael frequently mentioned his distrust of his defense team, saying that they didn't listen to him, didn't understand that it was his case and his life on the line, that they "disrespected" him and that they wouldn't be able to help him, anyway. At points he said he didn't care and would just let his team do whatever they wanted to do as long they didn't bother him, because he assumed the case was going to turn out badly no matter what. At other points, however, Michael acknowledged that he did have some hope that the reversal of his sentence would lead to some improvement in his life.

I asked Michael what outcome he hoped to get from his case. He did not directly answer this, but his response was something that suggested he might be open to

resolving the case. I told him about the agreed resolutions I had negotiated for other resentencing clients returned from Texas death row. He had heard of some of them and knew some of my clients. He seemed very interested, but cautious, as if he was afraid to get his hopes up…. It was very, very, clear that he was frightened of a new death sentence and wanted to live.

*Id.* 10-11.

Recer also observed the phenomenon that Dr. Brinkman had described in his 1995 testimony concerning the aspect of Mr. Gonzales's brain-damage-produced paranoia that causes him to believe he is something he is not.[15] As Recer explained:

One of the obstacles Michael put up at several points in the conversation was his notion of himself as a particularly bad guy. He made very strong and exaggerated statements about his own crimes and claims that he had committed many hundreds of crimes that were never discovered, that he was widely feared and that everyone in the county was out to get him. In his world view, the jail had changed their rules just for him and all the guards were scared of him and wanted to provoke him so that they would have an excuse to hurt or kill him. He talked about himself as an organized crime kingpin with gang involvements that would prevent him from being safely housed in any jail or prison. Many of his claims and stories were so exaggerated and improbable that they seemed childlike and I began to wonder if he was testing me (i.e. if I appeared to pretend to believe everything he said just to make him happy, then he would accuse me of being fake and a liar).

. . . .

This would become a recurring theme with Michael. For the year and a half that I knew him, he almost constantly exaggerated his own criminal conduct, demanding that we agree with his self-concept of being evil. Many of his stories of bad behavior were impossible on their face, or turned out to be false when investigated.[16]

*Id.* at 11-12.

---

[15] Dr. Brinkman testified that Mr. Gonzales' paranoia "also involves thought processes that have to do with making one's self think that he is something he really isn't. That he has great powers, that he is a great leader, that he is, in this case, bad. That he is a bad guy." 18 RR 89.

[16] For example, Recer later learned from a conversation with an officer, Lt. Alan Poor, at the jail that Mr. Gonzales was not at all the bad guy he portrayed himself to be in his conversations with his defense team. *See*, Exhibit 5, at 25-27.

After this visit and several others, Recer came to see very clearly that Mr. Gonzales was not just suffering problems adjusting to the change from death row to the Ector County jail, but was disabled – and that Nancy Piette was ill-equipped to work with Mr. Gonzales:

> Michael spent more than two hours with us [in the first visit on October 10, 2007] before he became overwhelmed and left the visiting area. Nancy's reaction to Michael's departure was to be offended.
>
> It was immediately clear to me in my first few contacts with Mr. Gonzales that he was experiencing distress that was far greater and much more complex than the typical re-adjustment problems I see with all of my retrial/resentencing clients, including his extraordinarily high level of anxiety and emotional suffering, his inability to 'change sets' (switching gears mentally or in response to questions or the flow of a conversation), his perseveration (getting 'stuck' on one idea or word or problem and repeating it, returning to it even once the topic has been exhausted or resolved), the degree of his distrust and paranoia, his shame and self-loathing and his very rigid, very concrete thinking.
>
> It was also immediately clear to me in working with Nancy that she was trained as a fact investigator and had no background or experience with mental illness.

*Id.* at 13-14.

With more contact with Mr. Gonzales's defense team in October and November 2007, Recer began to understand how the team got cross-ways with Mr. Gonzales and began to wonder whether the difficulties were inevitable or due to the team's lack of skill:

> There were a series of contacts between Phil Wischkaemper, Woody Leverett, Jason Leach, Nancy Piette, Rob Cowie and myself in October and November 2007. The appointed attorneys felt challenged by Mr. Gonzales and were determined not to let him "call the shots". They felt the need to make sure he did not think he could tell them what to do. Mr. Gonzales reacted to this lack of control by seeking to fire them. It was clear that the team's approach had not been very skilled and that Michael had been somewhat more responsive to a less confrontational approach in my visit with him, but that visit had not involved any substantive discussion of his case. Given the long history of mental illness already documented, and the limitations Mr. Gonzales displayed in my interaction with him, none of us knew whether Mr. Gonzales would be able to function in his own best interests with any defense team or respond to any technique for building a relationship. The way the dynamic was described by the team members (who were very frustrated) made it difficult to discern whether it was impossible to

build an effective attorney-client relationship with Mr. Gonzales or would simply require team members with different training and skills.

*Id.* at 16.

In an effort to try to repair the relationship with the defense team, the team asked Recer and mitigation specialist Rob Cowie (another person Recer was mentoring) to see Mr. Gonzales. After initially declining a visit with Recer, Mr. Gonzales came out on a second attempt after Recer sent him her business card. Recer reported the following about the visit:

> Michael was agitated, scared and overwhelmed with a sense of hopelessness. He did not believe anyone was on his side, and felt that his team was not responsive to any of his requests.
>
> . . . .
>
> During this visit, Michael was anxious, looking around, turning back to look through a window in the door behind him. He told us that someone was sitting in another visiting booth – two booths over – listening to our conversation and that he could tell because he heard clicks on the phone. This worry preoccupied and distracted him to the point where Rob volunteered to go check the other booths. He looked in each booth and returned to report that there was no one in any of the other booths. Michael gave us a knowing look and said something about how they could listen even if we couldn't see them, but he was briefly calmed down after Rob's search of the visiting area. Within fifteen minutes or so, he had returned to being very anxious and vigilant, looking around, and he told us that the clicking on the phone had returned. Jails are always noisy, but neither Rob nor I believed there were any unusual or suspicious noises in the booth or on the phone.

*Id.* at 18.

Recer "reported back to the team that Michael was still adamant about his representation but that we thought he was open to a negotiated resolution of the case, which might be the best thing for everyone." However, "[t]he team was adamant that Michael was not mentally ill, just in a power struggle with them." *Id.*

On December 19, 2007, Recer was in Odessa for the hearing before the trial judge which has been noted in connection with the *Pate-Drope* claim, claim II, *supra* (the hearing in which

the court predicted that the same problems would arise with new counsel if he substituted

counsel for Leverett and Leach).  After the hearing, she met with the defense team, who

expressed the following:

> Both attorneys and Ms. Piette were frustrated with Mr. Gonzales.  They believed he was "using them" and expected them to be "his butler" because he had asked them to help him get his eyeglasses prescription refilled and for a copy of the jail's inmate manual.  They didn't want him to have a copy of the rules because they thought he would break them.  The whole team was very distrustful of Michael and felt challenged when he told them what he wanted.

> We pointed out that the Court's position – that Mr. Gonzales would not be able to work with any other defense team either and that he had always been that way – came very close to conceding that Michael could never participate in his own defense.  The team was very dismissive of the notion that Mr. Gonzales was mentally ill and insisted that he was in a power struggle with them.  They said the Judge was going to make sure that Mr. Gonzales didn't think he could run his courtroom and that they were done running errands for Mr. Gonzales and trying to accommodate him.

*Id.* at 20-21.

Following this meeting, Recer and Mr. Cowie went to the jail to see Mr. Gonzales. After

telling him about the hearing, the following exchange took place:

> The fact that the judge knew we had visited him fed into Mr. Gonzales' distrust of "the system" and of his appointed defense team.  We did not argue with him or take sides regarding his counsel, but tried to focus Michael's attention on how he could protect his own interests despite his feelings about his team.  We tried explaining to him that he was only hurting himself and that the lawyers, judge, prosecutors, jailers and everyone else involved in the case would not "learn a lesson" about the way they had treated him or feel in any way that they were being punished if he was sentenced to die again.  For them, it was just a job.  But, Michael could not follow this kind of rational thinking.  In his world view, once someone had let him down, he could never again "acknowledge" them.  So, even though he agreed repeatedly that he wanted to live and wanted to improve his living circumstances by getting off of death row, and we explained to him the best way to increase his chances of this would be to participate in his defense, he was simply unable to do so.  He described himself as helpless to change the fact that once someone let him down they basically no longer existed.

*Id.* at 21-22.

Recer's next contact with anyone on the case was on May 20, 2008. Having learned that the court had recently denied another request by counsel to withdraw, Recer re-raised with the team that the court's belief that Mr. Gonzales would not cooperate with any lawyer "amounted to an acknowledgement that Mr. Gonzales could not participate in his own defense." *Id.* at 23. Nevertheless, "the team remained very skeptical of Michael's mental illness." *Id.*

The team then asked Recer if she and GRACE could come into the case to do the mitigation work. *Id.* Recer agreed to come into the case and insisted that she meet with Mr. Gonzales to explain her decision since "the addition of a mitigation specialist [Piette] without prior notice to Michel [*sic*] had been the precipitating event of the falling out a year previously," *id.* at 24, but the team was afraid that the court might not allow her into the case if she came again to see Mr. Gonzales before she had been authorized. *Id.* Both counsel went to see Mr. Gonzales in August 2008 to inform him of Recer's proposed entry into the case. He came out to see them because he had asked for their help in securing glasses. *Id.* "They told Michael that they were going to have me appointed as his mitigation specialist and he became upset, telling them he did not want me on the case because I had 'lied' to him." *Id.* Despite her repeated requests to the team to allow her see Mr. Gonzales, counsel insisted on her waiting until after she had been appointed. When she finally was allowed to see Mr. Gonzales, in early September— the same time as the hearing on the motion to fund her as the mitigation specialist—he would not see her. *Id.* at 25-27.

During this same period of time, Mr. Gonzales occasionally came out to see Leach to address some matters related to his confinement. While "Michael was still unable to cope with any conversations about his life history[,] [h]e … told the team some of the same very

69

exaggerated stories about his own criminal behaviors that he had related to me in the fall of

2007." *Id.* at 25. Recer recounts the team's response to these stories:

> I was surprised that the team was taking these claims very seriously at face value.
> They had not collected records or done investigation to determine if the claims
> were true, but they had incorporated these "bad acts" into their theories about
> Michael on the assumption that all of it was true. I suggested that what I knew of
> Michael's history did not support this portrait of him as a criminal mastermind
> and that he was sabotaging his defense because he was mentally ill. But, these
> tales fit the team's concept of Michael and they accepted them uncritically and
> without any reality testing.

*Id.*

Recer tried again to see Mr. Gonzales on September 29, 2008, and he again refused to see

her. *Id.* at 27. In the wake of this and his previous refusal to see her in early September, Recer

recommended that the lawyers move for a determination of Mr. Gonzales's competence to stand

trial. *Id.* at 28-29. She recounts her reasoning as follows:

> At this point, my best efforts to maintain an open door with Michael had failed.
> Michael was acting against his own best interests. He still could not tolerate any
> discussion of his case. By this, I mean that he was unable (not unwilling) to help
> himself or his team.
>
> Because Michael wanted to fight his case, wanted to live and wanted to have a
> relationship with his family, but he insisted that he could not do any of those
> things because people had let him down, I had come very firmly to the conclusion
> that he was not competent to participate in his defense in an adversarial setting
> and that there was nothing the team could do to make him competent. He was not
> psychotic in a way that would prevent him from entering into an agreed resolution
> because the knowledge, understanding and participation of a defendant necessary
> to enter a resolution where the parties are in agreement is much different than
> what is required of a defendant where the team is investigating, developing and
> presenting a case in adversarial proceedings before a jury. Mr. Gonzales' had an
> absolutely fixed belief that because each of his team members had lost his trust in
> some way, he must refuse to cooperate even when that meant he would hurt his
> own self-interests. To cooperate with any of us would be to "give in" or "let
> people push him around". There was an absolute, fixed, static and immovable
> line that Michael could not cross even when what was asked of him was exactly
> what he wanted.

We had also begun to review documents regarding Mr. Gonzales and learned that he had previously been treated with a psychotropic medication called Navane when he was in the custody of the Texas Youth Commission, and that the TYC doctors reported improvement of his ability to relate to others and control his emotions when treated with Navane. Accordingly, I believed that a competency commitment to a state hospital could result in his being treated again with Navane or a similar medication and improve his ability to work with his defense team.

I suggested that counsel move for a determination of his competence to stand trial. Trial counsel did not agree to raise a question about Mr. Gonzales' competence – they did not reject the idea out of hand but neither did they embrace it.

*Id.* at 28-29.

Again, almost three months later, on December 9, 2008, Recer urged counsel to consider

a claim of incompetence to stand trial. In the intervening time, Mr. Gonzales occasionally saw

GRACE mitigation staff but "was unable to tolerate much discussion of his life history." *Id.* at

29. Her reasoning and her efforts to persuade counsel are recounted as follows:

Michael was also discouraging his family and friends from cooperating with us – not because he wanted to die (which he did not) but because he did not trust his team and advised his family and friends not to trust his team. In our life history interviews, we had heard many descriptions of Michael that were similar to what we had witnessed – that he acted like a 'tough guy' and talked about himself as 'a bad guy', but had not done or did not do the bad things he bragged about. We also heard stories about his rigid and concrete thinking, that he was deeply distrustful and paranoid, and that when he felt betrayed or misled by someone, he completely shut them out and would not acknowledge them, even when this was not in his own best interest or doing so made him very sad.

My GRACE colleagues and I became more and more certain there was nothing any team could do that would allow him to participate in his own defense. We knew from records that psychotropic medications had worked for Michael in the past and we began to push the team to insist that the case could go no further until Michael was properly medicated. We had also received lots of records regarding Michael's diabetes and realized that his blood sugar was not at all well managed. We had begun to consult with experts about the consequences of this and advised the team that the diabetes alone – even if he were not mentally ill – could make Michael unable to participate in his defense. We did not know if medicating Michael's diabetes and his mental illness could make him competent, but we were certain that he could not be competent without it.

*Id.* at 29-30.

Even with this information, Leverett was unpersuaded and the more Recer and her

colleagues talked the more it appeared he was unpersuadable:

> Lead counsel Woody Leverett at first seemed willing to consider doing this, though he did not believe Mr. Gonzales would cooperate with an evaluation.  As we continued to discuss this, he seemed to talk himself out of any serious consideration of questioning Mr. Gonzales' competence.  He arrived at the position that he would occupy for the rest of the case – that he could not tell the Court Mr. Gonzales was incompetent due to mental illness because he himself did not believe it.  He believed that Mr. Gonzales was simply "an asshole" who was trying to manipulate him and he (Mr. Leverett) did not want to let him (Michael) make a fool of them.

> My colleague and I enumerated for the team all the evidence of severe mental illness that we had found in records and interviews as well as the signs and symptoms of mental illness we saw in Mr. Gonzales.  We pointed out that Mr. Gonzales had never gained anything from his refusal to cooperate and that if this had been some sort of manipulative strategy then it had failed, yet Michael persisted.

> We had no success at convincing Mr. Leverett to pursue the question of competence.

> He outright rejected the notion that any of the difficulties in working with Mr. Gonzales were associated with mental disorder.  The more I talked with Mr. Leverett, the more I came to understand that he had very little understanding of mental disorders and the effects such conditions have on our clients' thinking and behavior.  Our conversations went in circles.  The attorneys would not raise competency because they did not believe Michael was mentally ill, but when we presented them evidence of mental illness, they dismissed it with the insistence that Michael could not be experiencing any kind of distress because he was such a violent criminal, and that he was not ill but in a power struggle with them.  These conversations would end with discussion of how to bring about a negotiated resolution and how to get more time and resources so that we could continue our life history investigation.

*Id.* at 30-31.

Notwithstanding counsel's apparent unreachability on the issue of competence, Recer

kept trying.  She organized a conference call on February 9, 2009, with the team and Scharlette

Holdman, who had been Recer's mentor.  *Id.* at 32-35.  That effort failed as well, and during the

call it became apparent that neither counsel nor Piette accepted that Mr. Gonzales was mentally

ill because he did not meet their stereotypes of mental illness:

> Mr. Leverett insisted that Michael could not be mentally ill because he (the attorney) had never seen Michael engage in "abnormal thinking or hallucinations" and Michael had "never said that the TV was talking to him or anything like that". For Mr. Leverett, mental illness was limited only to some of the most obvious signs of psychosis. Ms. Piette pointed out that Michael "doesn't crap his pants" and Mr. Leach indicated that Michael was "oriented as to time and place."

*Id.* at 33.

On February 24, 2009, Recer began recounting the impressions of the defense team's

newly appointed psychiatrist, Dr. J. Arturo Silva. Dr. Silva insisted that Mr. Gonzales long-

elevated blood glucose levels could have damage his brain further and that he had to have his

glucose levels brought under control in order to conduct any evaluation:

> The need to get Mr. Gonzales' medicated more effectively for his diabetes and medicated for his underlying bipolar disorder/brain impairments was becoming more and more apparent and critical – simply for the defense team to have any chance to be able to work effectively with Mr. Gonzales. Trial counsel did not budge in their position. They did nothing to deal with Mr. Gonzales' out-of-control medical and mental disorders, and they seemed closed off to the information we were developing about Mr. Gonzales' very serious mental and medical disorders.

> On February 27, 2009, we had another call with counsel about the preparation of the continuance motion we were about to file, we talked specifically about needing a continuance because Michael was then incompetent but unmedicated so we needed time to get him medicated and stable so that he could be evaluated and we could determine whether to raise incompetence to stand trial. The team flatly rejected this approach. They wanted the continuance motion to focus solely on three points – that we had used our time well and diligently, working overtime to meet the court's deadline but could not do so because the more we dug, the more came up; that various factors and circumstances had made the mitigation investigation difficult; and that there was a "light at the end of the tunnel," meaning that if we were given time to finish the life history investigation there were specific reasons to believe that it would come to an end at some point.

*Id.* at 36-37.

Recer prepared an affidavit in support of the motion for continuance and attempted to educate the court about Mr. Gonzales's serious mental and physical health problems while avoiding Mr. Gonzales's lawyers' prohibition against raising competence as an issue:

> In the course of describing the mitigation work that still needed to be done, I related in detail the impressions that Dr. Silva had communicated to the defense team about the mental and medical disorders suffered by Mr. Gonzales and the need to bring his diabetes under control. In particular, I noted that Dr. Silva had told us that Mr. Gonzales' consistently high blood-glucose levels would likely cause symptoms such as irritability, anxiety, memory loss, fatigue, mood changes and sometimes mental confusion. I did not say in that affidavit that I thought Mr. Gonzales' competence to stand trial was in question, even though I thought that it was and had been advocating with counsel for months to raise a question about his competence. As the mitigation specialist and not the lawyer, it was not my place to raise this question, though I tried in the manner that I believed was appropriate to bring this question to the trial court's attention by describing the working expert opinion about Mr. Gonzales current functioning and mental health status.

*Id.* at 37-38.

During the course of the trial just a month after the motion for continuance was denied, as Mr. Gonzales "became increasingly out-of-control and self-destructive," *id.* at 38, Recer and her GRACE colleagues kept pushing counsel to raise the issue of competence, to no avail. When it became apparent that Mr. Gonzales was trying to waive the presentation of mitigation, Recer pushed even more for the team to raise competence, also to no avail. *Id.* The team settled on calling Dr. Silva to raise the issue of Mr. Gonzales's mental illness. *Id.* at 39. The next day, however, "the team decided to stop the presentation of all mitigating evidence at Michael's request without raising the question of whether he was competent to make such a decision." *Id.* Mr. Gonzales was then sentenced to death. *Id.*

Accordingly, defense counsel plainly had much more information than the trial court, and the trial court should have undertaken an inquiry into Mr. Gonzales's competence. Defense counsel were locked into a battle of wills with Mr. Gonzales, were losing that battle for months,

and finally lost it completely – because Mr. Gonzales's will was fueled by mental illness and brain damage, not by reason. Recer and her colleagues tried for eight months to help counsel see all the signs that mental illness and brain damage were the reason they could not win this battle and could not, without the intervention of mental health care, reach or work with Mr. Gonzales. Counsel's obstinate refusal to pursue the issue of competence in these circumstances fell far below the professional norms for the performance of counsel in a capital case.

**B.     But for counsel's failure to pursue Mr. Gonzales's competence to stand trial, the result of the resentencing proceeding would have been different.**

With respect to the prejudice prong of his claim of ineffective assistance of counsel, Mr. Gonzales "need only demonstrate a 'reasonable probability' that he was incompetent, 'sufficient to undermine confidence in the outcome.'" *Bouchillon v. Collins*, 907 F.2d 589, 595 (5th Cir. 1990) (quoting *Strickland* 466 U.S. at 694). "This is a lower burden of proof than the preponderance standard [by which his actual incompetence claim must be proved]." *Id.* Mr. Gonzales can readily meet this standard.

The evidence marshaled in support of the actual incompetence claim, claim I, *supra*, would have been as available to Mr. Gonzales's trial team as it has been to his current federal habeas team. As we have shown in Claim I, that evidence establishes at least a *prima facie* case of incompetence and, we submit, will establish incompetence by a preponderance standard in an evidentiary hearing. Thus, had trial counsel performed effectively, there is at least a reasonable probability that they would have established that Mr. Gonzales was incompetent to be tried. That, of course, would have changed the outcome of Mr. Gonzales's trial, for it would have meant that his trial could not have occurred unless and until his competence was restored.

Further, even if the trial court had found that the evidence fell short of establishing incompetence, at the very least the evidence would have shown that Mr. Gonzales's conflict with

his lawyers was the joint product of his mental illness and brain damage and his defense team's lack of skill in trying to work with Mr. Gonzales. At that point, the trial court would have, by a reasonable probability, been willing to allow a substitution of counsel. Up to that point, the only reason that the trial court continued to believe that Mr. Gonzales was just being stubborn and recalcitrant is that no advocate for Mr. Gonzales had attempted to marshal the evidence that was already before the court, through the testimony of Dr. Cunningham and Dr. Brinkman and the irrational behavior of Mr. Gonzales, to show the court that there was a substrate of illness beneath Mr. Gonzales's outward appearance of recalcitrance. Once this evidence had been marshaled and presented to the court, the result would have been eye-opening to the court. Thus, the deficient performance of Mr. Gonzales's trial counsel in the resentencing affected the outcome of that proceeding at multiple levels.

### The Procedural Posture of Mr. Gonzales's Competency-Related Claims

The foregoing claims were first presented to the state courts in a habeas application filed September 9, 2014, after this Court stayed Mr. Gonzales's federal habeas proceeding to permit him to file such an application. On June 3, 2015, the Court of Criminal Appeals entered a *per curiam* order in which it (1) recounted its previous order that Mr. Gonzales's failure to file a state habeas application by October 4, 2010 amounted to a waiver of his right to file an initial state habeas application, and then (2) held that the claims presented in his September 9, 2014 habeas application failed to meet the criteria for a subsequent state habeas application and the application must therefore be dismissed as an abuse of the writ. *Ex parte Gonzales*, 463 S.W.3d 508, 509 (Tex.Crim.App. 2015). Accordingly, these claims appear to have been procedurally defaulted. However, they are not barred from review by this Court, because either they have not been defaulted or there is cause for the default.

The claims are not defaulted, because the default does not rest on an adequate state procedural ground. Under the adequate state ground doctrine, a federal habeas court will not review a claim rejected by a state court "if the decision of [the state] court rests on a state law ground that is independent of the federal question and adequate to support the judgment." *Coleman v. Thompson,* 501 U.S. 722, 729 (1991). "To qualify as an 'adequate' procedural ground, a state rule must be 'firmly established and regularly followed.'" *Beard v. Kindler,* 558 U.S. 53, 60 (2009). Mr. Gonzales's purported default is not based on a state rule that is firmly established or regularly followed.

The holding that Mr. Gonzales waived his initial state habeas proceeding by not filing his habeas application by October 4, 2010 is in fact a *derogation* of state procedural rules, not a "regular[] follow[ing]" of such a rule. The due date for an initial state habeas application is determined by the date that state habeas counsel is appointed or that the habeas applicant elects to proceed *pro se*. Tex. Code Crim. Proc. Article 11.071, § 4. Counsel must be appointed "unless the applicant has elected to proceed pro se and the convicting court finds, after a hearing on the record, that the applicant's election is intelligent and voluntary." Article 11.071, §2(a). Mr. Gonzales never elected to proceed *pro se* in the May 8, 2009 hearing to appoint counsel, and he was never given the admonishment or asked the questions necessary to assure that such an election, if he did make it, was intelligent and voluntary. In the hearing, Mr. Gonzales merely told the court repeatedly that he did not want a lawyer, he did not want to appeal, and he wanted to be executed. The court made no inquiry of Mr. Gonzales's intentions or understanding of what he was saying. The court made no finding at the conclusion of the hearing that Mr. Gonzales elected to proceed *pro se* or that such an election was intelligent and voluntary. After the hearing, when the Court of Criminal Appeals questioned the trial court about why state

habeas counsel had not been appointed, the trial court -- without any further hearing -- construed the comments by Mr. Gonzales as his having "elected" to proceed *pro se* and having done so "intelligent[ly] and voluntar[ily]."

This record demonstrates unequivocally that the trial court failed to undertake the inquiry required in any other context where a criminal defendant or appellant in Texas seeks to waive counsel and proceed *pro se*. As the Court of Criminal Appeals has explained

> In order to competently and intelligently choose self-representation, the defendant should be made aware of the dangers and disadvantages of self-representation so that the record will establish that 'he knows what he is doing and his choice is made with eyes open.'

*Hubbard v. State*, 739 S.W.2d 341, 345 (Tex.Crim.App. 1987). This plainly never happened in connection with Mr. Gonzales's purported election to proceed *pro se*. Accordingly, the trial court could not accurately find, as required by Article 11.071, § 2(a), that Mr. Gonzales's "election" to proceed *pro se was* "intelligent and voluntary." The finding that it was intelligent and voluntary was, in short, a nullity.

Because of this, the triggering event -- the date state habeas counsel was appointed or the applicant elected, intelligently and voluntarily, to proceed *pro se* -- that would determine the due date for the filing of the state habeas application, Article 11.071, § 4, never occurred. Thus, the time for the filing of Mr. Gonzales's state habeas application *never began to run*. In these circumstances, the Court of Criminal Appeals' determination that Mr. Gonzales waived his initial state habeas proceeding by failing to file his state habeas application by October 4, 2010 is a derogation of state procedural rules. Because of this, it is not an adequate state ground.

The holding that Mr. Gonzales waived his initial state habeas proceeding by not filing his habeas application by October 4, 2010 is based, in addition, on a rule that is not firmly established. In the state habeas application he filed on September 9, 2014, Mr. Gonzales argued

that he was incompetent to waive state habeas counsel and state habeas proceedings, and that for this reason his application should be treated as an initial habeas application. As the dissenting judges in the CCA explained,

> In this proceeding, Applicant raises four claims, including that he was incompetent to stand trial at the punishment retrial and that his trial attorneys rendered ineffective assistance of counsel for failing to raise an issue of his competency to stand trial at the punishment retrial. Applicant does not presently try to satisfy the criteria of Article 11.071, Section 5. Instead, he argues that we should treat this application as an initial writ application because he was also incompetent to have waived his initial writ application. He argues that due process will not countenance such a waiver.

*Ex parte Gonzales*, 463 S.W.3d at 511 (Yeary, J., joined by Alcala, J., dissenting). In their *per curiam* order, the CCA majority did not even mention this reason advanced by Mr. Gonzales for treating his application as an initial application.[17] However, the discussion of this matter by the dissenting judges reveals that the majority implicitly held that there is no requirement under state law that a capital habeas applicant be competent to waive state habeas counsel and proceedings, and that this "rule" is not firmly established.

After recounting Mr. Gonzales's argument that due process "will not countenance" a waiver of state habeas proceedings by a person who incompetent to make such a waiver, Judge Yeary explained that Mr. Gonzales's showing of incompetence and his argument called for the court to confront the issue directly:

> [A]pplicant's present writ application alleges substantial facts to establish a bona fide doubt with respect to his competency to waive state habeas proceedings. If nothing else, the combination of his mental health history (which includes diagnoses as a juvenile with such potentially thought-distorting afflictions as Schizoaffective Disorder and Bipolar Disorder, and treatment with anti-psychotic medications) and his intransigent behavior during the course of the punishment retrial was sufficient to trigger an inquiry into his capacity to understand what he was relinquishing by foregoing post-conviction habeas proceedings. Neither the convicting court nor this Court has made any attempt to determine whether Applicant possessed the requisite capacity to make a rational, non-delusional

---

[17] "The Court does not address that contention [by Gonzales] in its order today." 463 S.W.3d at 510.

choice whether to continue post-conviction litigation proceedings. I believe we should address whether we were mistaken to overlook the competency issue before accepting Applicant's waiver.

463 S.W.3d at 512.

Judge Yeary then addressed the procedural rule that was, at least implicitly, the basis for the CCA's decision to treat the September 9, 2014 habeas application as a subsequent application rather than an initial application:

Has the Court determined that there is no requirement under state law that a capital habeas applicant be competent to waive his statutory right to post-conviction collateral attack of his conviction and death sentence? If so, it should say so.

463 S.W.3d at 513. By failing to address Mr., Gonzales's factual showing of incompetency to waive state habeas counsel and proceedings and his argument that due process does not permit such waivers by an incompetent prisoner, and holding instead that Mr. Gonzales did waive his right to pursue an initial state habeas application, the CCA has, in fact, held "that there is no requirement under state law that a capital habeas applicant be competent to waive his statutory right to post-conviction collateral attack of his conviction and death sentence[.]" *Id*. As Judge Yeary explains, the CCA has not before addressed this question. Accordingly, the rule underlying its decision is not firmly established and is not, for that reason, an adequate state ground.

Finally, the CCA's decision is not based on an adequate state ground, because the state ground violates due process. In *Rees v. Peyton*, 384 U.S. 312 (1966), the Supreme Court held that a condemned federal habeas petitioner cannot be permitted to waive federal review if he is incompetent to make such a waiver. The Fifth Circuit has followed the Supreme Court's lead and has amplified the requirements of due process in such circumstances. *See Rumbaugh v. Procunier*, 753 F.2d 395, 398 (5th Cir.), *cert. denied sub nom. Rumbaugh v. McCotter*, 473 U.S.

919 (1985); *Mata v. Johnson*, 210 F.3d 324, 329-32 (5th Cir, 2000). The refusal of the state courts to determine whether Mr. Gonzales was incompetent to waive state habeas proceedings, or even to recognize that a condemned habeas applicant must be competent to waive state habeas proceedings, violates due process.

Even if this Court determines that the CCA's decision dismissing Mr. Gonzales's state habeas application as an abuse of the writ is based on an adequate state ground, and that as a result the claims presented herein are now defaulted, Mr. Gonzales can overcome the default as to his ineffective assistance of trial counsel claim by a showing of cause for the default. In *Martinez v. Ryan*, ___ U.S. ___, 132 S.Ct . 1309, 1318 (2012),[18] the Court explained that "a prisoner may establish cause for a default of an ineffective-assistance claim in two circumstances. The first is where the state courts did not appoint counsel in the initial-review collateral proceeding for a claim of ineffective assistance at trial." *Id*. The state courts did not appoint counsel for Mr. Gonzales in connection with his initial-review state habeas proceeding. The reason, of course, was that Mr. Gonzales purported to waive his right to state habeas counsel. However, Mr. Gonzales' purported waiver of counsel should not have been given effect – and cannot now be given effect – because his waiver was made when he was incompetent, as demonstrated in this petition. Mr. Gonzales' waivers were made the very day after his resentencing trial ended. His incompetence to stand trial thus infected, and invalidated, his waiver of habeas counsel and habeas proceedings.

While *Martinez* provides a basis for showing cause for the default of Mr. Gonzales's trial ineffectiveness claim, on its face *Martinez* is limited to showing cause for trial ineffectiveness claims. Limiting *Martinez* to its literal meaning, however, makes no sense in the context of Mr.

---

[18]In *Trevino v. Thaler*, ___ U.S. ___, 133 S.Ct. 1911 (2013), the United States Supreme Court held that *Martinez* applies to Texas habeas petitioners.

Gonzales's case because the rationale underlying the decision in *Martinez* applies squarely to Mr. Gonzales's claims under *Dusky/Drope* (incompetence to be tried) and *Pate* (failure to inquire into competence to be tried when there is a *bona fide* doubt about competence).

Thus, *Dusky/Drope* and *Pate* claims "often require investigative work," *Martinez*, 123 S.Ct. at 1317. If that work has not been done at trial – as here – the issues "cannot be raised on direct review," *id.*, and thus there is no "court opinion or ... prior work of an attorney addressing that claim." *Id.* Accordingly, similar to the situation addressed in *Martinez*, "To present a claim [under *Dusky-Drope* or *Pate*] in accordance with the State's procedures, then, a prisoner likely needs an effective attorney." *Id.* Without the assistance of counsel in state habeas proceedings, just as the Court found in connection with trial ineffectiveness claims in *Martinez*, the prisoner who needs to assert incompetence to be tried claims cannot likely comply with procedural rules, may misapprehend federal constitutional law, and cannot investigate. *Id.*

Even more significantly, the prisoner who needs to raise *Dusky/Drope* and *Pate* claims is uniquely unsuited to do so without the assistance of counsel. He or she almost never appreciates or even recognizes his or her incompetence. For this reason, the Supreme Court recognized in *Pate*, that a defendant's failure to raise a claim of incompetence at trial cannot be deemed to be waived under otherwise-applicable procedural rules, because "it is contradictory to argue that a defendant may be incompetent, and yet knowingly or intelligently 'waive' his right to have the court determine his capacity to stand trial." 383 U.S. at 384.

Finally, the right not to be put to trial when one is incompetent is as much a part of "the foundation for our adversary system," *Martinez*, 132 S.Ct. at 1317, as the right to effective assistance of counsel. *See Drope v. Missouri*, 420 U.S. 162, 172 (1975) ("[f]or our purposes, it

suffices to note that the prohibition [against trying an incompetent defendant] is fundamental to an adversary system of justice").

Accordingly, Mr. Gonzales can show cause to overcome the default of his three incompetence-related claims should the Court find that the CCA's June 3, 2015 decision is based on an adequate state ground.

## SECTION TWO

## CLAIMS RELATED TO DUE PROCESS, THE RIGHT TO COUNSEL, AND THE EIGHTH AMENDMENT

I.    **BECAUSE OF THE EFFECTIVE ABSENCE OF MEANINGFUL REPRESENTATION AND SUPPRESSION OF EVIDENCE AT THE GUILT PHASE, NO MEANINGFUL ADVERSARIAL TESTING OF THE STATE'S EVIDENCE OF GONZALES'S CULPABILITY FOR CAPITAL MURDER HAS OCCURRED, IN VIOLATION OF THE SIXTH, EIGHTH, AND FOURTEENTH AMENDMENTS TO THE UNITED STATES CONSTITUTION.**

Evidence of Mr. Gonzales's guilt for the capital murder of Manuel and Merced Aguirre has never been meaningfully adversarially tested. During his 1995 trial, Mr. Gonzales was appointed starkly unqualified counsel without any meaningful criminal experience and whose representation at trial was so deficient as to amount to no counsel at all.

A.    **Mr. Gonzales is being held pursuant to a Judgment of Conviction entered on May 9, 2009; accordingly, challenges to the constitutionality of that conviction can be brought in this proceeding.**

In his federal habeas petition challenging his first capital judgment, Mr. Gonzales raised numerous claims challenging his conviction, including several IATC claims and a *Brady* claim, some of which were addressed on the merits while others were held to be procedurally defaulted and not reviewed. *See* Order Granting Respondent's Partial Summary Judgment and Recognizing Respondent's Notice of Error Allowing Petitioner a New Sentencing Hearing at 17-41, Gonzales v. Cockrell, No. 7:99-cv-00072 (W.D. Tex. Dec. 19, 2002) (Document 83)

[hereinafter "Order Granting Sentencing Relief"]. This Court ultimately granted Mr. Gonzales's petition in part relating to the State's improper reliance on race during sentencing. *Id.* at 41-49. As a consequence, Mr. Gonzales received a new sentencing trial in 2009, after which a new capital judgment against Mr. Gonzales was returned. 5 CR-R 1124-25.

A criminal judgment includes both the conviction and the sentence. *Magwood v. Patterson*, 130 S. Ct. 2788, 2808 (2010) (Kennedy, J., dissenting). *See also Teague v. Lane*, 489 U.S. 288, 314, n.2 (1989) ("As we have often stated, a criminal judgment necessarily includes the sentence imposed upon the defendant"). "This well-established principle applies in the federal habeas context, where the petitioner is 'in custody pursuant to the judgment.'" *Magwood,* 130 S. Ct. at 2808 (citing 28 U.S.C. § 2254(b)). Thus, Mr. Gonzales's 2009 capital judgment, which he challenges herein, is dependent upon his 1995 conviction and 2009 sentence, and his confinement pursuant to the 2009 judgment is unlawful if either were unconstitutionally obtained. *Id.* (the *Magwood* decision "allow[s] a challenger in Magwood's position [who is confined pursuant to a new judgment after a resentencing hearing] to raise any challenge to the guilt phase of the criminal judgment against him in his second application, since a "new" judgment—consisting of both the conviction and sentence—has now been reentered and all of the errors have (apparently) occurred anew").

Mr. Gonzales below raises a claim that encompasses various failures of trial counsel as well as the State's failure to disclose favorable evidence relating to the 1995 guilt phase proceeding. This claim contains some aspects that were reviewed on the merits by this Court previously and some aspects which were not. To whatever extent any of these issues currently may be procedurally defaulted, Mr. Gonzales believes that *Martinez v. Ryan*, 132 S.Ct. 1309

(2012), should provide cause to excuse it.[19]  And because harm from constitutional deficiencies in representation and the State's suppression of favorable evidence should be considered collectively, the Court's prior adjudication of aspects or parts of the below claim should not control the adjudication of the whole claim.  In short, Mr. Gonzales's claim below should be considered a wholly different claim from those previously raised and adjudicated before.

### B. The trial court appointed starkly unqualified counsel to represent Mr. Gonzales during his 1995 capital murder trial.

Ector County District Judge Joseph Connally appointed attorney Garry Garrison to represent Mr. Gonzales before he was indicted.  The indictment, which charged Mr. Gonzales with two counts of capital murder, was thereafter filed in the court of District Judge William McCoy.  Paragraph one of the indictment alleged that Mr. Gonzales intentionally caused the death of Merced Aguirre while in the course of committing or attempting to commit burglary.  1 CR 1.  Paragraph two alleged that Mr. Gonzales intentionally and knowingly murdered more than one person—Merced Aguirre and Manuel Aguirre—during the same criminal transaction. *Id.*

McCoy normally appointed a new lawyer to represent a defendant when another judge had appointed counsel for him, but McCoy made an exception to that practice in this case and appointed Garrison to represent Mr. Gonzales at his trial.  FH 243-44.[20]  Garrison had never served as counsel in a felony trial and his previous criminal trial experience was limited to less than a dozen misdemeanor cases.  FH 233.  He also had little or no civil trial experience.  FH

---

[19] This set of claims was presented in the state habeas application Mr. Gonzales filed on September 9, 2014, along with his three competence-related claims.  Even before the Court reaches the question of cause for the default  of the claims, it should address Mr. Gonzales's argument that the default of these claims by the CCA was not based on adequate state grounds.  *See* pp. 77-81, *supra*. If the Court agrees with Mr. Gonzales, there is no procedural default that precludes review of the claims on the merits.

[20] "FH" refers to the transcript of the federal evidentiary hearing held on March 15, 2001 in this Court concerning Mr. Gonzales's petition for writ of habeas corpus challenging his first capital judgment.  The number after FH is the page number within the transcript.

233-34.  Garrison felt that he should not have been selected for the job and he did not want to do it.  FH 244, 252.  Although he had been elected to the offices of county attorney and district attorney, Garrison performed administrative duties only.  FH 234-35.  He had experienced prosecutors on his staff who tried cases and made all of the litigation decisions.  FH at 234-35.  His office never sought the death penalty, and he would not have permitted a prosecutor with no felony trial experience to act as lead counsel in a capital case.  FH 235, 236.

Garrison knew that many people in the community were very upset about Mr. Gonzales's case because the elderly victims were well liked and respected.  Garrison's mother lived next door to a close relative of the deceased.  When the relative learned that Garrison was representing Mr. Gonzales, she stopped speaking to Garrison's mother.  Garrison was naturally upset when he learned about this.  FH 245.

Garrison decided not long after he was appointed that he needed co-counsel to assist him because he did not have the experience to properly defend Mr. Gonzales.  FH 245.  He asked Judge McCoy to appoint another lawyer to assist him without suggesting a name.  FH 246.  Judge McCoy picked Garrison's office mate, Benny Lowe.  FH 246.

Garrison did not think the judge should have appointed Lowe if more qualified counsel was available.  FH 252.  Although they officed together, Garrison and Lowe did not work together on any cases, and Garrison did not consider him a friend.  FH 236-40.[21]  Previously, they occasionally answered docket calls for each other, but Garrison stopped that practice when he noticed that Lowe was under the influence of alcohol in the office during business hours.  FH 67, 241-242.  Garrison did not trust Lowe to do the simplest legal work for him after he made

---

[21] Garrison was surprised when Lowe called him a year earlier and asked him if he had any office space to rent.  FH 236-40.  Garrison agreed that Lowe could use an empty office for a few months without charging rent because he felt sorry for Lowe.  *Id.*

that discovery because he knew that Lowe's drinking had seriously affected his work and ethical conduct in the past. SH 242.[22]

Lowe was a chronic alcoholic who had just completed a five year suspension of his law license when he moved into Garrison's building. Lowe admitted to the state bar that he had stolen money from several clients by forging their names on settlement agreements and checks. He also made serious mistakes in his law practice that were not brought to the attention of the bar without realizing it until his clients complained. He acknowledged that his professional misconduct and negligence was directly related to his alcoholism. FH 51-62.

When Garrison told Lowe that Judge McCoy appointed him to represent Mr. Gonzales, Lowe believed that Garrison picked him to be his co-counsel and convinced Judge McCoy to approve his selection. FH 64, 69-70, 74. Lowe thought that Judge McCoy should not have appointed either one of them to represent Mr. Gonzales because they were not qualified to do the job properly. FH 72. Lowe knew that Garrison had little or no criminal trial experience and that he himself did not like to work hard to prepare a case. FH 68. He accepted the appointment in spite of these problems because he believed that Garrison was a good friend and wanted his help. FH 64, 69-70, 74.

Garrison told Judge McCoy that he was not satisfied with Lowe's appointment because Lowe did not have sufficient experience for the job. SH 247. Lowe had served as defense counsel in about 25 felony trials, but he had never represented a defendant in a murder or capital murder case. FH 51-62. Garrison did not inform Judge McCoy that he was concerned about Lowe's alcoholism, but he correctly assumed that Judge McCoy was aware of it. SH 248. Judge McCoy refused to appoint a different lawyer to assist Garrison. He pointed out to Garrison that

---

[22] "SH" refers to the compiled record of the state habeas corpus proceedings concerning Mr. Gonzales's first capital judgment. The number after SH is the page number within the compiled record.

Lowe was his office mate and assured him that Lowe never had a problem "mixing it up in the courtroom."  SH 248.

Judge McCoy was aware of Lowe's history of alcoholism and five year suspension from the practice of law for stealing money from his clients when he appointed him to represent Mr. Gonzales.  FH 35-36.  Attorney Warren Heagy personally informed Judge McCoy about Lowe's problems when Heagy employed Lowe as a paralegal in Judge McCoy's courtroom during his suspension.  FH 35-36, 62-63.

Heagy was a very experienced criminal lawyer who had defended capital cases.  He had close personal and professional relationships with Lowe and Garrison.  In Heagy's opinion both of his friends were not qualified to represent Mr. Gonzales and Judge McCoy should have known it when he appointed them.  FH 39-40.  Heagy was familiar with Lowe's disciplinary and drinking problems because he represented Lowe before the Texas Bar Association.  FH 31-33.  When Lowe worked for Heagy as a paralegal during his suspension, he promised to remain sober.  Heagy felt that it was necessary to closely supervise his work in spite of that promise.  FH 33-34.  Heagy noticed that Lowe was under the influence of alcohol soon after Lowe started to work for him.  FH 34.  When Lowe regained his law license and moved into an office in Garrison's building, Heagy asked Garrison how Lowe was doing.  Garrison told him that he was concerned about Lowe because his drinking was getting worse.  FH 39.

Heagy also had considerable knowledge of Garrison's capabilities as an attorney.  Heagy did not consider Garrison to be a criminal lawyer or a trial lawyer at all.  FH 37-38.  Heagy was only aware of one trial that Garrison actually participated in.  Garrison's work on that case ended after the jury was selected.  Garrison went to Heagy's office and complained to him that it was

very hard to pick a jury.  FH 38.  In Heagy's opinion, Garrison had a reputation for not liking hard legal work.  FH 39.

Lowe believed that the court appointed Garrison to be lead counsel.  Lowe took it upon himself to act as lead counsel at the guilt stage because Garrison had no trial experience and did not like to prepare a case.  Lowe assumed that the job would not have been done if left to Garrison.  FH 73-76.  Garrison believed that the court gave him and Lowe equal authority.  FH 248.  Garrison concentrated all of his effort on the penalty phase of the trial and allowed Lowe to function as lead counsel at the guilt phase in spite of the fact that he did not trust him to answer a docket call.  FH 242, 262.

Neither Lowe nor Garrison had any plan for ensuring that every document in the State's huge open file was read by the attorney who needed the information.  FH 75, 335.  Garrison personally tried to review the entire file to prepare for the penalty phase, but he did not know whether Lowe was actually familiar with everything that he read because Lowe did his own independent review of the file.  FH 250-51.

**C.     As a consequence of trial counsel's sheer incompetence, evidence of Mr. Gonzales's guilt was not meaningfully adversarially tested and substantial doubt about his culpability remains.**

Garrison and Lowe have both admitted under oath that all of their mistakes were caused by a lack of proper preparation, ignorance of the law, ignorance of the facts or negligence.  The State's evidence of guilt upon which Mr. Gonzales's conviction rests was exceedingly thin.  The State conceded as much before the jury during closing argument.  17 RR 365 (explaining to the jury that the State's case was not "wrapped up with ribbons and bows on it").  Counsel's incompetence infected the entire proceeding and led to the admission, without objection, of

untested and unreliable evidence on which the State relied to secure a guilty verdict. These include:

- Unreliable and untested evidence that Mr. Gonzales made an admission to involvement in the crime to a jail guard;

- Unreliable and inadmissible hearsay evidence that Mr. Gonzales swept dirt between the Aguirre home and Gonzales home;

- Unreliable and untested evidence that Mr. Gonzales's teardrop tattoos represented his commission of murder;

- Unreliable and inadmissible hearsay evidence that the peppers discovered in the Aguirre home and in the Gonzales backyard were "very, very rare" for Odessa; and

- Unreliable and inadmissible opinion evidence that a photograph showing a stain on a camper between the Aguirre home and Gonzales home was a "blood transfer stain."

Moreover, trial counsel's failure to object to numerous instances of improper argument by the prosecution left the impression with the jury that it could convict Mr. Gonzales even if he only caused the death of just one individual and allowed the prosecutor to effectively give testimony to the jury, including his personal opinion that a knife entered into evidence was the murder weapon—despite the lack of any evidence in the record establishing that.

Even including additional evidence of guilt presented at Mr. Gonzales's 2009 resentencing trial, the evidence the State has marshaled to date to support its indictment of capital murder against Mr. Gonzales is exceedingly thin. Although there is evidence of Mr. Gonzales's possession and attempts to sell property taken from the Aguirre home, the State has arguably never presented any credible direct evidence that Mr. Gonzales caused the death of either of the two complainants. And while circumstantial evidence can often be just as strong, if not stronger, than direct evidence, no circumstantial evidence relied on by the State tended to show that Mr. Gonzales caused any individual's death.

Moreover, as this Court previously recognized, the presence of "a second assailant" was "strongly suggested by the evidence" and was even conceded by the State during the first trial. Order Granting Sentencing Relief at 22; 15 RR 15; 17 RR 388.[23] Indeed, all of the evidence presented at either trial, even when viewed in a light most favorable to the State, sheds only the faintest of light on what actually occurred inside the Aguirre house, or on who was in it when the Aguirres were killed. This extraordinarily weak case for guilt was amplified by the ineptitude of trial counsel, who allowed admission of evidence that went meaningfully untested and failed to exclude (and even sometimes elicited) unreliable hearsay testimony to Mr. Gonzales's detriment.

Mr. Gonzales was charged with murdering more than one person in the same criminal transaction. Evidence introduced in the guilt-innocence phase of Mr. Gonzales's 1995 trial reflected that Manuel and Merced Aguirre, an elderly couple, were stabbed to death in their house sometime on April 21, 1994. Their adult son discovered their bodies in the living room the following morning. A microwave, a VCR, a camera, a pistol and a stereo with speakers were missing, but there was no sign of forced entry. 15 RR 24-25, 33-35. A few flakes of red pepper were found under Ms. Aguirre's body. 15 RR 114-15. Unreliable and inadmissible hearsay testimony elicited (but not objected to) by defense counsel reflected that the peppers were "very, very rare." 15 RR 140-41.

The scene of the crime was bloody. The clothing and limbs of both victims were saturated with blood. There were large pools of blood on the floor near their corpses. A significant amount of blood was spattered on the walls and furniture in the room where the bodies were found. A blood spatter expert determined that Mr. and Mrs. Aguirre were both

_____

[23] It was precisely these concerns about the role of other individuals in the Aguirres' deaths that caused the Odessa Police Department to begin a second investigation into the homicides in 2000. Although this investigation predated this Court's decision and even the evidentiary hearing held in this Court, Mr. Gonzales was not privy to any of the information discovered in it until it was disclosed to him during his resentencing trial.

killed in that room. Mr. Aguirre was sitting in a chair when he was stabbed and died. Mrs. Aguirre was standing near him when she was attacked. Blood was also found in some of the other rooms of the house that the Aguirres did not enter after they were stabbed.[24] 15 RR 51, 106-111, 180-201; State's Ex. 7-13, 16 (1995).

Dr. Sparks Veasey performed autopsies on the bodies of both victims. Manuel Aguirre was stabbed eleven times with a single-edged knife. Merced Aguirre had stab wounds too numerous to count. Dr. Veasey believed that she fought for her life because she had many defensive wounds. He could not determine whether she was stabbed with the same knife as her husband. 16 RR 314-19, 327-28, 346-48.

Then-twenty-year-old Michael Gonzales lived with his mother and wife in a house that was adjacent to the Aguirre home. The Aguirres complained to the police that Mr. Gonzales had been disturbing them with noise from late night parties. They also put bars on their windows because they were afraid of him. 15 RR 21, 63.

Mr. Gonzales was arrested 15 days after the crime was committed. No one else was charged, but the lead investigator, Odessa Police Department (OPD) Detective Snow Robertson, suspected that two other people, Daniel Lugo and Jesse Perkins, were also involved in the offense. 15 RR 143, 144, 149. Their friend, Julian Olivarez, also believed that they both probably had something to do with the murder of the Aguirres. 16 RR 244. Lugo had told a friend that there were dead bodies in the Aguirres' house at least an hour before the crime had been reported to the police. 15 RR 125-26. Lugo also possessed and turned over to the police the stereo that had been stolen from the Aguirres' house. 15 RR 126.

---

[24] The jury saw a videotape of the bodies and crime scene that graphically illustrated the quantity and location of the blood. State's Ex. 16 (1995).

Ector County Jail guard Charles Kenimer provided the only direct evidence of Mr. Gonzales's involvement in the murders in the guilt-innocence phase. Kenimer testified that he saw Mr. Gonzales emerge from an interrogation room with Robertson and a Texas Ranger on the date of his arrest. Kenimer said to Mr. Gonzales, "Boy, you really got these officers upset. I don't know what you said," because Mr. Gonzales appeared to be "pretty upset" and he wanted to calm him down. 16 RR 309, 311. Kenimer claimed that Mr. Gonzales responded in Spanish, "They're trying to pin this rap on me, this murder rap on me. They can't do it. They don't have any evidence. Although I did it, you know, but they don't have anything to go on." 16 RR 309. Kenimer was stunned that his "little statement" prompted Mr. Gonzales to confess to him. 16 RR 309, 311.

Trial counsel could have, but did not, meaningfully impeach Kenimer, because they had overlooked a prior written inconsistent statement Kenimer had made. Mr. Gonzales's guilt phase trial counsel retained an investigator to assist them in reviewing the State's large open file. FH 335. In the file, he located a sworn, written statement by Kenimer. FH 336. The statement read,

> On May 7, 1994, I came to work on the 3 p.m.–11 p.m. shift in the Odessa
> Detention Center. About 8:20 p.m. we just finished setting bond on Michael
> Dean Gonzales. I was escorting him back to his cell, In D Block. He then blurted
> out "They can't pin nothing on me". I told him I don't know, I'm not familiar
> with what your case is. Michael Gonzales is my third cousin, on my mother's
> side, and he knows I'm his cousin. Michael then said "I did it, but they can't pin
> nothing on me." I then told him, I don't know what you're talking about. He
> replied [sic] was "On the murder of the old man and the old lady." I told him, "I
> didn't know anything about it, I'm kinda new around here." I just played it up. I
> then locked him down in D Block. I then called my nephew, Joel, and asked him
> what Pim's oldest son's name was, and he confirmed that it was Michael Dean. I
> then just hung the phone up, and that's when you [Detective Robertson] walked
> up to the window. I was just getting ready to call you when you asked me to let
> you know if Michael Gonzales makes statements to anyone about the murders.

Exhibit 7 (Affidavit of Charles Kenimer, May 7, 1994). The investigator called the statement to the attention of trial counsel and made a copy of it because he considered it "very vital" to the defense. FH 336.

Trial counsel also possessed OPD Detective Robertson's report, which quoted the text of Kenimer's statement verbatim and provided Robertson's own account of what transpired between him and Kenimer. According to Robertson's report, he booked Mr. Gonzales into the Odessa Detention Center on the first floor at 6:00 p.m. after he interrogated him on the second floor. He went back to his office on the second floor to question another witness, and returned to the jail for Mr. Gonzales's arraignment. He left again to examine some of the stolen property and returned to the jail at 8:25 p.m. Robertson's report described what happened next:

> 8:25 p.m. I went to the Odessa Detention Center and spoke to Detention Officer Charles Kenimer. I requested that if anyone, including inmates or detention officers heard anything from Michael Dean Gonzales concerning the homicides, that they should contact me immediately. He then informed me that Michael Dean Gonzales has just told him that he committed the murder. I then asked him to come to the detective division to give me a statement concerning the admission of guilt to Charles Kenimer who happens to be Michael Dean Gonzales's third cousin on his mother's side. Charles Kenimer believes this is why he told him that he had committed the murders.

Exhibit 8 (OPD Summary of Interview of Charles Kenimer, Apr. 22, 1994). Trial counsel did not interview Kenimer to prepare for trial. FH 261-62.

Because they had not prepared, trial counsel did not impeach Kenimer on the basis of divergences between his testimony, his written statement, and Robertson's report. Rather, counsel elicited that Mr. Gonzales made the statements in Spanish and asked Kenimer if there could have been a difference between what Mr. Gonzales said in Spanish and how Kenimer translated it into English. Kenimer testified it would be "real hard" to "lose translation" because "basically the words are the same." 16 RR 311–312.

After trial, Kenimer testified at an evidentiary hearing in this Court concerning the discrepancies. He revealed that he was a former Army intelligence officer and worked as a supervisor of corrections officers for the sheriff of Hudspeth County for eight years. FH 342-43, 345. Kenimer quit his supervisory position in Hudspeth County because he felt that he was "stuck in one rut and wasn't getting nowhere." FH 347. He wanted a promotion, but believed he would not get one because he did not have the right connections. FH 348. Kenimer obtained employment as a jail guard in Midland, but the job was less satisfying than the one he left in Hudspeth County. Kenimer felt like a glorified baby sitter for the inmates. FH 350. He hoped to find work better suited to his capabilities, and believed he could be a good law enforcement officer. FH 351. Kenimer was familiar with the requirements of the Miranda rule because he was trained to follow it. He knew that an inmate's unwarned statement to a guard could not be used in court if the guard initiated the conversation. FH 344. Kenimer had heard about the Aguirre homicides before Mr. Gonzales was arrested. He was a member of their church and knew that his fellow parishioners were upset about the crime. FH 351.

Regarding the circumstances of Mr. Gonzales's purported admission, Kenimer testified in the federal habeas hearing to an account inconsistent with his trial testimony. Kenimer testified he was on the ground floor in the Odessa Detention Center on May 7, 1994, when Robertson and Sanders brought Mr. Gonzales into the jail in his street clothes. FH 354, 398. Kenimer was stationed in a security area that was video and audio taped at all times. FH 355. The interrogation room in the Odessa Police Department was on the second floor of the same building. FH 354. Kenimer knew suspects were interrogated in that room. FH 394-95. Kenimer was related to Mr. Gonzales, but they did not recognize each other because they had not

met since Mr. Gonzales was a baby. FH 353-54, 356. He only learned they were relatives two weeks later. FH 370.

Kenimer saw Robertson and Sanders talking to Mr. Gonzales, but he did not hear their conversation. FH 394-95. The officers appeared frustrated and Mr. Gonzales appeared upset. FH 394-97. Robertson and Sanders told Kenimer that Mr. Gonzales wanted to make a telephone call before they left. FH 354-55, 400. The telephone was located near Kenimer's post in the video and audiotaped security area of the jail. Kenimer knew that the audio tape could record the voice of a person speaking in a conversational tone of voice. FH 355. Kenimer did not expect Mr. Gonzales to say anything to him when he escorted him to the telephone and he was careful not to initiate a conversation. FH 356, 359, 364-66, 382, 388. Mr. Gonzales spoke to him without any prompting when they were about 10 feet away from the telephone. FH 388. Mr. Gonzales's voice was only a little bit lower than a normal conversational tone. FH 391. Kenimer testified that Mr. Gonzales simply told him, "I did it." FH 388.

Kenimer testified six times at the federal hearing that he did not say a single word to Mr. Gonzales before Mr. Gonzales made this admission. FH 356,359,364-66, 382, 384-85. Kenimer denied that he even said a few words to calm Mr. Gonzales down before Mr. Gonzales spoke to him. FH 359. Kenimer acknowledged that he would have violated the jail's policy which forbid making statements to inmates that could agitate them if he had alluded to the fact that Mr. Gonzales appeared to be upset about the interrogation. FH 364-66.

Robertson called Kenimer about ten minutes after Kenimer put Mr. Gonzales in a cell and asked Kenimer to come upstairs to the police station on the second floor. FH 366-67. Kenimer told Robertson about Mr. Gonzales's confession at that time and gave him a written statement about it. FH 367-68.

Kenimer believed that it was part of his job to assist law enforcement and he was anxious to do it well. FH 368. Kenimer was trained to write accurate reports and supervised the report writing of other guards when he worked in Hudspeth County. FH 343-44, 367-68. Kenimer was careful to accurately write down what happened in his written statement because he was aware of the significance of the admission. FH 368. Kenimer was sure he wrote down "exactly" what happened in his contemporaneous statement because he read it carefully before he signed it. FH 367, 370.

Confronted with his statement, however, Kenimer insisted that parts of it were not accurate. Kenimer denied that he knew that Mr. Gonzales was related to him when he wrote that in his statement. Kenimer also insisted that he did not call his nephew before he wrote the statement to confirm they were related. FH 371. Kenimer suggested that all of the references to his family relationship with Mr. Gonzales in his written statement could have been caused by computer errors. FH 354.

Kenimer strongly denied that he ever told Robertson that he believed Mr. Gonzales confessed to him because they were related. FH 375. Kenimer insisted Robertson was lying if Robertson put that information in his report. FH 375-76. He was unable to explain how Robertson knew he was related to Mr. Gonzales or why Robertson said so in his report.[25] FH 377-78.

When Kenimer was confronted with the fact that his contemporaneous written statement and testimony at the federal hearing conflicted with his testimony at the trial and suppression hearing that he spoke to Mr. Gonzales before Mr. Gonzales confessed, he refused to say which version was incorrect. FH 382-84. When the court ordered Kenimer to state who spoke first, he

_____

[25] Robertson also testified at the evidentiary hearing. He averred that, if asked about it at trial, he would have testified that his report describing his and Kenimer's interactions was accurate. FH 295.

admitted, "it's written down, sir, that must have been it. . . .  I don't remember initiating the conversation."  FH 384-85.  Later, however, Kenimer claimed that he spoke to Mr. Gonzales near the telephone in the jail before he purportedly made his admission.  This time, Kenimer explained that he was "trying to calm him down, let him know I wasn't his enemy, I didn't do anything to him.  Just to let him know that we were there to help him out or anything."[26]  FH 401.

Lowe, who cross-examined Kenimer at trial, acknowledged during the same post-trial evidentiary hearing held in this Court that there were many inconsistencies between Kenimer's trial testimony and written statement; that he could have effectively impeached Kenimer by questioning him about those inconsistencies; and that he should have done so.  FH 91–94.  Lowe also recognized that there were many inconsistencies between Kenimer's trial testimony and Robertson's report; that he should have asked Kenimer whether Robertson's report was accurate; and that Kenimer would have been heavily impeached if he had used the report and prior inconsistent written statement.  FH 96–99.  Lowe further believed it would have been much more effective to impeach Kenimer's credibility than to try to show the possibility of a discrepancy in translating Mr. Gonzales's statement from Spanish to English, as Lowe's questioning was not based on any evidence or reason to believe that any such discrepancy existed.  Trial counsel Garrison likewise believed that Kenimer's statement could have been effectively used to impeach Kenimer and that it was a serious omission not to do so.  FH 261-62.  Because of their lack of preparation, trial counsel did not engage in any such meaningful impeachment of Kenimer at trial.

---

[26] The attorneys at the hearing agreed to terminate Kenimer's questioning at this Court's suggestion without resolving any of the conflicts about when, where, how and why Mr. Gonzales allegedly confessed to him. The Court explained that "the testimony of Mr. Kenimer is hopelessly confused. We could go back over this for I think hours and not get anything straight."  FH 404.

Aside from Kenimer's testimony, only circumstantial evidence linked Mr. Gonzales to the Aguirres' deaths. Linda and Julian Olivarez testified that about a week after the Aguirres' deaths, Mr. Gonzales sold items—a VCR, microwave, and stereo—to them that were identified as having been stolen from the Aguirres' house. 16 RR 223-26, 233-34. Mr. Gonzales subsequently retrieved the stereo from Olivarez when Olivarez did not pay for it. 16 RR 237. The stereo was eventually recovered from Daniel Lugo. Latent print analysis reflected that Mr. Gonzales's fingerprints were on the back of the stereo cabinet. 16 282-84. No evidence was introduced concerning fingerprints on any of the other stolen items. Unobjected-to hearsay testimony reflected that Lugo had obtained the stereo from Mr. Gonzales. 16 RR 275. Unobjected-to testimony also reflected that Mr. Gonzales had sold a handgun from the Aguirre house to a woman named Delia Sanchez.[27] 15 RR 69.

Additional circumstantial evidence consisted of improper and inadmissible references by OPD Detective Robertson to "blood transfer stains" on a camper parked in the alley between the Aguirres' house and Mr. Gonzales's house. 15 RR 155. In fact, the substance, whatever it was, was not shown to be a "blood transfer stain" and instead was "just" Detective Robertson's "determination from a photograph that was taken." *Id.* He did not know if any analysis had been performed on the stain. *Id.* Defense counsel did not object to, or challenge, Robertson's speculation about the stain. Additional unobjected to hearsay testimony reflected that an anonymous Crime Stoppers informant reported that Mr. Gonzales had swept dirt in that alley on the morning that the bodies were discovered. 15 RR 160; 16 RR 213. Additionally, police

---

[27] Only two pieces of *actually admissible* evidence therefore connected Mr. Gonzales to any of the Aguirre property: a latent print matching his finger detected on the stereo and the testimony of Julian and Linda Olivarez, who were married. The Olivarez's testimony that Mr. Gonzales had the Aguirre property in his home was impeachable, however. First, it was Julian Olivarez who was actually in possession of the property. Second, Jesse Perkins had made statements that Olivarez had actually been present at the Aguirre home when the murders occurred. *See* Exhibit 9 at 209-11 (OPD Transcribed Interview of Eric Butler, May 16, 1994).

discovered a red pepper like the one found under Merced Aguirre's body on Mr. Gonzales's back doorstep. A bowl of peppers was discovered in the Gonzales refrigerator. 15 RR 116. Unobjected to hearsay testimony elicited by defense counsel himself suggested that the peppers matched each other and that the peppers were "very, very rare." Robertson's testimony about the rarity of the peppers consisted of unobjected to hearsay statements by a "pepper expert" from Texas A&M Research Center in Weslaco, Texas. 15 RR 140-41.

The State also presented unreliable evidence through OPD Detective Robertson that Mr. Gonzales's two tear drop tattoos on his face is a sign that he has killed someone. 15 RR 137-39. Trial counsel did nothing to counter this evidence, even though, as this Court previously concluded, defense counsel "could have easily found a witness to refute Robertson's testimony and they could have easily challenged his testimony by using other evidence." Order Granting Sentencing Relief at 28.

> [P]roducing recent photos of [Mr. Gonzales] was a simple undertaking to undermine Robertson's testimony and it [] was not done nor is there evidence that defense counsel made such an attempt. Furthermore, there is no evidence that it was sound trial strategy to avoid the subject because . . . it was evidence that connected Petitioner to two murders requiring them to refute it.

*Id*. at 29. The Court concluded that trial counsel's failure to challenge this evidence was constitutionally deficient. *Id*. at 28.

When the State rested its case, defense counsel presented no evidence. The court prepared its charge and asked whether the parties had objections. 17 RR 356. The State requested that the court change the first paragraph to make it clear that "we are only prosecuting on count two of the indictment," that Mr. Gonzales committed the murder of more than one person in the same criminal transaction. *Id*. The instructions presented to the jury did not contain instructions permitting them to find Mr. Gonzales guilty under a parties theory of

liability.  *See* 1 CR 139–47.  Accordingly, by law, the jury had to find as a fact that Mr. Gonzales's own actions caused the deaths of both Merced and Manuel Aguirre before finding him guilty of capital murder.[28]

Defense counsel argued in his summation that the State failed to prove that petitioner was guilty of capital murder because other suspects were involved in the offense; that there was no direct evidence that he caused the death of the victims; and that the court's instructions did not permit the jury to find that he was legally responsible for the criminal conduct of another.[29]  17 RR 374.

The prosecutor argued that Mr. Gonzales personally killed the Aguirres, but he conceded that "other people were there" and "perhaps" played a role in the taking of their lives.  15 RR 15; 17 RR 388.  The prosecution relied heavily in its closing argument on Kenimer's unchallenged testimony about Mr. Gonzales's alleged admission of responsibility to him.  17 RR 365, 390.  It also repeatedly emphasized the unobjected-to hearsay testimony that Mr. Gonzales had swept the dirt between the houses "to cover something up."  17 RR 363, 365.

Counsel's dismal preparation and lack of experience extended to closing argument, in which they failed to object to numerous instances of improper argument by the prosecution. Most damagingly, counsel failed to object to the prosecution telling the jury that they could convict Mr. Gonzales even if they believed somebody else caused the death of one of the complainants.  District Attorney John Smith reminded the jurors that he used a hypothetical fact

---

[28] In Texas, a person may be held criminally responsible for the conduct of another under certain circumstances. *See generally* Tex. Penal Code § 7.02. Thus, under a parties theory, a person may be found guilty of capital murder even if the person did not in fact cause the death of the complainant. Absent a parties instruction, however, a jury must find that the defendant himself caused the death. *See Prystash v. State*, 3 S.W.3d 522, 540 (Tex. Crim. App. 1999) ("If a defendant were convicted as the primary actor, he would have necessarily caused the death of the deceased. However, if the accused were convicted under a parties liability theory, then the possibility is raised that the accused did not actually cause the deceased's death.").

[29] Staying true to their lack of preparation, however, defense counsel repeatedly argued that Mr. Gonzales's fingerprint was discovered on a VCR, when in fact it was discovered on a stereo.  17 RR 374, 381.

situation about his assistant to explain the law of parties during *voir dire* and told them that they

had to apply this legal doctrine to the evidence:

> [I]f [my assistant] Mr. Stevens and I went to the grocery store and I robbed it and
> then I killed the clerk, that Mr. Stevens is just as guilty of capital murder as I am.
> That's still true. Still true. He's a party to the crime. Now, I believe that Michael
> Dean Gonzales killed both Manuel and Merced Aguirre. I believe he did it. But I
> believe other people were there. But they are not on trial today. Michael Dean
> Gonzales is on trial and you need to deal with him . . . . But don't you think for a
> minute that if Michael Dean Gonzales came in and took care of Mr. Aguirre and
> somebody else took care of Mrs. Aguirre, that does not make him guilty of capital
> murder. Of course it makes him guilty. He was there, he took part in it, he aided,
> he abetted.

17 RR 388-89. Mr. Gonzales's trial counsel failed to object to this misstatement of the law as

applicable to the case. Trial counsel Lowe subsequently admitted that the prosecutor's argument

misstated the law applicable to Mr. Gonzales's case because the jury's instructions did not allow

them to find Mr. Gonzales criminally responsible for the murder of either victim if he did not

personally cause the death. Lowe offered no strategic justification for his failure to object to that

improper comment. FH 123–24. Nor is any justification conceivable.

> Also during closing, the prosecutor testified as to his opinion about the murder weapon.
> What about a murder weapon? In my opinion and that is all that it is, this is the
> murder weapon. I can't prove it beyond a reasonable doubt. The other evidence
> is beyond a reasonable doubt but you heard Sparks Veasey say that is the type of
> weapon that would have caused the wounds to Mr. and Mrs. Aguirre.

17 RR 388. Counsel did not object. Lowe subsequently testified that the prosecutor held up a

knife that was found in Mr. Gonzales's house when the prosecutor offered that testimony to the

jury. FH 125-26. He admitted he should have objected as soon as he saw the prosecutor pick up

the knife and heard him say, "In my opinion," because there was no evidence to connect the

knife to the murder and it was improper for him to express his personal opinion about the facts.

Lowe had no strategic justification for his failure to object to the improper testimony. FH 125–

26.

Counsel did not object again when the prosecutor responded to his argument that Mr. Gonzales had no motive to spontaneously confess to a jail guard by giving unsworn testimony about his personal experience as a defense attorney in other cases:

> Mr. Lowe asked the rhetorical question, why in the world would he say such a thing? I will tell you why. Because he is a tough guy. I have represented a thousand of them. I have seen a thousand of them, and they can't keep their mouths shut. They have got to tell somebody, "I did it but they will never figure it out." I have asked them a hundred times, "Why didn't you just keep your mouth shut?" "Well, I don't know." They convict themselves. And that is what Michael Dean Gonzales has done in this case. He has convicted himself. He had to tell somebody. He had to show somebody what a tough guy he is.

17 RR 386. Lowe admitted he should have objected as soon as the prosecutor said, "I have represented a thousand of them." Although Lowe recognized that the testimony was intended to buttress Kenimer's testimony about Mr. Gonzales's alleged spontaneous confession, he offered no strategic justification for not objecting. FH 119-21.

Trial counsel also failed to object in two instances when the prosecutor gave unsworn testimony about his experience as a prosecutor in other cases:

> I have tried many cases up here, and every time there is -- the State didn't do something, the State did too much, the State didn't do this right, the State didn't do that right. Let's attack the State. Let's attack the district attorney's office. May I suggest to you that is for one purpose and for one purpose only, is to take your eyes off of the evidence and Michael Dean Gonzales.

17 RR 361. The prosecutor then argued:

> I have been called upon very few times in my life, and the privilege of trying one of those cases that they say that it is wrapped up with ribbons and bows on it, it's got a confession and it's got eyeball witnesses, that there is a video camera, all that stuff, that stuff doesn't exist.

17 RR 365.

Finally, counsel failed to object to testimony given by the prosecutor during closing about what the community is expecting and what the community wants:

Because of my position, I am out in and amongst the community a lot of the month and I meet with various groups. I give speeches, I give talks, and I visit with our citizens on a daily basis, and almost without exception, somebody will say, "John, when are they going to do something about this crime? When are they going to do something about this stuff?" And I tell them, "Look, we are trying them as fast as we can try them. The police are catching them as fast as they can catch them. We are sending them to the pen as fast as we can send them." They say, "But when are they going to do something?" And it didn't dawn on me until a few years ago, what they are talking about is themselves. That you happen to be up here today. You happen to be the jury. You happen to be "they." You are the ones that has got to do something about this, folks.

17 RR 389–90. Counsel did not object. *Id.* Lowe knew that both comments were improper because there was no evidence in the record to support them, and he believed that both were designed to explain away gaps in the evidence that could have created reasonable doubt. Lowe recognized that he should have objected as soon as the prosecutor referred to his experience in other cases, and he had no justification for not doing so. FH 129–31.

During deliberations, the jury sent a note to the trial judge which read, "We need clarification on requirements of capital vs. murder verdict. If Mr. Gonzales murdered one individual only, then does his "association" make him guilty of both." 1 CR 149. Although aware of the prosecutions misstatement of law to the jury during closing argument, the court responded, "I can only refer you to the charge as written." *Id.* After further deliberation, the jury returned a verdict of guilty for capital murder.

### D. The State's failure to disclose negative luminol testing contributes to the lack of confidence in the guilty verdict.

Testimony from trial reflected the presence of blood around Mr. Aguirre and "cast off" blood on the ceiling near him. 15 RR 108-09. There was "an extremely large amount of blood" pooled around Mrs. Aguirre and "a lot" of blood on the wall near Mrs. Aguirre. *Id.* at 109. "There was transfer blood from where her head had struck the wall as she was fighting for life. There was blood that extended from this point to this point from different type of spatter." *Id.*

Unknown to the jury that convicted Mr. Gonzales, however, a luminol test had been performed

on Mr. Gonzales the day after the homicides with negative results.

After his 1995 trial, counsel for Mr. Gonzales discovered and alleged in a motion for a

new trial that the State had concealed this exculpatory negative result. 1 CR 166-67. Mr.

Gonzales raised this claim for relief in his federal habeas corpus petition challenging his first

state court capital judgment. As this Court summarized the relevant facts,

> On the same day that the autopsies were being done, [Mr. Gonzales] was taken
> into custody for questioning by the Odessa Police Department. Shortly thereafter,
> between 3:20 p.m. and 3:30 p.m., within sixteen to eighteen hours of discovery of
> the bodies of the Aguirres, Bret Lambert and Sergeant Harold Thomas conducted
> a luminal [*sic*] test of Petitioner. A luminal [*sic*] test consists of the use of a
> chemical compound that fluoresces when it comes into contact with any traces of
> blood, including a surface which has had blood on it but which has been washed.
> It is very difficult for someone to clean themselves to such a degree that a luminal
> [*sic*] test would not glow in the area which has had blood. The test will luminesce
> even when there were only small amounts blood on the area. This compound is
> sprayed onto the surface which has contacted blood. The subject is then
> examined with the light off to determine whether or not any trace of blood exists
> on the areas examined. The luminal [*sic*] substance was sprayed from the tips of
> Petitioner's fingers all the way up his arms to his shoulders, as well as on his
> shoes. The lights were then turned off and Petitioner was viewed. Both officers
> examined Petitioner closely and the only area that fluoresced on Petitioner was at
> the crook of his arm, where blood had been drawn from him shortly before. In a
> report, the results were documented by Officer Lambert as "inconclusive," but at
> a Motion for New Trial Hearing, he and Officer Thomas said, "negative" would
> have been more accurate.

Order Granting Sentencing Relief at 4-5. Because the negative result was wrongly couched as

"inconclusive," the fact of luminol testing and the negative result were not used at trial by the

defense. *Id*. at 5 n.7.

This Court previously found that this evidence was favorable to Mr. Gonzales and that

the State wrongly failed to disclose it:

> After careful consideration of all the facts and pleadings, the Court finds that the
> prosecutor was under an obligation to reveal exculpatory evidence even though
> the defense attorney's had access to the prosecution's entire file and even though

> [Mr. Gonzales] was present when the luminal [*sic*] test was administered and results were immediately available to him in his presence. The obligation stems from the "First-Pretrial Order(s)" entered by the trial court on August 3, 1994. Specifically, the Order requires the District Attorney to "allow inspections of all the following, to the extent that they exist and are in the possession or control of, or accessible to, the District Attorney." As part of the discovery that the District Attorney was required to disclose was, "Exculpatory Evidence: Descriptive content of all evidence not otherwise covered elsewhere in these orders, that is favorable to the accused on the issue of guilt or innocence, or that is inconsistent with the guilt of the Defendant."
>
> The evidence of the negative test result fits squarely within the trial court's definition of what the District Attorney should have brought to Defendant's attention as part of the discovery before trial. The Assistant District Attorney, during a pretrial hearing, informed the trial court of its open file, which the Court applauds, but then he failed to make sure that the defense knew of any possible exculpatory evidence. While the parties have disagreed on whether or not the evidence is exculpatory based on the "inconclusive" label put on the results initially, it seems that all the parties including Officer Lambert at the Motion for New Trial hearing conceded that the accurate characterization of the test result would be "negative" rather than "inconclusive."

*Id*. at 19-20.[30] Despite the State's misconduct, this Court deferred to the prior state court determination that the introduction of the negative result of the luminol test would not have changed the jury's finding at the guilt stage and denied the claim. *Id* at 21. Though the negative luminol testing on its own may have been insufficient to establish prejudice on a *Brady* claim in light of the evidence known at the time, it nevertheless forms part of the evidentiary picture for Mr. Gonzales's contention that confidence in the verdict has been undermined by the trial counsel's deficient representation and the State's failure to disclose exculpatory evidence.

**E.      As a consequence of Mr. Gonzales's incompetency during his resentencing, newly presented evidence of his culpability went meaningfully unchallenged, and should provide no confidence in Mr. Gonzales's guilt.**

---

[30] This Court rejected on the merits Mr. Gonzales's claim that the failure to disclose the negative luminal test violated due process. Giving deference to the prior state court adjudication, the Court concluded that the introduction of the negative result of the luminal test would not have changed the jury's finding at the guilt stage. Order Granting Sentencing Relief at 21. Although the negative luminal testing on its own may have been insufficient to establish prejudice on a *Brady* claim in light of the evidence known at the time, it nevertheless forms part of the evidentiary picture of Mr. Gonzales's contention that confidence in the verdict has been undermined by the appointment of unqualified trial counsel who afforded deficient representation and the State's failure to disclose exculpatory evidence.

Although her testimony was not before the jury that returned the guilty verdict supporting Mr. Gonzales's current judgment, Martha Reyes testified for the first time during Mr. Gonzales's 2009 resentencing trial about events relevant to Mr. Gonzales's culpability. Because of his incompetency at the time and inability to meaningful assist in his representation, Reyes's testimony was not meaningfully challenged during the resentencing proceeding, and it should afford no confidence in the guilty verdict rendered against him in 1995.

Reyes was Mr. Gonzales's girlfriend and mother of his child in 1994. She lived with Mr. Gonzales and his mother at the Gonzales home. Reyes testified that in order to get some money to try to have a birthday party and presents for their daughter, Mr. Gonzales asked her to get the Aguirres to open the door for him. 27 RR-R 61. Mr. Gonzales told her that once inside he was going to "[j]ust push around, you know, get a VCR so he knew he could sell it, pawn it." *Id*. at 62. Reyes did go over to the Aguirres' house "about 9:00" and she was allowed inside. *Id*. She talked to the Aguirres until about 10:00 pm. *Id*. at 64. She knew this because it was close to when the local news was coming on the television. *Id*.

As Reyes was leaving, she kept talking to Mrs. Aguirre, who was standing near the doorway. *Id*. at 64-65. Reyes stood outside talking to her for a few minutes. *Id*. at 65. Reyes saw Mr. Gonzales come around the corner. *Id*. She did not see any weapons, and she did not see anybody else with Mr. Gonzales. *Id*. at 66, 69. Reyes then went into her house until Mr. Gonzales returned "shortly thereafter." *Id*. at 65, 66. Gonzales had blood on his clothes. *Id*. at 66. When she asked what happened, Mr. Gonzales said, "There was an accident." *Id*. She saw that Mr. Gonzales had a knife, which he washed and put back in the drawer. *Id*. at 67. She knew that Mr. Gonzales had stolen a VCR, but that was the only item she saw. *Id*.

On cross-examination, Reyes testified that a statement she gave to Odessa police on May 7, 1994, that she went to bed about 11:30 p.m. and learned that something had happened when she woke up at 10:00 a.m. was false. *Id*. at 77-78. She also testified that when defense investigator Nancy Piette spoke to her on September 25, 2007, Reyes told her the same story as she had told the Odessa police in 1994, *i.e.*, that she had gone to bed and seen nothing. *Id*. at 78-79. Reyes went with Mr. Gonzales to Julian Olivarez's house to sell some of the stolen items. *Id*. at 79. She did not see anybody with Mr. Gonzales, but she did not know for a fact if anybody else was involved. *Id*. at 80. She told police that somebody else probably could have helped Mr. Gonzales, and that it could have been an individual named Daniel Lugo. *Id*. at 79, 82. She did not actually see Mr. Gonzales enter the Aguirre house, and she did not know who entered the house with him. *Id*. at 80-81. The decision to rob the Aguirres was a spur-of-the-moment idea that Mr. Gonzales had while he and Reyes were discussing a birthday for their daughter. *Id*. at 81. She believed that Mr. Gonzales had been drinking all day. *Id*. at 82. Cross-examination was abruptly interrupted by an outburst from Mr. Gonzales and never resumed.[31] *Id*. at 83.

There are several reasons why Reyes's testimony should not imbue Mr. Gonzales's conviction with any confidence. First, Reyes's account makes her an accomplice of Mr. Gonzales and liable for capital murder. Her alleged agreement to assist and alleged assistance in fact to Mr. Gonzales in gaining entry into the Aguirre home so that he could commit robbery makes her an accomplice. *See Smith v. State*, 332 S.W.3d 425, 439 (Tex. Crim. App. 2011) ("An accomplice is a person who participates in the offense before, during, or after its commission with the requisite mental state" and "must have engaged in an affirmative act that promotes the

---

[31] Although not covered in cross-examination, perhaps because of its abrupt termination due to Mr. Gonzales's outburst, Reyes told authorities that when she saw Mr. Gonzales enter the Aguirre home, she did not see him carrying a knife or any other weapon. She also told them that after arrest he repeatedly told her, "I didn't do it." Exhibit 11 at 8 (OPD Transcribed Interview of Martha Reyes, June 7, 2000).

commission of the offense that the accused committed"). Her agreement and participation in a conspiracy to burglarize the Aguirres renders her criminally responsible for their murder under Texas law. *See* Tex. Penal Code § 7.02(b) ("If, in the attempt to carry out a conspiracy to commit one felony, another felony is committed by one of the conspirators, all conspirators are guilty of the felony actually committed, though having no intent to commit it, if the offense was committed in furtherance of the unlawful purpose and was one that should have been anticipated as a result of the carrying out of the conspiracy").

Texas law distrusts accomplice witness testimony. *See* Tex. Code Crim. Proc. art. 38.14 ("A conviction cannot be had upon the testimony of an accomplice unless corroborated by other evidence tending to connect the defendant with the offense committed; and the corroboration is not sufficient if it merely shows the commission of the offense"); *Smith v. State*, 332 S.W.3d 425, 439 (Tex. Crim. App. 2011) ("The [Texas] Legislature has determined that the factfinder should exercise caution when considering the testimony of an accomplice"); *Blake v. State*, 971 S.W.2d 451, 454 (Tex. Crim. App. 1998) ("accomplices often have incentives to lie"). Reyes was in fact highly motivated to tell a story that ensured Mr. Gonzales would never be released from prison. She was afraid of him—Mr. Gonzales reportedly physically abused her while she lived with him—and told investigators that she wanted to make sure that Mr. Gonzales did not ever leave prison. Exhibit 10 (OPD Summary of Interview of Martha Reyes, May 24, 2000) ("Martha Reyes told us that she was deathly afraid of her former husband and was afraid of what he would do to her if he ever got out of prison. Martha Reyes would like to see Michael remain in prison for the safety of herself and her family.").

Second, this is not Reyes's first story, nor has it even been consistently told since it originated. On May 7, 1994, Reyes told the police that she was in bed all night and neither heard

nor saw anything.  Exhibit 12 (Written Statement of Martha Gonzales, May 7, 1994).  On May

24, 2000, she told OPD detectives "basically the same story that she had given detectives on 05-

07-94."  Exhibit 10.  But just two weeks later, on June 7, 2000, Reyes, for the first time, told

police an account about having tricked the Aguirres into allowing Mr. Gonzales into their home.

Then, on September 25, 2007, Reyes told defense investigator Nancy Piette the same story as she

had told the Odessa police in 1994, *i.e.*, that she had gone to bed and seen nothing.  27 RR-R 78-

79.  And finally on May 4, 2009, at Mr. Gonzales's resentencing hearing, she testified to the

account in which she tricked the Aguirres into opening their door.

Third, substantial evidence is in tension with Reyes's testimony and statements to police.

Most evidently, Jesse Perkins's own admissions to being at the Gonzales house the day of the

murders and to his and other individuals' being present at the Aguirre home when the Aguirres

were killed, if accurate, suggests that Reyes was not being truthful that she did not see anybody

with Mr. Gonzales that night.[32]  *See, e.g.,* Exhibit 13 (OPD Summary of Interview of Ike Isaacs,

May 23, 2000); Exhibit 9 (OPD Transcribed Interview of Eric Butler, May 16, 1994).  Moreover,

when Mr. Gonzales's sister Michelle Payne was interviewed a couple of weeks after the

Aguirres' deaths were discovered, she gave an account of her being at the Gonzales home at

about 9:15 p.m. in which she observed that Mr. Gonzales "had a friend along then."[33]  Exhibit 14

(OPD Transcribed Interview of Michelle Payne, May 6, 1994).

---

[32] Jesse Perkins has made numerous statements to several individuals throughout the course of the investigation into the Aguirre homicides.  These statements were not always consistent, except in one regard:  he was at the Aguirre home, and so were other individuals besides he and Mr. Gonzales.  Perkins never made statements admitting to actually having participated in the stabbing of the Aguirres, but he has variously claimed to have witnessed several individuals do so.  Those individuals include Mr. Gonzales, Daniel Lugo, and Julian Olivarez.

[33] While Reyes has consistently maintained, at least in this version of her story, that she did not see anybody with Mr. Gonzales that night, she has always hedged her statement.  She told police, for example, that "[s]omebody could have helped" Mr. Gonzales.  She "kinda figured that maybe [Daniel Lugo] was the one involved … with Michael" in the Aguirre burglary and that "Lugo could have gone in [the Aguirre house]."  Exhibit 11 at 15 (OPD Transcribed Interview of Martha Reyes, June 7, 2000).  *See also id.* at 17 ("Someone probably could have helped him.").  During

As well, Reyes's account of that night is generally incompatible with the account given by Payne. Reyes told police that Payne came by the Gonzales's house shortly after Mr. Gonzales had returned from the Aguirres. At the time, Mr. Gonzales had not cleaned up and still had blood on him. When Payne showed up, Mr. Gonzales did not go outside, but stood at the doorway. Payne never saw Mr. Gonzales because she did not get out of the car and because it was dark. Payne wanted Mr. Gonzales or Reyes to go to the store with her so she would not have to wake her children up. She left angrily when Mr. Gonzales refused to go with her or allow Reyes to accompany her. Exhibit 11 at 10.

Payne was interviewed at least twice by the OPD, once in 1994 and again in 2000. Payne reported that she had stopped by the Gonzales home on the night of the homicides at about 8:30 p.m. and stayed there for about thirty minutes. Contrary to Reyes's testimony, Payne went inside the Gonzales home. Mr. Gonzales, Reyes, and their baby were watching television. While she was there, Mr. Gonzales asked Payne if she wanted to buy a camcorder or a camera with a long lens. Payne left about 9:00 p.m., but returned after five minutes because she thought she had forgotten her purse. She stopped at the house and honked. Mr. Gonzales then came out from around the back of the house "and he had a friend along then." Exhibit 14 at 164 (OPD Transcribed Interview of Michelle Payne, May 6, 1994). Mr. Gonzales came to the car, and Payne asked him to go check if she left her purse. Mr. Gonzales went inside and returned saying no. Payne then discovered her purse in the trunk of her car. Mr. Gonzales did not act nervously and was behaving normally.[34] Exhibit 15 at 21 (OPD Transcribed Interview of Michelle Payne, June 2, 2000).

_____

trial, she admitted that she did not actually see Mr. Gonzales enter the Aguirre house, and she did not know who else entered the house with him. 27 RR-R 80-81.

[34] For Reyes's account to have been true, Payne would have had to have stopped by the Gonzales house sometime after 10:00 p.m. But Payne's account consistently placed her there at 8:30 p.m. and consistently placed her inside the

Reyes's story is also incompatible with known physical evidence. Reyes told OPD Detective Bartlett that when Mr. Gonzales returned from the Aguirre home, "he had blood all over him." Exhibit 11 at 4 (OPD Transcribed Interview of Martha Reyes, June 7, 2000). "He had blood here. Blood there. Everywhere." *Id*. at 17. She also stated that Mr. Gonzales washed off a bloody knife in the kitchen sink. *Id*. at 13-14. Yet, a luminal test performed on Mr. Gonzales on the day of the Aguirres' bodies were discovered was negative. As well, testing of the contents of the Gonzales's kitchen sink's P trap for human blood was negative. Exhibit 16 at 3 (Texas Department of Public Safety Preliminary Report, Jan. 13, 1995). Reyes's statement is also in significant tension with conclusions this Court formed in prior litigation that the negative luminal testing could be explained by Mr. Gonzales's having disposed of bloody clothing prior to entering his home and that the blood at the crime scene was isolated. Order Granting Sentencing Relief at 21-22.

Fourth, Reyes's testimony occurred during a resentencing hearing. As such, Mr. Gonzales's guilt or innocence was not a relevant legal issue, and the cross-examination of Reyes was therefore not directed to impeaching Reyes's inculpatory testimony as it would have been had the testimony occurred during the guilt phase of a capital murder trial. Moreover, the cross-examination of Reyes was abruptly interrupted by an outburst from Mr. Gonzales, after which it never resumed. For that reason, her materially untested testimony should not increase confidence in Mr. Gonzales's conviction.

**F. The Court should not have confidence in Mr. Gonzales's conviction.**

When trial counsel's failures to meaningfully test evidence, to exclude unreliable and inadmissible evidence, and to object to improper prosecution argument are considered with the

---

house for a period of time and in close proximity to Mr. Gonzales. Moreover, she first gave this account initially just a couple of weeks after the night in question.

State's failure to disclose the negative luminal tests, confidence in the verdict is undermined. Given the weakness of the State's evidence that Mr. Gonzales directly caused the death of either individual he was alleged to have killed, all of these omissions significantly increased the likelihood of an erroneous guilty verdict.

The note sent by the jury plainly indicated its having taken seriously the possibility of finding that Mr. Gonzales only caused the death of one individual which, under the terms of its jury instructions, would have required it to acquit Mr. Gonzales of capital murder. Significantly impeaching the State's only direct evidence of guilt, excluding unreliable hearsay testimony, correcting the State's misstatement of law to the jury that they were legally permitted to find Mr. Gonzales liable for the criminal actions of third parties, prohibiting the prosecutor's repeated opinion testimony, and presenting evidence that testing reflected no blood on Mr. Gonzales within hours of the stabbings of two individuals would have gone a long way towards the jury returning a not guilty verdict and should not leave the Court with confidence in the outcome.

Under these circumstances, Mr. Gonzales has been deprived of his rights to counsel, to the effective assistance of counsel (to the extent any counsel can be said to have been meaningfully appointed), to a fundamentally fair trial, and to a reliable capital sentence. *See Powell v. Alabama*, 287 U.S. 45 (1932) (provision of counsel must be meaningful and not pro forma to satisfy requirement of the right to counsel); *Strickland v. Washington*, 466 U.S. 668 (1984) (right to assistance of counsel includes the right to effective assistance of counsel); *Brady v. Maryland*, 373 U.S. 83 (1963) (due process requires the State to disclose to the accused favorable evidence in its possession); *Ake v. Oklahoma*, 470 US 68, 76 (1985) (the due process clause guarantees a fundamentally fair criminal trial); *Caldwell v. Mississippi*, 472 U.S. 320

(1985) (Eighth Amendment requires heightened reliability in the determination that death is the appropriate punishment).

First, the State is constitutionally required to provide a trial "with counsel **to help the accused defend against the State's charge**." *Rose v. Clark*, 478 U.S. 570, 577 (1986) (emphasis supplied). Absent this, "a criminal trial cannot reliably serve its function as a vehicle for determination of guilt or innocence, . . . and no criminal punishment may be regarded as fundamentally fair." *Id*. (internal citation omitted). In this regard, "[t]he Constitution's guarantee of assistance of counsel cannot be satisfied by mere formal appointment." *Avery v. Alabama*, 308 U.S. 444, 446 (1940).

The appointment to Mr. Gonzales of grossly unqualified and inexperienced counsel deprived Mr. Gonzales of the assistance of counsel. Just as "the denial of opportunity for appointed counsel to confer, to consult with the accused and to prepare his defense, could convert the appointment of counsel into a sham and nothing more than a formal compliance with the Constitution's requirement that an accused be given the assistance of counsel," so, too, may the appointment of unwilling, starkly unqualified, and inexperienced counsel ignorant of the criminal law and rules of evidence convert the appointment of counsel into "a sham and nothing more." *Id*.

Second, to whatever extent Mr. Gonzales can be said to have had the assistance of counsel, that assistance was clearly ineffective under the standards set forth in *Strickland*. "Counsel . . . has a duty to bring to bear such skill and knowledge as will render the trial a reliable adversarial testing process." *Strickland*, 466 U.S. at 688. Trial counsel failed to fulfill this paramount duty. Trial counsel's numerous deficient acts, which were "very serious

mistakes" in trial counsel Lowe's own words, FH 220, collectively undermine confidence in the guilty verdict rendered against Mr. Gonzales.

Third, Mr. Gonzales was deprived of a fundamentally fair trial. The right to effective assistance of counsel "is personal to the defendant, and is explicitly tied to the defendant's right to a fundamentally fair trial — a trial in which the determination of guilt or innocence is 'just' and 'reliable.'" *Kimmelman v. Morrison*, 477 U.S. 365, 392-93 (1986) (Powell, J., concurring in the judgment). The right to the effective assistance of counsel and to the disclosure by the State of favorable evidence in its possession before trial protect the same interests—preservation of the integrity of the trial process—and have equivalent, built-in harm standards; moreover, prejudice for each claim is assessed cumulatively. *Compare Kyles v. Whitley*, 514 U.S. 419, 434 (1995) (touchstone of materiality is a "reasonable probability" of a different result); and *id.*, at 436 (courts are to consider the cumulative impact of *Brady* error when determining whether undisclosed evidence was material) *with Strickland*, 466 U.S. at 694 (defendant must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different (emphasis supplied)). *See also id.* ("the appropriate test for prejudice finds its roots in the test for materiality of exculpatory information not disclosed to the defense by the prosecution"); *Gonzales v. McKune*, 247 F.3d 1066, 1078 (10th Cir. 2001) ("[W]e can see no basis in law for affirming a trial outcome that would likely have changed in light of a combination of *Strickland* and *Brady* errors, even though neither test would individually support a petitioner's claim for habeas relief."), *vacated on other grounds*, 279 F.3d 922 (10th Cir. 2002) (*en banc*). The knowing appointment of unwilling, starkly unqualified, and inexperienced counsel ignorant of the criminal law and rules of evidence, in conjunction with the State's failure to disclose its knowledge that it could detect no blood on Mr. Gonzales's body

hours after the homicides were believed to have occurred, renders Mr. Gonzales's trial fundamentally unfair and violates due process.

Fourth, the capital nature of Mr. Gonzales's case, and the requirement of heightened reliability attendant to it, *see Caldwell v. Mississippi*, 472 US 320, 340 (1985), amplifies all of these problems as it relates to his death sentence and violates the Eighth and Fourteenth Amendments to the United States Constitution.

## CONCLUSION AND PRAYER FOR RELIEF

WHEREFORE, Mr. Gonzales prays that this Court:

1.  Determine that the procedural default found by the Court of Criminal Appeals is not based on adequate state grounds;

2.  If necessary because of the Court's determination with respect to the adequacy of the state grounds for the Court of Criminal Appeals' decision, hold an evidentiary hearing on the bases for cause for the default of the claims raised herein;

3.  Hold an evidentiary hearing on the merits of the claims raised herein;

4.  Grant relief and order Mr. Gonzales released from custody; and

5.  Grant such other relief as law and justice requires.

Respectfully submitted,

s/ Richard Burr

Mandy Welch
Texas Bar No. 21125380
Richard Burr
Texas Bar No. 24001005
BURR AND WELCH, PC
Post Office Box 525
Leggett, Texas 77350
Tel. (713) 516-5229

mandy.burrandwelch@gmail.com
dick.burrandwelch@gmail.com

**Counsel for Petitioner**

**VERIFICATION**

I, Richard Burr, attorney for Petitioner in the above-entitled action, state that to the best of my knowledge and belief, the facts set forth in this Petition are true.

I declare under penalty of perjury that the foregoing is true and correct. Executed on Tuesday, September 1, 2015.


s/Richard Burr


**CERTIFICATE OF SERVICE**

I certify that on September 1, 2015, a copy of the foregoing pleading was electronically served on counsel for the Respondent by filing the document with the Clerk of the Court for the U.S. District Court, Western District of Texas, using the electronic case filing system of the court.

W. Erich Dryden
Office of the Texas Attorney General
Post Office Box 12548
Austin, Texas 78711
erich.dryden@oag.state.tx.us


s/ Richard Burr