UNITED STATES DISTRICT COURT

WESTERN DISTRICT OF TEXAS

MIDLAND DIVISION

| | | |
|---|---|---|
| **MICHAEL DEAN GONZALES**, | § | |
| | § | |
| Petitioner, | § | |
| | § | |
| | § | CIVIL NO. 7:12-CV-00126-DAE |
| -VS- | § | *CAPITAL CASE* |
| | § | |
| | § | |
| **LORIE DAVIS**, | § | |
| Director, | § | |
| Texas Department of Criminal | § | |
| Justice, Correctional Institutions | § | |
| Division, | § | |
| | § | |
| Respondent. | § | |

———————————————————

**CLOSING ARGUMENT OF THE PETITIONER**

———————————————————

# TABLE OF CONTENTS

I.   Mr. Gonzales was incompetent to stand trial.................................................................1

   A.   Introduction .................................................................................................................1

   B.   The behaviors of Mr. Gonzales that are relevant to the competency question
        .....................................................................................................................................2

   C.   Mr. Gonzales was incapable of assisting in his defense due to brain
        impairment, paranoid personality disorder, and delusional disorder, and
        these disorders, rather than antisocial personality disorder, accounted for the
        behaviors that called his competence into question. .............................................4

        1.   Mr. Gonzales's brain impairments and paranoid disorders are well
             documented. ...................................................................................................4

        2.   Mr. Gonzales's brain impairments and paranoid disorders made him
             incapable of assisting in his defense. ..........................................................11

   D.   Nothing in the record before this Court contradicts the evidence establishing
        that Mr. Gonzales was incompetent to be tried due to his inability to assist
        in his defense. ...........................................................................................................16

        1.   Despite appearances, at times, that Mr. Gonzales was engaged in
             rational decision-making, he was not.........................................................16

        2.   Mr. Gonzales's expressed belief that he would get a new trial if there
             was a conflict of interest between him and his lawyers or if he refused
             to "acknowledge" his lawyers, does not support the view that his
             refusal to assist his lawyers was simply a strategy to attack what he
             believed would inevitably be a new death sentence, rather than a
             product of brain damage and paranoia. ......................................................18

        3.   Mr. Gonzales's wavering about what outcome he wanted at trial...............19

        4.   Whether Mr. Gonzales has a paranoid delusional disorder does not
             matter because his paranoid personality disorder in combination with
             brain damage produces the same unyielding misperception of reality
             that a delusion produces. ............................................................................20

        5.   The Court should rely on Dr. Brinkman's neuropsychological testing........21

6.    Malingering is not an issue in this case. ........................................................22

7.    Antisocial personality disorder cannot explain Mr. Gonzales's behavior or account for the uniqueness of Mr. Gonzales's behavior among all the criminal clients Mr. Leverett and Mr. Leach have represented. ................................................................23

E.   Despite the absence of case law addressing trial competency in a case parallel to Mr. Gonzales's case, the Fifth Circuit has provided guidance that is helpful to this Court. .......................................................25

II.   Judge McCoy violated Mr. Gonzales's due process right not to be subjected to trial while incompetent, under *Pate v. Robinson*, 383 U.S. 375 (1966). ..................27

A.   Judge McCoy's common practices regarding competency explain his failure to act in this case. .............................................................28

B.   Judge McCoy failed to act on evidence, viewed objectively, that should have raised a reasonable doubt as to Mr. Gonzales's competency. ..............................29

1.   What the record and evidence told Judge McCoy about Mr. Gonzales .......29

2.   Facts that developed before resentencing .........................................................31

3.   What Judge McCoy observed at trial .............................................................32

C.   Despite seeing evidence that, viewed objectively, should have raised a reasonable doubt as to Mr. Gonzales's competency, Judge McCoy failed to inquire into it. ..................................................................33

III.   Defense counsel rendered ineffective assistance of counsel to Mr. Gonzales, under *Strickland v. Washington*, 466 U.S. 668 (1984). ................................................35

A.   Defense counsel's performance fell below an objective standard of reasonableness. ....................................................................36

1.   Defense counsel was bound by professional standards. ...............................36

2.   Defense counsel failed to meet those professional standards. .....................36

B.   But for counsel's failure to pursue the issue of Mr. Gonzales's incompetency, the result of the resentencing trial would probably have been different. ..............................................................................................38

CERTIFICATE OF SERVICE ......................................................................... 41

# Mr. Gonzales's Closing Argument

I. **Mr. Gonzales was incompetent to stand trial.**

A. **Introduction**

The key to analyzing the competency question presented by Mr. Gonzales's case is to take into account Mr. Gonzales's full mental health history when considering whether he lacked the ability to consult with counsel with a reasonable degree of understanding before and during his resentencing. Dr. Cunningham did that. Dr. Proctor and Dr. Arambula did not. They simply analyzed Mr. Gonzales's behavior in relation to his defense team and his disruptive behavior in the courtroom, and concluded—without giving any genuine consideration to his mental health history—that he had a severe form of antisocial personality disorder which caused his behaviors but that did not impair his ability to act differently. Dr. Cunningham explained the shortcoming in Dr. Proctor and Dr. Arambula's evaluations quite succinctly:

> [T]o say this is simply anti-social personality disorder that is causing him to refuse, you have to set aside the developmental history that pretty compellingly demonstrates that there are neurocognitive problems that he has had from early childhood that increasingly are displayed in very significant impulsivity limitations and interpersonal limitations as he moves across his adolescence and into early adulthood. You have to set aside Dr. Brinkman's finding of dementia and say actually his neurocognitive status is not significantly affecting anything, without doing any additional assessment that would put that earlier finding of Dr. Brinkman to bed that would refute that in some fundamental way. You also have to set aside that the descriptive criteria of paranoid personality disorder are so much more descriptive and so much more consistent with the presentation and interaction that he has with his defense counsel and with other people. You also have to set aside that mostly individuals with anti-social personality disorder are predative and exploitative of other people, that they're seeking their own interest, whatever it may cost others. Whereas Mr. Gonzales is proceeding in a way that is directly and overtly self-defeating.

Transcript of Evidentiary Hearing, Vol. 1 [hereafter TR 1], at 111–12.

1

To illustrate how important it is to take Mr. Gonzales's full mental health history into account, we first recount his relevant behaviors. We will then show that, while *some* of those behaviors were consistent with the behaviors of a person who has antisocial personality disorder, *all* of these behaviors were consistent with the brain impairments and paranoia Mr. Gonzales suffered due to neurodevelopmental disorders, trauma, and ingestion of drugs and inhalants in his life. Combined with the stress of a resentencing proceeding, a move to a new facility, and the pain of alienation of his family, these impairments and paranoia render the view of the State's experts—that Mr. Gonzales was capable of choosing to relate to counsel differently and to comport himself at trial—insupportable.

**B.   The behaviors of Mr. Gonzales that are relevant to the competency question**

The Court is familiar with the behaviors of Mr. Gonzales that are relevant to the competency question, but it is helpful to summarize them:

1.   Although Mr. Gonzales was able to, and frequently did, make ministerial demands of his trial team, he refused to relate to and cooperate with counsel on all matters of defense—investigation (including talking with the defense team about his life history), mitigation theories, trial strategy, and trial witnesses. He was apparently willing to relate to counsel prior to their refusal to hire Dr. Charles Lanier as the mitigation specialist. In the aftermath of that, Mr. Gonzales came to believe that counsel had lied to him about checking Dr. Lanier's credentials and experience. Once he believed that, Mr. Gonzales refused to relate to the defense team on all matters of defense, saying repeatedly that once an attorney "lies to you," the attorney "can't be trusted."

2.   As Woody Leverett testified, TR 6, at 38, Mr. Gonzales was "mercurial" in his moods, sometimes communicating with counsel aggressively and hatefully, sometimes communicating

with them calmly and respectfully—though never relating to them prior to trial on matters of defense.

3.    Mr. Gonzales articulated impulsive thoughts about his defense, but those thoughts were as mercurial as his moods—alternating between wanting to prevail at trial and wanting to be resentenced to death.

4.    On one or two occasions, Mr. Gonzales expressed the belief that his refusal to relate to counsel, counsel's efforts to withdraw for these reasons, and the court's refusal to permit counsel to withdraw would provide a basis for reversing the death sentence if he was resentenced to death. Notwithstanding this belief, he asked the jury to resentence him to death, he refused to pursue direct appeal or state habeas remedies—the avenues necessary to try to gain relief on this ground, and he made no affirmative effort to seek federal habeas remedies.

5.    Mr. Gonzales engaged in some intimidating and threatening behaviors against jail personnel. For example, after being caught with a contraband cell phone, he threatened a guard, and crushed and attempted to eat the phone.

6.    Mr. Gonzales failed to comport himself at trial. He threatened to disrupt the trial as it was beginning, yelled and cursed at counsel during the trial, threatened his wife when she testified for the prosecution, gave the finger to a prosecution witness, threatened to grab a bailiff's gun and start shooting if the defense called his sister or daughter as witnesses, and drew a picture of a clown with a bloody knife and displayed it during closing argument.

**C. Mr. Gonzales was incapable of assisting in his defense due to brain impairment, paranoid personality disorder, and delusional disorder, and these disorders, rather than antisocial personality disorder, accounted for the behaviors that called his competence into question.**

**1. Mr. Gonzales's brain impairments and paranoid disorders are well documented.**

As Dr. Cunningham testified, Mr. Gonzales's mental health history showed that, by the time of his 1995 trial, he suffered from neurocognitive disorders and a history of paranoid thinking. By 2007, his paranoid thinking had evolved into two paranoid disorders, and his neurocognitive disorders had worsened—exacerbated by the onset and poor control of diabetes. These disorders resulted in Mr. Gonzales having very thin "reserves," and, when he was confronted with the stressful circumstances surrounding the resentencing trial, he was unable to assist in his defense.

Dr. Cunningham explained that Mr. Gonzales suffered from neurodevelopmental disorders that, in combination with several traumatic brain injuries; the ingestion of alcohol, drugs, and inhalants during Mr. Gonzales's childhood and adolescence; and chronic child abuse, caused neurocognitive disorders, or, simply put, significant brain dysfunction. These disorders were first diagnosed by Dr. Sam Brinkman through neuropsychological testing and psychological evaluation prior to Mr. Gonzales's 1995 trial. The neurocognitive disorders found by Dr. Brinkman were:

> [1] [D]ementia … [which] reduce[d] his thinking and problem solving skills, his language and communication skills, his memory and learning[,] attention[,] and executive processes ... [and]

> [2] [P]ersonality change due to multiple traumatic brain injuries, and polydrug abuse combined type ... [which] affected the personality structures of the brain or the personality centers of the brain.

Petitioner's Exhibit 7 [hereafter "PX 7"] (excerpt from 1995 Trial Transcript), at 87–88 [internal transcript pages].

Elaborating, Dr. Brinkman further described the symptoms of the dementia suffered by Mr.

Gonzales:

> [The] most common symptoms, therefore, would be … disturbance in complex behaviors, such as inhibition of impulses, a knowledge of the social appropriateness of one's behavior, relevancy of behaviors, the ability to look at a problem from different standpoints and not become highly rigid in one's thinking.

*Id.* at 78–79.

Dr. Brinkman explained that there were four types of personality characteristics associated with Mr. Gonzales's brain damage. He described these as:

> **Labile**, which means becoming extremely emotional at fairly low levels of being provoked.

> **Disinhibited**, which means doing things that we normally would inhibit ourselves from doing.…  Disinhibited means that behaviors will come out much more quickly, much more strongly. That … [would be] … all motivationally based, emotionally based, and drive based behaviors.

> The **aggressive** is as its name applies, and as you are aware, has characterized Mr. Gonzales's history for some time.

> The **paranoid** has to do with thought processes that cause a misperception or a somewhat bizarre perception of events and bizarre thought processes that have to do with interpreting people's motivations and interpreting people's attitudes toward him, interpreting people's trustworthiness, etc., as such that he might think that someone would unjustifiably want to hurt him, unjustifiably want to do him in, screw him over, whatever the term may be.

> It also involves thought processes that have to do with making one's self think that he is something he really isn't. That he has great powers, that he is a great leader, that he is, in this case, bad. That he is a bad guy.

*Id.* at 88–89 (emphasis supplied).

The neurocognitive disorders identified by Dr. Brinkman in 1995 became worse by the time of the resentencing proceedings in 2007 to 2009. As Dr. Cunningham observed, "[Mr. Gonzales's] psychological status and arguably his neurocognitive status deteriorated over the intervening 12 years between 1995 and 2007." TR 1, at 88. Dr. Alan Jacobs, a board-certified neurologist

and endocrinologist, confirmed this, testifying that Mr. Gonzales's neurocognitive status did deteriorate after 1995 and that the likely cause for that was diabetes.

Dr. Jacobs explained that "in recent decades it's become quite apparent that the central nervous system, specifically the brain is damaged by diabetes over a period of time," TR 2, at 253, and that the less the diabetes is under control, the more likely the brain damage over time. *Id.* at 254.

Applying his expertise to Mr. Gonzales's circumstances, Dr. Jacobs found that Mr. Gonzales's diabetes very likely began in 1999, four years before Texas Department of Criminal Justice staff diagnosed it and eight years before Mr. Gonzales returned to Ector County for his resentencing proceedings. *Id.* at 255. Dr. Jacobs also found that "his diabetes has never been well-controlled." *Id.* at 257. He then explained, "It's well known that if you just take people who only have diabetes and measure … cognitive function over a decade or more, having diabetes alone with no other problems can increase the rate of decline by 20 to 50 percent." *Id.* at 268. However, the deteriorating effect of diabetes on the brain is worse if the brain is already "compromised," as Mr. Gonzales's brain was (as demonstrated by Dr. Brinkman's neuropsychological testing in 1995). *Id.* at 267–68. And, significantly for Mr. Gonzales, "It's well known actually that diabetes has a particular damage to something called the prefrontal cortex of the brain," TR 2, at 270, which is one of the parts of Mr. Gonzales's brain that Dr. Brinkman found damaged and that produced executive dysfunction. *Id.* at 274. Dr. Jacobs examined Mr. Gonzales and performed neurological tests that assessed Mr. Gonzales's brain function—testing the same functions that Dr. Brinkman tested but with instruments used by neurologists, *id.* at 277, and found that there "[c]learly [was decline] in the prefrontal systems." *Id.* at 292.

Dr. Jacobs concluded that "[t]here is every reason to believe" that Mr. Gonzales's neurocognitive functioning declined between 1995 and 2007 and that the reason for that was diabetes. PX 32 (Dr. Jacobs' deposition), at 18; *see also* TR 2, at 293.

Contributing to the features of paranoia associated with Mr. Gonzales's neurocognitive disorders was the chronic abuse that he suffered throughout his developmental years. This led to his developing complex Post-Traumatic Stress Disorder (PTSD). The most important feature of this was that it changed Mr. Gonzales's "assumptive view of the world." As Dr. Cunningham explained,

> [C]hronic trauma impact[s] on what's called the assumptive world of the child or kind of the fundamental schema of how this child exists in the world that is what we build our personality and interpersonal relationship capabilities with. … [T]he assumptive world that you're trying to create for a child is that the world is benevolent, that the events in the world are meaningful and that this kid, the self is positive and worthy. The experiences of Michael Gonzales's childhood are running fundamental[ly] against this assumptive model … where he is out of control developmentally where the people around him are punitive or harassing or rejecting without good cause, where he has very little control over the outcomes that he gets and where even the closest relationships with others are not to be trusted.

TR 1, at 83. The effect of the chronic trauma of childhood abuse in his life was to predispose Mr. Gonzales to paranoia: "So if we were going to try to build in childhood experiences that would predispose someone to paranoid reactivity in their interpersonal relationships, you couldn't do a much more effective job than the arenas that happened in Michael Gonzales's life." *Id*. at 83–84.

With the paranoia arising from Mr. Gonzales's neurocognitive disorders, and the paranoia arising from his complex PTSD, Mr. Gonzales was bound to develop disorders in which paranoia was the central feature. As Dr. Cunningham explained, "[T]he interactive effect of neurocognitive deficits, the psychological history [of complex trauma][,] and vulnerabilities that he has in his metabolic status, the interactive effect of that was to produce two different or overlapping

paranoid disorders. One of those is paranoid personality disorder and the other one is delusional disorder." *Id*. at 89.

Dr. Cunningham testified that the DSM-5 describes paranoid personality disorder as "a pervasive distrust and suspiciousness of others such that their motives are interpreted as malevolent beginning by early adulthood and present in a variety of contexts." *Id*. at 89. Four of seven specific kinds of behaviors must be present to make the diagnosis. Dr. Cunningham found that six of the seven were present in Mr. Gonzales's behaviors. He described each of the six behaviors along with the evidence of how each manifested in the behaviors of Mr. Gonzales during the re-sentencing trial period:

(1)   "suspects without sufficient basis that others are exploiting, harming or deceiving him or her," *id*. at 89 (from DSM-5)—supported by the following:

> [I]n his interactions with his attorneys, … there is an assumption that he is being harmed or deceived even with little to no evidence to that, that he believes that they're plotting against him in some way or that they're going to turn on him suddenly. Then he is deeply and irreversibly injured by that, he cuts off the relationship at that point.

TR 1, at 92.

(2)   "is preoccupied with unjustified doubts about the loyalty or trustworthiness of friends or associates," *id*. at 90 (from DSM-5)—supported by the following:

> He's preoccupied with doubts about the loyalty or trustworthiness of his attorneys. He is scrutinizing the actions of others for evidence that they're untrustworthy. And again any perceived deviation from being trustworthy or loyal, so as his attorney retains Nancy Piette, a local investigator instead of somebody out of state without discussing this with him first. If one attorney says they can write motions and the other one says that really won't do any good when we look at changing your jail conditions, that's viewed as a deviation that is a basis for complete disillusionment.

*Id*. at 92–93.

(3)  "is reluctant to confide in others because of unwarranted fear that the information will

be used maliciously against him or her," *id*. at 90 (from DSM-5)—supported by the following:

> This reluctance to confide, you know, as he's being asked about his family, for example, or as a mitigation investigation is being undertaken. He refuses to provide that information, doesn't answer personal questions.

*Id*. at 93.

(4)  "reads hidden demeaning or threatening meanings into benign remarks or events," TR

1, at 90 (from DSM-5)—supported by the following:

> H[e] is responding both to my benign compare and contrast question as well as Dr. Arambula's competency inquiries as somehow being demeaning and threatening to him. So this is extraordinarily descriptive and explanatory of what happens in his interpersonal relationships.

*Id*. at 93.

(5)  "persistently bears grudges, that is[,] is unforgiving of insults, injuries or slights," *id*. at

90 (from DSM-5)—supported by the following:

> [T]hat's the cutting off of relationships from now on. Minor slights arouse major hostility and the hostile feelings persist for a long time.

*Id*. at 93.

(6)  "perceives attacks on his or her character or reputation that are not apparent to others

and is quick to react angrily or to counter attack," *id*. at 90—supported by the following:

> Mr. Gonzales perceives that he is being played or punked as he interprets how his defense attorneys are reacting to him. [He is] quick to counter-attack and react with anger to perceived insults. So then he fires off a profanity-laden letter, he reactively turns to them in front of the jury. He seeks to fire them.

TR 1, at 94.

The DSM-5 also contained narrative descriptions of the behavior of people who have para-

noid personality disorder, two of which Dr. Cunningham found particularly descriptive of Mr.

Gonzales's behavior. First, from the DSM-5, "Although they may appear to be objective, rational and unemotional, they more often display a labile range of affect with hostile, stubborn and sarcastic expressions predominating." *Id.* Consistent with this, Dr. Cunningham found:

> [T]his is evident in his attorney interactions and also his interactions with jail staff. The[ir] combative and suspicious nature may elicit a hostile response in others as it did with Mr. Leverett which then serves to confirm their original expectations.

*Id.* Second, from the DSM-5, "They also need to have a high degree of control over those around them." *Id.* Consistent with this, Dr. Cunningham found:

> [T]hat's demonstrated in his interactions with Mr. Leverett who in his notes reflects that he saw Michael as trying to control him and he wasn't going to have the defendant run the legal case. And you also see this in the jail staff interactions.
>
> [A] lot of interactions … turn into contests between him and members of the jail staff, so that as you read the interviews of jail staff, there are many interactions with them that seem to be about what I call kind of positional hierarchy, sort of who is on top of who and who is exerting dominance or who is controlling who.

*Id.* at 94–95.

Finally, Mr. Gonzales's life history fits within the DSM-5's description of life history that leads to the development of paranoid personality disorder. Dr. Cunningham explained:

> [A]s a child he was ostracized, harassed, had poor peer relationships, underachieving in school, was sensitive, his mother described his pain at his father denying paternity, for example, and disappearing from his life when he was eight or nine years old. By the time he's in his teens he's describing peculiarity of thoughts, the juvenile psychiatric records recurrently reference paranoia and also reference his self-report of auditory hallucinations. And so the developmental history that he exhibits is consistent with the formation of this personality disorder.

TR 1, at 99–100

The second paranoid disorder that Mr. Gonzales suffers, a delusional disorder, is the "persecutory type, the delusion that the person … is being malevolently treated in some way," *id.* at 107–08. Distinct from his paranoid personality disorder, Mr. Gonzales's delusional disorder is

"encapsulated":

> The paranoid personality disorder descriptions that I gave cover such a gamut of behavior and interactions with his fiance, with people at the jail. The delusional disorder is more confined and irrational regarding his defense attorneys or people that are trying to work with him particularly in a legal setting. He has these broad reactions to everybody, but as he interacts with his counsel, it takes on … crazy proportions.

*Id.* at 108–09. The characteristics of Mr. Gonzales's paranoid misperceptions about his lawyers that made the misperceptions "crazy" were these:

> He believed that he could not trust them based on a single interaction, despite all kinds of evidence that occurred—had occurred up to then, the reputation he had learned about them and was evident as they continued to work on his case. And I found that distrust and even belief that they were working against him to be so detached from reality and so impervious to the new data that was coming in all the time that it represented a non-bizarre delusion.

TR 4, at 639.

### 2. Mr. Gonzales's brain impairments and paranoid disorders made him incapable of assisting in his defense.

Together, Mr. Gonzales's neurocognitive disorders and paranoid disorders caused him to be incapable of assisting in his defense in his resentencing trial. The core of Mr. Gonzales's problem in relating to and assisting counsel stemmed from two features of these disorders. First, he was paranoid. He decided that he could not trust counsel or anyone they brought into the defense team because he believed, without any basis in reality, that they had lied to him about the investigation they undertook in relation to Dr. Lanier. The paranoia that gave rise to this view was *both* psychological—based in his paranoid disorders—*and* neurocognitive—based in his brain impairments, a part of which changed the personality structures of his brain to cause him to see others' behaviors toward him as malevolent. Together with the paranoid disorders that grew out of his experience of abuse during childhood and adolescence, Mr. Gonzales was literally hard-wired to

see others' actions toward him as hostile. The hostility with which he perceived his lawyers' actions was so disconnected from reality as to be fairly characterized as a delusion.

Mr. Gonzales's hard-wired paranoia also caused him to see himself in a very distorted way, as especially bad. As Dr. Brinkman testified, another feature of the brain-impairment-related paranoia Mr. Gonzales suffered "involves thought processes that have to do with making one's self think that he is something he really isn't. That … he is, in this case, bad. That he is a bad guy." PX 7, at 89. Danalynn Recer observed this quite directly in her interactions with Mr. Gonzales. As she testified:

> He portrayed himself as a very tough guy, he portrayed himself in a very unflattering light in a way that I couldn't imagine what he would gain from that.
>
> He had sort of escalated … talking about all these bad things he did. He talked about that he had disciplinaries that I later learned were not true. He claimed that … everyone at the jail was out to get him because he was such a terrible inmate and they were scared of him, so he had all these exaggerated claims which I know not to be true.
>
> He could not let go of this idea of himself as hated and just inherently criminal and having done a lot of bad things.

TR 4, at 686, 697–98. In December 2007, following a meeting with Judge McCoy in which he told the lawyers that he would not replace them, Ms. Recer went to the jail to let Mr. Gonzales know what had occurred. *Id.* at 707. His perception of his defense team and the court as malevolent toward him, coupled with his view of himself as the kind of bad guy his team and the court could hate, was strikingly evident in his response:

> He pointed to it as confirming that nothing good would happen for him, that everybody was out to get him, that he was sort of a bad guy, that everybody knew he was a bad guy and things that worked for other people were not going to work for him. *[I]t sort of confirmed his ideas that, his sort of very fixed ideas about the team and the system and himself as being a very bad guy and the options for resolution that were available to other people weren't available to him.*

*Id*. at 707–08 (emphasis supplied).

In addition to the paranoia, the second feature of Mr. Gonzales's disorders that caused him to be unable to relate to counsel originated with the executive dysfunction in his brain. As Dr. Brinkman explained, this impairment interfered with his "ability to look at a problem from different standpoints and not become highly rigid in one's thinking." PX 7, at 79. This "reduction of thinking abilities in … problem solving," *id*. at 87, was profound in Mr. Gonzales.

More than any other person involved in Mr. Gonzales's resentencing trial, Ms. Recer observed this in its most elemental form. The rigidity in his thinking and his inability "to look at a problem from different standpoints" and engage in "problem solving," PX 7, at 79, 87, surfaced in Ms. Recer's meetings with Mr. Gonzales in the fall of 2007, primarily around two issues— whether he could have a relationship with his family and whether he could have a relationship with his lawyers that served his interest in getting his case resolved with a life sentence.

With respect to his family, Ms. Recer testified:

> He became a little bit heartened and emotional at the idea that his family might love him ... but then he would come back to, but no, I know that they're dead to me. He would come back to being stuck.

TR 4, at 696.

With respect to his lawyers, Ms. Recer testified:

> He would say, I have to show them that they can't do this to me, when somebody has lied, that's the end of it, I can't acknowledge them anymore, I have to teach them they can't do that, teach them a lesson.

> And I pointed out to him, they're not learning any lesson, this isn't going to change them, they're just doing a job and you're not going to have a relationship with them beyond this case. … Absolutely could not entertain that idea at all. He would say repeatedly, I can't, in a way that sort of somebody with an allergy would say, I can't eat that, I cannot, it's an absolute.

*Id.* at 701.

13

As Ms. Recer's observations make clear, Mr. Gonzales's rigidity in his thinking was intertwined with his paranoid perceptions about both his family—"they're dead to me"—and his lawyers—"they lied to me." This combination made it even more difficult for him to overcome his paranoid misperceptions.

The incapacitating quality of Mr. Gonzales's cognitive rigidity and paranoia is especially apparent in a meeting between counsel and Mr. Gonzales after a hearing on October 15, 2008.  Mr. Leverett's notes about that meeting reflect that Mr. Gonzales was "unusually talkative and not at all surly or hostile." PX 14, at 233. The truly incapacitating quality of his disorders emerges when Mr. Leverett notes, "[Mr. Gonzales] says he knows we are trying to help him, but he's not going to cooperate with us, talk to us about his case, etc." *Id*. Despite Mr. Gonzales's desire, which Ms. Recer had seen, to have a good outcome for his trial, he simply could not do what he recognized that it would take—and that he recognized counsel was trying to accomplish—to get to that outcome.

Together, Mr. Gonzales's paranoia and cognitive rigidity rendered him unable to assist counsel. Dr. Cunningham explained it this way:

> [H]is beliefs regarding how he can best be defended are illogical and ill-advised, his cognitive rigidity and poor insight render him impervious to self-scrutiny of these strategies or alternative considerations offered by counsel. He interprets resistance from counsel to his ideas as evidence that they are against him and have malevolent intentions. Mr. Gonzales's paranoia renders him quite reactive to perceived dishonesty from counsel with associated unshakeable conclusions of malevolent intent. He then withdraws from functional interactions with counsel and advises others that his family and friends not to cooperate with counsel.

TR 1, at 137–38.

Apart from his inability to relate to counsel, Mr. Gonzales was also unable to comport himself in the courtroom. The State's experts ascribed his courtroom disruptions and threatening and

self-defeating behavior to two features of antisocial personality disorder, impulsivity, and poor

behavioral controls. They were steadfast, however, in saying that Mr. Gonzales could have exer-

cised control over his impulses and antisocial behavior. As Dr. Cunningham, pointed out, how-

ever, the State's experts did not test their conclusions that Mr. Gonzales could have exercised

control if he had wanted to:

> If you are looking as you are in this case at poor behavioral control[,] that some-
> one is blurting things out and disrupting a proceeding[], for example, then the
> question [becomes] … to what extent can they exert control over that blurting
> things out. That question of their capacities in that way can be quantified. It's not
> just a dichotomous, I can eyeball them and I think they can control it or I think
> they can't[.] [W]e can actually quantify what nature of disturbance is present in
> terms of those self-restraint capabilities. You can do assessment of frontal lobe
> functioning and identify what degree of impairments may be present, so that that
> issue is optimally illuminated for the court.

TR 4, at 631–32. This is precisely what Dr. Brinkman's neuropsychological testing in 1995 al-

lowed evaluators in 2017 to do. As Dr. Brinkman testified, Mr. Gonzales's damaged brain made

him emotionally labile or volatile, disinhibited, and aggressive. PX 7, at 88. His brain-damage-

driven paranoia also caused him to think of himself "as a bad guy." *Id.* at 89. This combination of

impairments made him unable to control himself when emotions arose. The emotions came out

aggressively without the inhibiting brain processes that make the choice to control impulses pos-

sible. Dr. Proctor and Dr. Arambula were simply mistaken when they testified that he could have

controlled these behaviors if he had wanted to. Mr. Gonzales was in fact *unable, not just unwill-*

*ing,* to control these behaviors because his brain did not have the same capacity as an undamaged

brain to control emotionally-driven behaviors.

   The most dramatic example of Mr. Gonzales's inability to control his behavior in the court-

room occurred toward the end of the trial when counsel told him they were going to call his sister

and daughter as witnesses. Mr. Gonzales had repeatedly stated his fixed belief that his family

was dead to him and his fixed belief that his lawyers were malevolent toward him. And, he had directed his lawyers not to call his family members to the stand. Their decision to do so anyway produced an enormous emotional reaction from Mr. Gonzales, including threats of violence, unlike any that his lawyers had ever seen before. *See* 30 Reporter's Record-Resentencing [hereafter "RR-R"] 4–5 ("He exhibited an emotional state that I have not seen in the 17 to 18 months that I have represented him"). Mr. Gonzales simply *could not*—not would not—accept the reality that the family who he believed reviled him would appear in court to try to save his life.

Mr. Gonzales's emotional reaction to the intention to call his family members as witnesses was clearly not within his control. It was not the impulsive acting out of a person with antisocial personality disorder who could control his emotions if he wanted to. It was, instead, the reaction of a person who is incapable of inhibiting strong emotions. It was very much the situation that Dr. Arambula testified could occur if you "confront a [delusional] individual with the legitimacy of that delusion[,] because then the anxiety level rises and somebody could act out." TR 3, at 547.

**D.  Nothing in the record before this Court contradicts the evidence establishing that Mr. Gonzales was incompetent to be tried due to his inability to assist in his defense.**

**1.  Despite appearances, at times, that Mr. Gonzales was engaged in rational decision-making, he was not.**

In at least two instances that came to light in the hearing, evidence showed that Mr. Gonzales appeared to be able to engage in rational decision-making. During Mr. Leverett's testimony about his meeting with Mr. Gonzales on October 15, 2008, Mr. Gonzales told Mr. Leverett and Jason Leach that he wanted to be executed because his family was dead to him and he had nothing to live for. The Court asked Mr. Leverett whether Mr. Gonzales "seem[ed] hyper or irrational or did he sound reasoned." TR 6, at 31–32. Mr. Leverett responded, "I had no sense at all that he

was engaged in any irrational thinking or delusional thinking," and nothing "gave me concerns about his thought processes." *Id.* at 32. The second instance occurred as trial was starting on May 4, 2009. Before any witnesses were called, the prosecutor informed the court that Mr. Gonzales had told security personnel he was going to disrupt the trial. 27 RR-R 7.

Dr. Cunningham testified as to how these two matters should be interpreted. He explained that the mere fact that behavior can be purposeful and intended does not mean that it is rational:

> [B]ehavior can be purposeful and still be irrational or delusionally driven and also be an unreasoned behavior. In other words, that somebody announces I'm going to do something and then they follow through and do it simply reflects that it was purposeful and intended. It doesn't inform whether or not that behavior was driven by a reasoned reflection. It doesn't demonstrate whether that behavior is being acted out in response to a delusional motivation and a delusional perception of the people involved.

TR 1, at 132. Dr. Cunningham also explained that even if Mr. Gonzales was intending to do something, like disrupt the trial proceedings, "his emotions still get away with him and end up carrying him places that he didn't otherwise intend to go." *Id*. at 133.

Quite clearly, when Mr. Gonzales told his lawyers that he wanted to be executed because his family was dead to him, he was acting on a fixed paranoid delusion, or at least a paranoid misperception that functioned like a delusion, because of cognitive rigidity produced by his brain damage. He unreasonably, and intractably, believed his family meant him ill and that his relationship with them was over. No evidence supports such a belief. Indeed, family members were willing to talk to trial counsel about mitigation, and family members appeared to testify on his behalf. What might be an unusually bad family dispute to persons without mental illness and cognitive defects became, in Mr. Gonzales's mind, a line in the sand that could not be crossed.

Just as clearly, when he announced his intention to disrupt trial proceedings, his motivation for doing so was at least in part based on his paranoid delusion about his lawyers. His letter to

Mr. Leach on January 30, 2009 made that motivation clear, when he said, "I will make myself be known at trial for the jury to see 'our' relationship between attorney and client." Respondent's Exhibit 7 [hereafter "RX 7"], at 487. It is also plain that Mr. Gonzales's emotions got away from him during the trial when shortly after his verbal assault against his wife as a witness, he told Judge McCoy that he could not promise that something like that would not happened again because, "whenever my blood rises I speak my mind." 27 RR-R 87–88.

>    **2.  Mr. Gonzales's expressed belief that he would get a new trial if there was a conflict of interest between him and his lawyers or if he refused to "acknowledge" his lawyers, does not support the view that his refusal to assist his lawyers was simply a strategy to attack what he believed would inevitably be a new death sentence, rather than a product of brain damage and paranoia.**

In a telephone conversation with his pen friend, Kay Bandell, on July 22, 2008, Mr. Gonzales told Ms. Bandell that he believed that if there were a conflict of interest between him and his lawyers, he would get a new trial. PX 27a (transcript of relevant portion of call), at 1. In a subsequent telephone call with Ms. Bandell on November 4, 2008, Mr. Gonzales told Ms. Bandell that he had "case law" that if he refused to "acknowledge," his lawyers he would get a new trial, and that is why he refused their visits and refused to endorse any of their work for him. PX 27b (transcript of relevant portion of call), at 3–4.

As Dr. Cunningham's testimony concerning purposeful behavior, TR 1, at 132, teaches, "behavior can be purposeful and still be irrational or delusionally driven." Mr. Gonzales's belief that he would get a new trial because of a conflict of interest between him and counsel, or because he refused to acknowledge counsel, was driven by his delusions about counsel and the court. As Dr. Cunningham explained,

>    [T]his is a potential outcome … that in his eyes that he will be reversed that is driven by a paranoid perception of their [counsel's] malevolence as well as a per-

ception that the court is malevolently aligned against him. And so in his mind be-
cause his attorneys are obviously malevolent and the court is malevolent and en-
tirely unreasonable in its posture toward him, of course then he would get relief at
some later point.

*Id.* at 126.

It is also worth noting that when Mr. Gonzales was communicating with Ms. Recer in the
fall of 2007 about his rigidly held beliefs that his lawyers were malevolent toward him—long be-
fore Ms. Recer joined the defense team and then in his mind became just as malevolent as his
lawyers—Mr. Gonzales never even hinted at a tactical reason for refusing to have anything to do
with the lawyers. He explained to Ms. Recer that he refused solely because they were untrust-
worthy and malevolent, not because he believed he could gain a tactical advantage by refusing to
relate to them. The perception that he might have a tactical advantage by not relating to them oc-
curred only months thereafter in telephone calls with his closest friend, Ms. Bandell, who was
expressing concern that he was not working with counsel. *See* PX 27b, at 4 (Ms. Bandell sug-
gesting that Mr. Gonzales reconsider not working with Ms. Recer). Thus, his suggestion that
there was a tactical advantage to not relating to counsel was also likely to have been, at least in
part, a defensive response to her concerns—a way of appearing to her as though he were in con-
trol when he really was not. Certainly, there is no evidence that he ever followed through, or was
able to follow through, on any "tactic" or "strategy."

### 3.   Mr. Gonzales's wavering about what outcome he wanted at trial

Dr. Cunningham explained that Mr. Gonzales's wavering about the outcome he wanted at
trial is a function of two aspects of his brain damage. First, it is due to the lability of his emo-
tions, which Dr. Brinkman found to be a consequence of his brain damage. As Dr. Cunningham
explained,

> His agenda about his defense, that fluctuates in terms of whether he desires to live or whether he's feeling futile and overwhelmed and blurts out that he wants to die. And those instances where he shifts to just kill me then are typically in response to feelings of futility that he's unable to effect this, that it won't make any difference, that he is powerless in this situation, so then just go ahead and do whatever you're going to do. And that's that thin emotional reserve that when he's stressed, he then shifts to something extreme like he did with his daughter. So then it's just over with her.

TR 1, at 197–98. Second, it is due to damage to the frontal lobes of his brain, documented by Dr. Brinkman when he noted the impairment of Mr. Gonzales's executive processes:

> One of the things that Dr. Proctor testified about that I agree with is that Mr. Gonzales is very changeable and that he behaves one way on one given day and a very different way on another day and he asserts an agenda on one thing on one day and an agenda of the polar opposite of that on another day. And so the relationship that this has to the dementia is that it's your frontal lobes that give you a continuity and stability over time about your perspective and agendas and goals and that kind of thing, so that then as contextual stresses arise or even as you experience frustration, those are modulated in the service of that long-range goal. That's what's missing in Mr. Gonzales.

TR 4, at 647–48.

The inconsistent behaviors produced by these two disorders surfaced in other ways during trial. In one respect, Mr. Gonzales seemed to want to succeed with the jury. He got angry at Mr. Leverett for failing to ask for a jury shuffle, 13 RR-R 95, 98, and he told Mr. Leach that he did not like certain prospective jurors, TR 6, at 189. Counter to that objective, he sabotaged himself with the jury by wearing jail garb, making threatening and frightening outbursts and disdainful gestures, and testifying as he did.

### 4. Whether Mr. Gonzales has a paranoid delusional disorder does not matter because his paranoid personality disorder in combination with brain damage produces the same unyielding misperception of reality that a delusion produces.

While Dr. Proctor and, to some extent Dr. Arambula, agreed that Mr. Gonzales had paranoid personality disorder, TR 3, at 433, 553, both disagreed with Dr. Cunningham's assessment that

he also had paranoid delusional disorder. That disagreement is immaterial because Mr. Gonza-

les's paranoid misperceptions—at the very least produced by paranoid personality disorder and

brain damage—functioned the same way as a delusion for Mr. Gonzales.

A delusion is "a fixed false belief." TR 1, at 58. When Mr. Gonzales has a paranoid misper-

ception, that misperception becomes a fixed false belief because of the cognitive rigidity caused

by his brain damage. As Dr. Cunningham explained, "The paranoia that he has is rooted in part

with his cognitive limitations. In terms of being able to look at things from various points of

view, that concreteness and that cognitive limitation then sets up and helps sustain the paranoid

reactions that he has." *Id*. at 182–83. In short, there is no functional difference between a psy-

chotic paranoid delusion and this kind of paranoid delusion.

### 5.   The Court should rely on Dr. Brinkman's neuropsychological testing.

Dr. Proctor questioned the reliability of Dr. Brinkman's neuropsychological for three rea-

sons: (a) his raw test data was unavailable so there was no way to verify the accuracy of his scor-

ing, TR 4, at 661; (b) Mr. Gonzales "score[d] on these [Brinkman's] tests about what you would

expect for somebody with his level of intelligence," TR 3, at 435; and (c) Dr. Brinkman gave no

effort testing, TR 4, at 662. None of these reasons stand up to scrutiny. The unavailability of raw

test data does not mean that Dr. Brinkman mis-scored any of the tests; it simply means that his

scoring cannot be verified.[1] The expectation that Mr. Gonzales would score as he did given his

relatively low IQ also means nothing. Dr. Brinkman is a neuropsychologist; Dr. Proctor is not. If

Mr. Gonzales's IQ score had been any sort of confounding factor for measures of brain function

---

[1] Nonetheless, of course, Dr. Jacob's remarkably similar results in 2017 provide some verification.

other than IQ, Dr. Brinkman would have noted that. Finally, Dr. Proctor was mistaken that Dr.

Brinkman failed to administer effort testing. He did administer such testing, and Dr. Proctor be-

grudgingly acknowledged it. TR 4, at 665–67.

More importantly, Dr. Cunningham explained that if Dr. Proctor was inclined to ignore Dr.

Brinkman's neuropsychological testing in assessing Mr. Gonzales, it was incumbent upon Dr.

Proctor to have new neuropsychological testing done. Thus, Dr. Cunningham testified:

> At the point that I am setting aside the historical dementia finding and asserting
> this individual has capacity for self-restraint, for reflection about abstractions, set-
> ting aside that 1995 evaluation. If that's going to be the position in the present,
> then it behooves that evaluator to, in fact, quantify where we are at this point in
> terms of neuropsychological neurobehavioral capability.
>
> Q. And Dr. Proctor, as he acknowledged on the stand, did not do that?
>
> A. That's correct.

TR 4, at 633–34.

### 6. Malingering is not an issue in this case.

Dr. Proctor several times mentioned that Mr. Gonzales may have been malingering in his

dealings with mental health professionals. He even tested Mr. Gonzales for malingering and ob-

tained results that pointed toward malingering but called for further assessment. TR 3, at 391–94.

At the end of his testimony, however, he acknowledged that the only question about malingering

is whether Mr. Gonzales actually experiences auditory hallucinations, a claim Mr. Gonzales has

periodically made since he reported such hallucination as a child. *Id*. at 485–86. There is no

question about Mr. Gonzales malingering with respect to the testing of his brain functions, and

there is no question of malingering concerning his paranoia. He is not malingering in either of

these contexts.

**7. Antisocial personality disorder cannot explain Mr. Gonzales's behavior or account for the uniqueness of Mr. Gonzales's behavior among all the criminal clients Mr. Leverett and Mr. Leach have represented.**

The State's experts found that most of Mr. Gonzales's behaviors that were relevant to competency were consistent with the behaviors of a person with severe antisocial personality disorder. Dr. Proctor testified that Mr. Gonzales's problems with his counsel stemmed from his simply being upset with counsel when they did not do something he wanted them to do rather than a mental illness. *Id.* at 427. Once Mr. Gonzales got angry with his lawyers, his antisocial personality disorder, and nothing more, accounted for the rest of his behavior relevant to the trial competency question. *Id.* at 411–12. Neither Dr. Proctor nor Dr. Arambula considered Mr. Gonzales's history of neurodevelopmental disorders, trauma, and ingestion of drugs and inhalants as relevant to the question of trial incompetency.

While Mr. Gonzales does have antisocial personality disorder, the features of that disorder, even its most extreme form, psychopathy, do not adequately account for Mr. Gonzales's behaviors. Dr. Cunningham explained why this is so:

> [Having psychopathy] would account for not being a good historian and thinking that what you do, the idea you have about your defense is preferable to everybody else's. But we would also expect a psychopath to be extraordinarily self-serving and strategic in their agenda, not self-defeating, not waiving their appeals, not announcing to the jury, "Then just kill me," not go back and forth about whether they desire to be defended and avoid the death penalty or whether they are wanting the death penalty. You wouldn't expect to see this extraordinarily easy injury and betrayal that he feels and then the reactive exclusion on the basis of that and so while that would be a—it's a working theory or a hypothesis, you would then examine that hypothesis against the totality of the other information that you have and historically about him and neurodevelopmentally and psychologically and look at what other diagnostic features seem to be present.

TR 1, at 237–38.

The other reason that antisocial personality disorder or psychopathy is not a sufficient explanation for Mr. Gonzales's behaviors is simply demographic. In light of the prevalence of psychopathy in the prison population, Mr. Leverett and Mr. Leach would have encountered numerous clients with psychopathy in their criminal defense practice—approximately 20 to 25 percent of their clients. TR 4, at 645. Yet, Mr. Gonzales was unique in Mr. Leverett's practice. TR 6, at 27–28 (Leverett affirming that "'[i]n almost 30 years of practice, I have never had a poorer relationship with a client'"). And for Mr. Leach, Mr. Gonzales was in the "top 3–5 most difficult clients" out of 1,500 to 2,000 criminal defense clients. TR 6, at 143.

The reason for this was provided by Dr. Cunningham:

> The distinguishing feature in Mr. Gonzales is not that he has the extreme form of anti-social personality disorder, if he does. The distinguishing feature is that he has a 1995 diagnosis of dementia and then he has seven to ten years of additional cognitive dysfunction that's occurred as a result of his diabetes. And that's the most obvious distinguishing feature as we try to account before we ever get to he also has a distinguishing feature of having a much greater load of paranoid personality traits than the typical person does, inmate, who is in that upper 25 percent, I believe at a level of a paranoid personality disorder given those symptoms. That's also distinguishing him. And certainly a delusional disorder distinguishes him and so rather than try to stretch this severe end of anti-social personality disorder, rather than trying to stretch that diagnosis to account for behaviors that these individuals almost never exhibit, we instead have other disorders that are present that are quite readily explanatory. If you have dementia and then you have additional brain damage on top of that and you were already identified as having issues of mood lability and irritability and your frontal lobes are impaired so that you don't maintain a good long-range perspective that modulates your behavior, then you are going to [behave] like this.

TR 4, at 645–46.

24

**E.  Despite the absence of case law addressing trial competency in a case parallel to Mr. Gonzales's case, the Fifth Circuit has provided guidance that is helpful to this Court.**

Dr. Cunningham testified that the typical case that raises a question about trial competence is where the defendant "is presenting as overtly psychotic and has a disorder on a schizophrenia spectrum." TR 4, at 630. Dr. Proctor implicitly agreed. TR 3, at 482–83.

For this reason, there are virtually no reported cases—none that we have been able to find—that address competency for a person who has neurocognitive disorders and paranoid disorders, the disabling features of which overlap and feed into each other, as in Mr. Gonzales's case. Nevertheless, there are aspects of Mr. Gonzales's case that the Fifth Circuit has addressed and that can provide guidance for this Court.

In *Bruce v. Estelle*, 536 F.2d 1051 (5th Cir. 1976), *cert. denied*, 429 U.S. 1053 (1977), the court addressed a federal district court's finding that the habeas petitioner was not incompetent to stand trial because he had no mental illness at the time of trial. Competency had long been at issue in Mr. Bruce's trial, which took place approximately eight years before the federal district court's evidentiary hearing on competency. The district court appointed two mental health experts to examine Mr. Bruce, and they disagreed both on whether Mr. Bruce was mentally ill and whether he was competent. One expert, who found that he had only antisocial personality disorder, concluded that he was competent. The other, who found that he had schizophrenia, concluded that he was incompetent. The district court agreed with the first doctor, but the Fifth Circuit disagreed, found the evidence supported the finding of the second doctor, and determined that Mr. Bruce was incompetent to stand trial. In so doing, the Fifth Circuit's reasoning provides guidance on issues that have also arisen in Mr. Gonzales's case:

(1)      The Court emphasized the need for an assessment of competency to take into account "the entire medical and personal background," not just what appears in the trial transcript. *Bruce*, 536 F.2d at 1061. As Dr. Cunningham repeatedly pointed out, Dr. Proctor and Dr. Arambula failed to take into Mr. Gonzales's entire medical and personal background, focusing instead only on the trial transcript and the pretrial record of non-interaction between Mr. Gonzales and his counsel.

(2)      The expert, who found Mr. Bruce only to have antisocial personality disorder, did not see him at the time of trial or close to that time. This expert saw Mr. Bruce several years after the trial. The experts who saw him closer in time to the trial were deemed more credible. *Id*. None of the experts in Mr. Gonzales's case saw him at the time of his resentencing trial. However, Dr. Cunningham did see him extensively in connection with his first trial and thus had a baseline of experience against which to compare Mr. Gonzales's condition when he saw him again in 2013 and 2017. In addition, Dr. Brinkman saw him at the time of trial, and we have his testimony and report to guide our understanding of his assessment.

(3)      The expert who found Mr. Bruce only to have antisocial personality disorder saw him for a total of less than four hours, while the other experts, who found that Mr. Bruce had schizophrenia, saw him for many hours—one for six weeks of inpatient study. These other experts were all deemed more credible. *Id*. In Mr. Gonzales's case, Dr. Proctor and Dr. Arambula each saw Mr. Gonzales for three hours. By contrast, Dr. Cunningham saw Mr. Gonzales for more than 16 hours in 1995 and for nearly 8 hours in 2013 and 2017.

## II. Judge McCoy violated Mr. Gonzales's due process right not to be subjected to trial while incompetent, under *Pate v. Robinson*, 383 U.S. 375 (1966).[2]

Mr. Gonzales believes the weight of the evidence demonstrates that he was incompetent at the time of his resentencing trial. But, as this Court observed several times during the evidentiary hearing in this case and as Mr. Gonzales recognizes, the question is a difficult one. It is difficult because, while Mr. Gonzales's resentencing trial was sandwiched between evaluations (1995 and 2017) that suggested serious cognitive and mental health impairments, no doctor examined him for competency during the period relevant to this petition. Thus, this case has required the Court to consider the question retrospectively. The difficulty of making a retrospective competency determination was recognized in *Pate* itself. *Pate v. Robinson*, 383 U.S. 375, 387 (1966). In making such a determination, "[t]he [factfinder] would not be able to observe the subject of [its] inquiry, and the expert witnesses would have to testify solely from information contained in the printed record." *Id.* Additional problems with a retrospective analysis include: the passage of time and the inability of experts to recall their evaluations or testimony in previous proceedings (or, in this case, the absolute unavailability of experts such as Dr. Brinkman). *Barber v. State*, 737 S.W.2d 824, 828 (Tex. Crim. App. 1987). Because of these problems, "[a] concurrent determination is indisputably the preferred method for ensuring an accurate assessment of defendant's mental status." *United States v. Makris*, 535 F.2d 899, 904 (5th Cir. 1976). Indeed, the *Pate* court refused to order a retrospective analysis and instead directed the state court to retry the defendant or release him. *Pate*, 383 U.S. at 387; *see also Drope v. Missouri*, 420 U.S. 162, 183 (1975).

---

[2] While the evidentiary hearing was not held on the *Pate* issue, which has not been ruled on yet, in light of the fact that the State called Judge McCoy to testify and that his testimony is relevant to this issue, Mr. Gonzales addresses it in his closing argument.

As this Court has said, a competency evaluation of Mr. Gonzales should have been ordered. To the extent that the Court finds it impossible to decide the competency question because it was not explored at the resentencing trial and there is therefore insufficient contemporaneous medical evidence, the Court should find that the trial court violated due process in failing to conduct a competency inquiry.

Judge McCoy failed in his independent duty to jealously guard Mr. Gonzales's right not to be tried while incompetent. Two, somewhat contradictory, views prevented him from doing so: first, he did not, as a matter of practice, act independently on competency questions but, instead, relied on others to raise and essentially decide the issue; and, second, he believed that, in his words, "you would know [incompetency] when you saw it," TR 7, at 286. Because of these views, Judge McCoy was not sensitive to the record or to the facts as they were developing before him, and did not recognize that the evidence, viewed objectively, raised a reasonable doubt as to Mr. Gonzales's competency. Ignoring the evidence of profound mental illnesses, and believing instead that Mr. Gonzales was trying to control his court, Judge McCoy did not inquire further into his incompetency, as this Court would have.

**A. Judge McCoy's common practices regarding competency explain his failure to act in this case.**

Judge McCoy was not practiced at identifying competency issues. Throughout the almost 30 years that he presided over the 358th District Court of Ector County in Odessa, Texas, if a competency issue arose in his courtroom, it was always because a defense attorney raised the issue. *Id.* at 285. In response to a defense motion, Judge McCoy would appoint a medical professional to evaluate the defendant. *Id.* at 271, 285. Because he relied on the defense attorneys, prosecutors, and medical professionals, Judge McCoy never *sua sponte* raised the issue of a defendant's

incompetency or inquired further into it during the almost 30 years that he presided over criminal proceedings. *Id.* at 285. Although the judge never *sua sponte* raised the question of competency, he testified that he would know incompetency if he saw it. However, likely because he always deferred to others, he could not say what factors, or evidence, he would consider in deciding whether to order a competency hearing on his own initiative. *Id.* at 285–86. He testified that "I don't know that I can actually tell you one, two, three what I would be looking for." *Id.* at 285–86; *see also* TR 7, at 272.[3]

**B.  Judge McCoy failed to act on evidence, viewed objectively, that should have raised a reasonable doubt as to Mr. Gonzales's competency.**

Judge McCoy's common practices in dealing with competency issues failed in Mr. Gonzales's case because they were not suited to either the kind of incompetency Mr. Gonzales presented or the ineffectiveness of his attorneys.

**1.  What the record and evidence told Judge McCoy about Mr. Gonzales**

Of course, Judge McCoy did not begin Mr. Gonzales's resentencing on a blank slate; he had been the judge at his original trial and sentencing. From that experience, the judge knew two things: (a) Mr. Gonzales had serious emotional and cognitive impairments, resulting from a toxic and abusive childhood and, almost certainly, from defects present at birth; and (b) nonetheless, in 1995, Mr. Gonzales was competent to stand trial.

---

[3] We know that anger and disruptive behavior do not appear to be red flags for Judge McCoy. He had had disruptive defendants in his courtroom before. Although the judge recognized the possibility that disruption could indicate incompetency, TR 7, at 283, he did not handle such defendants by assessing their competency. He sometimes gave admonishments "and things of that nature." *Id*. at 282. He recounted that, in one instance, he "duct taped" a disruptive defendant. *Id*.

At the original trial, Judge McCoy heard testimony from Dr. Brinkman and Dr. Cunningham of Mr. Gonzales's neurocognitive insults, chronic trauma from childhood abuse, and psychological disorders. Dr. Brinkman testified about his diagnostic impressions of Mr. Gonzales. PX 7, at 87; *see* discussion *supra* Section I.C.1. Dr. Cunningham testified in detail about Mr. Gonzales's neurocognitive insults, childhood abuse, and history of treatment for paranoia, explosiveness, and aggressiveness. The deficiencies were significant to say the least. In Dr. Brinkman's view, they were so severe that they mitigated Mr. Gonzales's culpability for the offense; in Dr. Cunningham's view, Mr. Gonzales's background and deficiencies made it less likely he would pose a danger in the future.

It is possible Judge McCoy did not remember the evidence regarding Mr. Gonzales's mental health by the time resentencing was ordered in 2007. But, he was soon reminded of it. In August 2008, Mr. Gonzales's defense counsel filed a pretrial motion to preclude the death penalty, noting the loss of valuable medical records in the case that may have had further evidence of Mr. Gonzales's childhood abuse or trauma, mental-health treatment, "organic brain damage, or impaired brain development or function, which existed at the time of the alleged offense," and intellectual disability. 3 Clerk's Record-Resentencing [hereafter "CR-R"] 612–16. In March 2009, defense counsel filed a motion to continue the trial. The motion to continue was based on the need for extensive mitigation investigation and for an expert mental health evaluation, and it extensively reviewed Mr. Gonzales's mental-health history and neurocognitive and psychological disorders. 4 CR-R 818–27. The motion noted symptoms of paranoia and aggressiveness. And it, along with supporting affidavits, discussed the need to evaluate Mr. Gonzales's metabolic disorder of diabetes, which "may have been so poorly controlled over such a period of time that it has

actually caused permanent brain damage resulting in cognitive impairments and mood abnormalities." *Id.* at 816–17; *see also id.* at 833–34, 844–45.

### 2.   Facts that developed before resentencing

Meanwhile, Judge McCoy was hearing and seeing evidence that Mr. Gonzales's behavior had changed dramatically since his 1995 trial. In 1995, the judge had noticed nothing that would indicate incompetency; this was consistent with all the testimony regarding the original trial, including that of Dr. Cunningham.

Judge McCoy noticed changes in Mr. Gonzales in 2007. Mr. Gonzales was more vocal, confrontational, and "perhaps belligerent." TR 7, at 275. The judge knew that Mr. Gonzales was not assisting in his defense and that the relationship between him and the defense team was "irreparably broken" because he believed they had lied to him about the investigation they undertook in relation to Dr. Lanier. TR 7, at 276, 286–88; PX 43, at 15. *See Turner v. State*, 422 S.W.3d 676, 681 (Tex. Crim. App. 2013) (finding some evidence of incompetency in fact that defendant had been "adamant" and "menacing" to trial counsel and their relationship had become "untenable"). Mr. Gonzales's behavior and paranoia were discussed with or made known to Judge McCoy throughout the pretrial period, including during ex-parte hearings in October 2007 and May 2008; in Mr. Leverett's December 2007 letter to the judge outlining the difficulties between client and counsel; and in Mr. Leverett and Mr. Leach's motions to withdraw as counsel, and their attached affidavits, which were filed with the court in February and May 2008. Judge McCoy had the opportunity to view Mr. Gonzales's demeanor at the May 2008 hearing on his request for new attorneys—a hearing at which Mr. Gonzales said, "I don't trust [Mr. Leverett and Mr. Leach], plain and simple. When an attorney lies to you one time, he is going to lie to every time." 4 RR-R 4.

### 3.  What Judge McCoy observed at trial

During trial, there should have been no doubt that Mr. Gonzales needed to be evaluated. Judge McCoy repeatedly observed that Mr. Gonzales was unable to comport himself in the courtroom. *See* discussion *supra* Section I.C.2. His trial demeanor in 2009 differed significantly from that in 1995 when Judge McCoy "didn't see much action from him." TR 7, at 272. In 2009, he was more aggressive and had spontaneous outbursts during witnesses' testimony, including his outburst at his wife. *Id.* at 288–89. During that outburst, Judge McCoy admonished Mr. Gonzales that if he had another outburst, the judge would either remove him from the courtroom or gag him. 27 RR-R 55–56.

As the trial proceeded, the outbursts continued. Toward the end of the trial, after Mr. Leach told Mr. Gonzales that his sister and daughter would be called as witnesses, Mr. Gonzales stated that "he would rather be shot in the courtroom than to have anybody ask for help for him." 30 RR-R 5. Mr. Leach told Judge McCoy that "[Mr. Gonzales] exhibited an emotional state that [Mr. Leach] had not seen in the 17 to 18 months that [he] had represented him." *Id.* Mr. Leach then informed Judge McCoy that, because of the outburst, he and Mr. Leverett had decided not to call any other defense witnesses besides Mr. Gonzales. After a recess, Judge McCoy allowed the trial to continue with Mr. Gonzales testifying from counsel table that "[y]'all can fucking kill me. Makes me no fucking difference. Pass the witness." *Id.* at 9. The defense then rested.

The next day, at the post-sentencing hearing, Mr. Gonzales told Judge McCoy that he wanted to waive his direct appeal and habeas proceeding and to have his execution date set as soon as possible. 31 RR-R 3.

Judge McCoy knew this was a very different Michael Gonzales from the defendant who had appeared in his courtroom in 1995. The only explanation the judge could offer for the difference

was that Gonzales had been to prison and had picked up a rougher way of handling himself. This post-hoc explanation is speculative at best—and it is inadequate. In fulfilling his obligations to ensure that Mr. Gonzales was competent, Judge McCoy should have investigated the behaviors he saw, including any possible explanations for them. He did not do so because he failed to see the behaviors as indications of incompetency. Instead, he believed that Mr. Gonzales was simply trying "to run the show." Moreover, the institution-based explanation can only go so far. Institutionalization might explain new savvy on the part of an inmate or a willingness to take a risk or two in jail. But, the judge offered no basis for believing that it would explain the irrational, impulsive, uncontrolled behavior that Mr. Gonzales devolved into as the resentencing trial proceeded. *See Pate v. Robinson*, 383 U.S. 375, 385 (1966) (looking at history of "pronounced irrational behavior" to conclude competency should have been assessed).

C. **Despite seeing evidence that, viewed objectively, should have raised a reasonable doubt as to Mr. Gonzales's competency, Judge McCoy failed to inquire into it.**

During sentencing, Judge McCoy, who believed that he would know incompetency when he saw it, failed to correctly interpret the manifestations of it in Mr. Gonzales. He admitted that Mr. Gonzales acted impulsively, at least in his outbursts. He admitted that Mr. Gonzales was disruptive. He agreed that Mr. Gonzales's behavior could be characterized as aggressive. He knew that Mr. Gonzales had refused to meet with, and thus assist, counsel. All of these characteristics, which he did not notice in Mr. Gonzales in 1995, corresponded to the paranoia, disinhibition, labililty, and aggressiveness about which Dr. Brinkman and Dr. Cunningham had previously testified. But, as the judge had always done, he was relying on defense counsel to raise the issue of incompetency, or he was waiting for something—probably obviously delusional behavior—that would immediately identify itself as a sign of incompetency.

While Judge McCoy waited, Mr. Gonzales spiraled downward, from the client who obstructed his attorneys at the beginning of their relationship to the enraged defendant in extreme psychic anguish who threatened to take a gun and start shooting people in the courtroom when his attorneys tried to help him by calling friendly mitigation witnesses. Even at that point, when Mr. Gonzales was essentially threatening to commit "suicide by cop" and was certainly derailing his sentencing hearing, Judge McCoy allowed the trial to proceed. He permitted the defense to shut down its mitigation case. He permitted Mr. Gonzales to testify, bizarrely and irrationally, that he wanted to be killed. He permitted Mr. Gonzales, the next day, to waive (or try to waive) all of his rights to have his death sentence reviewed.

Judge McCoy had before him the "rare" case identified by the Texas Court of Criminal Appeals, in which there is at least some evidence "from which it may rationally be inferred *not only* 1) that the defendant suffers some degree of debilitating mental illness, and that 2) he obstinately refuses to cooperate with counsel to his own apparent detriment, *but also* that 3) his mental illness is what fuels his obstinacy.'" *Turner*, 422 S.W.3d at 696. In *Turner*, as here, a defendant accused of a serious crime began displaying signs that he did not trust his attorney. *Id*. at 679–82. As in this case, he objected when his attorney wanted to interview his family members as witnesses. *Id.* at 680–81. As in this case, the defendant sought to fire his attorneys, became convinced that they were working against him, and displayed signs of both paranoia and delusions. *Id.* at 681–83. The trial court believed the defendant's own obstinacy and refusal to cooperate with counsel accounted for his difficulties and refused to grant a requested competency hearing. *Id.* at 683–85. As in this case, the entire spectacle culminated with the defendant taking the stand in his own defense and giving highly inculpatory testimony. *Id*. at 685–86.

34

The Texas Court of Criminal Appeals held that the trial court had erred in refusing to hold a formal competency hearing. In particular, the court observed, "[W]e think there is particular cause for concern when a defendant's mental impairment directly touches upon certain fundamental decisions that the criminal justice system reserves for him to make personally ... such as whether to testify in his own defense. ... It is critical that he be able 'to consult with counsel with a reasonable degree of rational understanding' about them." *Id.* at 690–91 (citations omitted).

Judge McCoy's failure to order a competency evaluation in this case violated Mr. Gonzales's due process right not to tried while incompetent. As this Court stated during the evidentiary hearing,

> Had [Mr. Gonzales's case] been in the federal system from day one, somebody would have sent him for a competency exam.  I mean I certainly would have sent him. ... [W]e wouldn't have this issue here or at least not to the degree we do.

TR 5, at 769.

## III. Defense counsel rendered ineffective assistance of counsel to Mr. Gonzales, under *Strickland v. Washington*, 466 U.S. 668 (1984).

Regardless of Judge McCoy's duty to guard Mr. Gonzales's right not to be tried while incompetent, Mr. Leverett and Mr. Leach, as his attorneys, had an independent duty to do the same. As capital counsel, they were bound by professional standards to pursue the issue of Mr. Gonzales's competency, given the facts that they knew, which were sufficient to raise a good-faith doubt of his competence, as it did with Ms. Recer, an experienced mitigation specialist and attorney. Counsel failed to meet these professional standards because they had a narrow view of mental illness and, from early on in their representation of Mr. Gonzales, were engaged in a tug of war with him over control of the case that arose from Mr. Gonzales's mental disorders. But for

35

counsel's deficient performance, the result of Mr. Gonzales's resentencing hearing would probably have been different.

**A.  Defense counsel's performance fell below an objective standard of reasonableness.**

      **1.  Defense counsel was bound by professional standards.**

Defense counsel's performance is measured against professional norms, such as the American Bar Association's criminal-justice standards and the State Bar of Texas's capital-counsel standards. *Wiggins v. Smith*, 539 U.S. 510, 524 (2003). The American Bar Association's criminal-justice standards state that "counsel should make known to the court and to the prosecutor those facts known to counsel which raise the good faith doubt of competence." AM. B. ASS'N, *Standards for Criminal Justice* Standard 7-4.2(c). And, whenever counsel has a good faith doubt about the defendant's competence, counsel should move for a competency evaluation. *Id.* Similarly, the State Bar of Texas's Guidelines and Standards for Texas Capital Counsel provide that "in the event that the mental health associate determines the possibility of legitimate mental health issues, lead counsel should then make application to the Court that the appropriate experts be appointed by the Court for making expert valuations of the defendant's condition." STATE B. OF TEX., *The State Bar of Texas Guidelines and Standards for Texas Capital Counsel* 10.2(B)(2)(c), 69 TEX. BAR. J. 966 (2006). These standards bound Mr. Leverett, who was lead counsel, and Mr. Leach, who was second chair.

      **2.  Defense counsel failed to meet those professional standards.**

Mr. Leverett's file notes, his correspondence, the defense team's filings, and Mr. Leverett and Mr. Leach's testimony at the evidentiary hearing reveal that the defense team members were well aware of facts suggesting that a competency evaluation was warranted. The facts known to counsel include Mr. Gonzales's mental-health history (going back to when he was 14 years old);

his neurological, psychological, and metabolic disorders; his paranoid refusal to relate to and co-operate with counsel on all matters of his defense; and his inability to control his demeanor at trial. When Ms. Recer, Scharlette Holdman, a renowned leader in mitigation investigation, and Dr. Arturo Silva, a psychiatrist, were made aware of these facts, they all suggested that mental health issues were playing a role in counsel's difficulties with Mr. Gonzales. *See, e.g.*, 4 TR 680–88; 6 TR 41; 4 CR-R 832–36. Ms. Recer repeatedly raised the issue of Mr. Gonzales's incompetence in discussions with counsel about the case. *See, e.g.*, 4 TR 706. But, despite her good-faith doubt about Mr. Gonzales's competence—doubts based on her extensive experience as an attorney and a mitigation specialist—she could not persuade counsel to accept that Mr. Gonzales might be incompetent. Similarly, although Ms. Holdman stated it in blunt terms—"you've got a brain-damaged client," PX 14, at 276, counsel did nothing.

This was so because counsel's ability to see what was apparent to others was marred by their narrow view of mental illness, which required, for example, an individual to be unable to speak comprehensibly or to have delusions of being spied on, before incompetency would be suspected. *See* 6 TR 47–49. In addition, counsel were also engaged in a long-standing tug of war with Mr. Gonzales. *See, e.g.*, PX 14, at 161. Mr. Leverett's need to retain control over the case and to remind Mr. Gonzales of his control only confirmed and fueled Mr. Gonzales's paranoid distrust of his attorneys. *See* discussion *supra* Section I.C.1 (explaining that "[Mr. Gonzales's] combative and suspicious nature may elicit a hostile response in others as it did in Mr. Leverett which then serves to confirm [Mr. Gonzales's] original expectations"). Jockeying for control so that they could perform their nuts-and-bolts, case-driven duties in the case, counsel lost sight of their duty to stand back, observe their client, and report problems that impede that client's access

to a fair trial. As a result, counsel failed to pursue the many leads that should have taken them directly to a qualified medical professional.

**B.  But for counsel's failure to pursue the issue of Mr. Gonzales's incompetency, the result of the resentencing trial would probably have been different.**

Had Mr. Leverett and Mr. Leach sought a competency evaluation for their client, the result of the resentencing trial in this case would probably have been different because Mr. Gonzales probably would have been found incompetent. Mr. Gonzales understands that the failure on the part of the trial court and trial counsel to request a competency evaluation between 2007 and 2009 complicates the question whether, at that time, he was incompetent. But, he need not prove, beyond a reasonable doubt or even by a preponderance, that he would have been found incompetent in order to demonstrate that his attorneys were ineffective. Mr. Gonzales need only show that there is a "reasonable probability" of it. *Strickland v. Washington*, 466 U.S. 668, 694 (1984). This is a lower burden than the preponderance standard required to show that he was incompetent. *Bouchillon v. Collins*, 907 F.2d 589, 595 (5th Cir. 1995). "Thus, even if [Mr. Gonzales] were to fail to prove his incompetency by a preponderance of the evidence, it is still possible that he raised sufficient doubt on that issue to satisfy the prejudice prong of his ineffective assistance of counsel claim." *Id*. Mr. Gonzales's conduct, combined with the medical evidence presented, leads inescapably to that conclusion.

In *Bouchillon*, the court found prejudice on much slimmer facts than those present here. Mr. Bouchillon suffered from PTSD. *Id*. at 590. That disorder caused him to go through "lucid and competent intervals" that alternated with episodes of "numbing" and blackouts, during which he could not "be expected to exercise judgment or reason." *Id*. at 593. His trial attorney did not in-

38

vestigate competency or insanity before Mr. Bouchillon pleaded guilty to robbery and kidnapping charges because his attorney found him to be lucid and able to assist in his own defense. *Id.* at 590–91. On habeas review, a medical professional opined, based solely on the PTSD diagnosis, that Mr. Bouchillon had been incompetent. *Id.* at 594. The district court agreed, and the Fifth Circuit accepted that conclusion, even though it held that the evidence "arguably supports a different result." *Bouchillon v. Collins*, 907 F.2d 589, 594 (5th Cir. 1995). The Fifth Circuit also held that the trial counsel's failure was prejudicial. *Id.* at 595. This was so even though the evidence arguably supported a conclusion that he was competent. *Id.*

The case for incompetency in Mr. Gonzales's case is much stronger. There is no dispute about whether he was impeding his defense team and, at least at times, acting against his best interest. The question here is whether he could have chosen to behave differently, and there is substantial evidence that he could not have. The medical evidence in 1995 showed that Mr. Gonzales suffered from mental illnesses and cognitive impairments. Dr. Brinkman diagnosed trauma and substance-induced brain damage; Dr. Cunningham diagnosed PTSD. As Dr. Cunningham noted in 1995, and as the testimony at the evidentiary hearing in 2017 bore out, Mr. Gonzales scored significantly high for paranoia before his 1995 arrest.

Before his resentencing trial, in 2007, Mr. Gonzales was exhibiting plain signs of paranoia—in his beliefs—which were contrary to the facts—that his lawyers were working against him and that his family did not care about him. He was obstructing his attorneys' attempts to secure a life sentence for him—even though he had been hopeful about getting such a sentence when his case was originally remanded to the trial court. He was engaging in self-destructive and, on at least one occasion, nearly suicidal behavior. And, although he had, in one relatively lucid moment, expressed an understanding that his lawyers were trying to get him to the result he wanted, he was

unable to change his behavior. With these signs, if Mr. Leverett or Mr. Leach had asked the lead prosecutor about a competency evaluation, the prosecutor would have been amenable to it. Wesley Mau TR 27.

There was at least a reasonable probability that a competency evaluation between 2007 and 2009 would have revealed what Mr. Gonzales has asserted in this case: at his resentencing trial, he was unable to disclose relevant facts and states of mind to his attorneys; he was unable to engage in a reasoned choice of legal strategies and options; he was unable to engage in appropriate courtroom behavior; and he was unable to testify—he was incompetent. *See* TEX. CODE CRIM. PROC. 46B.024(1)(A), (B), (C), (E), (F) (factors to consider in determining whether defendant is competent). And, with this evaluation, as this Court stated, "[W]e wouldn't have this issue here or at least not to the degree we do." TR 5, at 769.

Respectfully submitted,

RICHARD BURR
Burr and Welch, P.C.
P.O. Box 525
Leggett, Texas 77350
(713) 628-3391
Texas Bar No. 24001005


MAUREEN SCOTT FRANCO
Federal Public Defender

/s/ DONNA COLTHARP
Deputy Federal Public Defender
Western District of Texas
727 East César E. Chávez Blvd., B–207
San Antonio, Texas 78206–1205
(210) 472-6700
(210) 472-4454 (Fax)
Texas Bar No. 24001909

*Counsel for Petitioner*


## CERTIFICATE OF SERVICE

I certify that on November 13, 2017, I electronically filed this Closing Argument of the Petitioner with the Clerk of Court using the CM/ECF system, which will send notification of such filing to the following:

Travis G. Bragg
Assistant Attorney General
Office of the Attorney General of Texas
Post Office Box 12548, Capitol Station
Austin, Texas 78711-2548


/s/ Donna Coltharp
*Counsel for Petitioner*